# 15-3426-cv(L),

**15-3442-cv(CON), 15-3505-cv(CON), 15-3509-cv(CON), 15-3524-cv(CON),
15-3542-cv(CON), 15-3583-cv(CON), 15-3605-cv(CON)**

# United States Court of Appeals
## for the
# Second Circuit

◆▶●◀◆

IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLANTS

STEPHEN A. COZEN
SEAN P. CARTER
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
(215) 665-2000

– and –

CARTER G. PHILLIPS
RICHARD KLINGLER
JACQUELINE G. COOPER
RICHARD E. YOUNG
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, DC 20005
(202) 736-8000

JERRY S. GOLDMAN
NICHOLAS R. MAXWELL
BRUCE STRONG
ANDERSON KILL P.C.
1251 Avenue of the Americas
New York, New York 10020
(212) 278-1000

JAMES P. KREINDLER
ANDREW J. MALONEY, III
KREINDLER & KREINDLER LLP
750 Third Avenue, 32nd Floor
New York, New York 10017
(212) 687-8181

*Attorneys for All Plaintiffs-Appellants*

*(For Further Appearances See Reverse Side of Cover)*

CHRISTOPHER T. LEONARDO
ADAMS HOLCOMB LLP
1875 Eye Street N.W., Suite 810
Washington, DC 20006
(202) 580-8820


ANDREA BIERSTEIN
SIMMONS HANLY CONROY LLC
112 Madison Avenue, 7th Floor
New York, New York 10016
(212) 784-6400
    – and –
ROBERT T. HAEFELE
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
(843) 216-9000


ROBERT M. KAPLAN
FERBER CHAN ESSNER & COLLER, LLP
60 East 42nd Street, Suite 2050
New York, New York 10165
(212) 944-2200

*Attorneys for All Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, appellants certify as follows:

*Docket No. 15-3605 (Burnett v. Al Baraka Inv. & Dev. Corp.)*:

Appellants are natural persons.

*Docket No. 15-3542 (Ashton v. Al Qaeda Islamic Army)*:

Appellants are natural persons.

*Docket No. 15-3524 (Cantor Fitzgerald Associates, L.P. v. Akida Investment Co., Limited)*:

Appellants Cantor Fitzgerald & Co.; Cantor Fitzgerald Securities; Cantor Fitzgerald, L.P.; C02e.com, LLC (now known as Cantor C02e, LLC) have no parent corporation and there is no public corporation that holds more than 10% of any of them. Cantor Index Limited is owned by Cantor Index Limited Holdings, L.P., which is not a corporation.

Appellant eSpeed, Inc. (now known as BGC Partners, Inc.) has no parent corporation and there is no public corporation that holds more than 10% of it; BCG Partners, Inc. is publicly-held.

Appellants Cantor Fitzgerald Associates, L.P. (now known as BGC Capital Markets, L.P.); Cantor Fitzgerald Brokerage, L.P. (now known as

i

BGC Environmental Brokerage Services, L.P.); Cantor Fitzgerald International (now known as BGC International); Cantor Fitzgerald Partners (now known as Mint Brokers); eSpeed Securities, Inc. (now known as Aqua Securities, L.P.); Tradespark, L.P; and eSpeed Government Securities, Inc. (now known as BGC Technology Brokerage, L.P.), have no parent corporation; BGC Partners, Inc., a publicly-traded corporation, owns more than 10% of each of them.

The parent company of Appellant Cantor Fitzgerald Europe is Cantor Fitzgerald, L.P. (which is not a corporation); no publicly-traded corporation owns more than 10% of it.

*Docket No. 15-3583 (Continental Cas. Co. v. Al-Qaeda Islamic Army)*:

Appellants Transportation Insurance Company, National Fire Insurance Company of Hartford (which is also the successor by merger to plaintiff-appellant Transcontinental Insurance Company) and American Casualty Company of Reading, Pennsylvania are wholly-owned subsidiaries of plaintiff-appellant Continental Casualty Company; plaintiff-appellant Valley Forge Insurance Company is a wholly-owned subsidiary of plaintiff-appellant American Casualty Company of Reading, Pennsylvania;

and plaintiff-appellant Continental Casualty Company is a wholly-owned subsidiary of CNA Financial Corp., which is publicly traded.

*Docket No. 15-3426 (Estate of John P. O'Neill, et al. v. Kingdom of Saudi Arabia, et al.)*:

The Appellant Estate is not a corporate entity. The other named Appellants are natural persons. The members of the putative class consist of Estates which are not corporate entities and natural persons.

*Docket No. 15-3509 (Euro Brokers, Inc. v. Al Baraka Inv. & Dev. Corp.)*:

Appellant BGC Brokers US, L.P. (successor to Euro Brokers, Inc.) has no parent corporation; BGC Partners, Inc., a publicly-traded corporation, indirectly owns more than 10% of it.

Appellant BGC Financial, L.P. *(f/k/l a Maxcor Financial, Inc.)* has no parent corporation; BGC Partners, Inc., a publicly-traded corporation, indirectly owns more than 10% of it.

BGC Financial Asset Management, Inc. (successor to Maxcor Financial Asset Management, Inc.) dissolved December 23, 2010.

Appellant BGC Information, L.P. (successor to Maxcor Information, Inc.) has no parent corporation; BGC Partners, Inc., a publicly-traded corporation, indirectly owns more than 10% of it.

Seminole Financial Limited (successor to Euro Brokers Ltd.) has no parent corporation; BGC Partners, Inc., a publicly-traded corporation, indirectly owns more than 10% of it.

Appellant Tradesoft Technologies, Inc. has no parent corporation;

BGC Partners, Inc., a publicly-traded corporation, indirectly owns more than 10% of it.

Appellant Euro Brokers Financial Services Limited dissolved April 23, 2008.

Appellant Euro Brokers Mexico, S.A. de C.V. has no parent corporation; BGC Partners, Inc., a publicly-traded corporation, indirectly owns more than 10% of it.

Appellant Euro Brokers (Switzerland) S.A. has no parent corporation; BGC Partners, Inc., a publicly-traded corporation, indirectly owns more than 10% of it.

*Docket Nos. 15-3442, 15-3505 (Federal Ins. Co. v. al Qaida; Vigilant Ins. Co. v. Kingdom of Saudi Arabia; Pacific Employers Insurance v. Kingdom of Saudi Arabia)*:

Appellants Federal Insurance Company, Pacific Indemnity Company, Chubb Custom Insurance Company, Chubb Indemnity Insurance Company, Chubb Insurance Company of Canada, Chubb Insurance Company of New

iv

Jersey, Great Northern Insurance Company, and Vigilant Insurance Company are members of the Chubb Group of Insurance Companies. Chubb Limited is the ultimate parent of these subsidiaries and the only entity within the Chubb Group of Insurance Companies that is traded on any public exchange. Chubb Limited trades on the New York Stock Exchange under the symbol CB. No publicly held corporation owns 10% or more of the stock of Chubb Limited.

Appellants OneBeacon Insurance Company, OneBeacon America Insurance Company, American Employers' Insurance Company, The Camden Fire Insurance Association, and Homeland Insurance Company of New York are members of the OneBeacon Insurance Group. Appellants' parent organization, White Mountains Insurance Group Ltd., a publicly traded corporation, owns more than 10% of their stock.

Appellant TIG Insurance Company is a member of the Fairfax Financial Group. Appellant's parent organization, Fairfax Financial Holdings Ltd, a publicly traded corporation, owns more than 10% of their stock.

Appellants American Alternative Insurance Corporation, Great Lakes Reinsurance U.K. PLC, and The Princeton Excess and Surplus Lines

Insurance Company are members of the Munich Re Group. Appellants'
parent organization, Muenchener Rueckversicherungs-Gesellschaft
Aktienqesellschaft, a publicly traded corporation, owns more than 10% of
their stock.

Appellant Allstate Insurance Company is a member of The Allstate
Insurance Group.  Allstate Insurance Company is wholly owned by The
Allstate Corporation, a publicly traded corporation.

Appellants Boston Old Colony Insurance Company, The Continental
Insurance Company, Commercial Insurance Company of Newark, NJ, CNA
Casualty of California, Continental Insurance Company of New Jersey,
Fidelity and Casualty Company of New York, Glens Falls Insurance
Company, and National Ben Franklin Insurance Company of Illinois are
members of the CNA Insurance Companies. Appellants' parent
organization, the CNA Financial Corporation, a publicly traded corporation,
owns more than 10% of their stock.

Appellant Hiscox Dedicated Corporation Member, Ltd. is a member of
Lloyds' Syndicate 33.

Appellants ACE American Insurance Company, ACE Capital V Ltd for
itself and as representative of all subscribing underwriters for ACE Global

Markets Syndicate 2488, ACE Bermuda Insurance Ltd, ACE INA (Canada), ACE Indemnity Insurance Company, ACE Insurance SA-NV, ACE Property & Casualty Insurance Company, Atlantic Employers Insurance Company, Bankers Standard Insurance Company, Indemnity Insurance Company of North America, Insurance Company of North America, Westchester Fire Insurance Company, Westchester Surplus Lines Insurance Company, and Pacific Employers Insurance Company are direct and indirect subsidiaries of Chubb Limited, formerly named ACE Limited. Chubb Limited is the ultimate parent and the only entity within the Chubb Group of Companies that is traded on any public exchange. Chubb Limited trades on the New York Stock Exchange under the symbol CB. No publicly held corporation owns 10% or more of the stock of Chubb Limited.

Appellant Woburn Insurance Ltd. is a captive insurance company, wholly owned by Viacom Inc.

Appellants AXA Corporate Solutions Assurance, AXA Corporate Solutions Insurance Company, AXA Corporate Solutions Assurance UK Branch, AXA Corporate Solutions Assurance (Canada), AXA RE Asia Pacific Pte. Limited, AXA RE, AXA RE Canadian Branch, AXA RE UK Plc., AXA Corporate Solutions Reinsurance Company, AXA Art Insurance

Corporation, SPS Reassurance, AXA Re Madeira Branch, Compagnie Generale de Reinsurance de Monte Carlo, AXA Versicherung AG, AXA Cessions and AXA Global Risks UK, Ltd. are members of the AXA Group. Appellants' parent organization, AXA S.A., a publicly traded corporation, owns more than 10% of their stock.

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ...................................................................1

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION. 5

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................................6

STATEMENT OF THE CASE ...................................................................7

STATEMENT OF FACTS .....................................................................12

    A.    The Kingdom ..........................................................................15

        1.   *Individual Officials, Employees and Agents of the Kingdom*.............15

        2.   *The "Charities" Controlled by the Kingdom* .....................................27

    B.    SHC..................................................................................31

    C.    The District Court's Treatment of Plaintiffs' Factual Allegations and Evidence .........................................................................33

SUMMARY OF ARGUMENT ....................................................................35

STANDARD OF REVIEW ......................................................................39

ARGUMENT ...................................................................................39

I.   PLAINTIFFS' FACTUAL ALLEGATIONS AND EVIDENCE WERE MORE THAN SUFFICIENT TO ESTABLISH THAT THE FSIA'S TORTS EXCEPTION PROVIDES JURISDICTION OVER PLAINTIFFS' CLAIMS..................................................................................39

    A. Plaintiffs' Detailed Submission Was More Than Sufficient to Satisfy Its Burden as to The Kingdom.....................................................45

        1.   Saudi Employees in the United States.........................................46

            a.   Bayoumi and Thumairy..........................................................46

                1.   *Allegations and Evidence of the Nature of Employment*......47

                2.   *This Court's Previous Conclusions* ...................................50

                3.   *Evidence Confirming the Plausibility of Plaintiffs' Allegations* .........................................................52

4. *The Affidavits of Senator Graham and Secretary Lehman*...64

5. *No Legal Basis for the District Court's Conclusion*............66

b. Basnan ......................................................................69

c. Hussayen.................................................................73

2. The Ostensible "Charities" .............................................75

B. Plaintiffs' Detailed Submission Was More Than Sufficient to Satisfy Its Burden as to SHC ....................................................86

C. Defendants' Submissions and the *9/11 Commission Report*.................90

D. Plaintiffs Were Entitled to Jurisdictional Discovery ...........................95

II. THE DISTRICT COURT'S INTERPRETATION OF THE "ENTIRE TORT" RULE IS UNDULY NARROW AND INCONSISTENT WITH THE RULE'S APPLICATION BY THIS AND OTHER COURTS. ..........95

III. THIS COURT SHOULD NOT REACH THE ALTERNATIVE GROUNDS FOR THE MOTION THAT THE DISTRICT COURT DID NOT ADDRESS.................................................................................105

CONCLUSION ................................................................................106

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arg. Republic v. Amerada Hess Shipping Corp.*,
  488 U.S. 428 (1989)...........................................................................99, 100

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................44

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
  902 F.2d 194 (2d Cir. 1990) ......................................................................42

*Barkanic v. Gen. Admin. of Civil Aviation of China*,
  923 F.2d 957 (2d Cir. 1991) ......................................................................67

*Bell Atl. Corp. v. Twombly*,
  540 U.S. 544 (2007).............................................................................44, 95

*Billings v. United States*,
  57 F.3d 797 (9th Cir. 1995) .......................................................................68

*Doe v. Bin Laden*,
  580 F. Supp. 2d 93 (D.D.C. 2008)..............................................101, 102, 104

*Doe v. Bin Laden*,
  663 F.3d 64 (2d Cir. 2011) .................................................11, 101, 104

*Doggett v. United States*,
  875 F.2d 684 (9th Cir. 1988) .....................................................................67

*EM Ltd. v. Banco Cent. de la República Arg.*,
  800 F.3d 78 (2d Cir. 2015) ........................................................................90

*Farricielli v. Holbrook*,
  215 F.3d 241 (2d Cir. 2000) ....................................................................105

*Fields v. Sanders*,
  180 P.2d 684 (Cal. 1947) ...........................................................................68

xi

*First City, Texas-Houston, N.A. v. Rafidain Bank*,
  150 F.3d 172 (2d Cir. 1998) ............................................................ 95

*First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*,
  462 U.S. 611 (1983) .................................................................. 76, 90

*Garb v. Republic of Poland*,
  440 F.3d 579 (2d Cir. 2006) ............................................................ 83

*Globalnet Financial.com, Inc. v. Frank Crystal & Co.*,
  449 F.3d 377 (2d Cir. 2006) ............................................................ 67

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ................................................. 103, 104

*Letelier v. Republic of Chile*,
  488 F. Supp. 665 (D.D.C. 1980) ...................................................... 102

*Liu Bo Shan v. China Constr. Bank Corp.*,
  421 F. App'x. 89 (2d Cir. 2011) ...................................................... 90

*Liu v. Republic of China*,
  892 F.2d 1419 (9th Cir. 1989) ......................................................... 102

*In re: Magnetic Audiotape Antitrust Litig.*,
  334 F.3d 204 (2d Cir. 2003) ............................................................ 42

*McLachlan v. Bell*,
  261 F.3d 908 (9th Cir. 2001) ........................................................... 67

*Merchants Ins. Grp. v. Mitsubishi Motor Credit Ass'n*,
  356 F. App'x 548 (2d Cir. 2009) .................................................... 105

*Mukaddam v. Permanent Mission of Saudi Arabia*,
  136 F. Supp. 2d 257 (S.D.N.Y. 2001) ............................................... 42

*O'Neill v. Asat Trust Reg.*,
  714 F.3d 659 (2d Cir. 2013) ............................................... 24, 51, 74

*O'Neill v. SJRC*,
  714 F.3d 109 (2d Cir. 2013) .................................................... *passim*

*OBB Personenverkehr AG v. Sachs*,
  136 S. Ct. 390 (2015) ........................................................................67

*Olsen v. Pratt & Whitney Aircraft Div. of United Techs. Corp.*,
  136 F.3d 273 (2d Cir. 1998) ...........................................................105

*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil &
  Shapiro, LLP*,
  150 Cal. App. 4th 384 (2007) ............................................................68

*Perez v. Van Groningen & Sons*,
  41 Cal. 3d 962 (1986) .........................................................................68

*Robinson v. Gov't of Malay.*,
  269 F.3d 133 (2d Cir. 2001) ........................................................39, 41

*Saudi Arabia v. Nelson*,
  507 U.S. 349 (1993) ............................................................................42

*SerVaas Inc. v. Republic of Iraq*,
  2011 U.S. App. LEXIS 2709 (2d Cir. Feb. 16, 2011) ......................83

*Swarna v. Al-Awadi*,
  622 F.3d 123 (2d Cir. 2010) ..............................................................39

*In re Terrorist Attacks on Sept. 11, 2001*,
  349 F. Supp. 2d 765 (S.D.N.Y. 2005) (*Terrorist Attacks I*) .............10

*In re Terrorist Attacks on Sept. 11, 2001*,
  392 F. Supp. 2d 539 (S.D.N.Y. 2005) (*Terrorist Attacks II*) .....10, 84

*In re Terrorist Attacks on Sept. 11, 2001*,
  538 F.3d 71 (2d Cir. 2008) (*Terrorist Attacks III*) ....................*passim*

*In re Terrorist Attacks on Sept. 11, 2001*,
  740 F. Supp. 2d 494 (S.D.N.Y. 2010) ..............................................84

*In re Terrorist Attacks on Sept. 11, 2001*,
  741 F.3d 353 (2d Cir. 2013) ..............................................................11

xiii

*Turkmen v. Hasty,*
    789 F.3d 218 (2d. Cir. 2015) ...........................................................43, 44, 50, 54

*United States v. Olson,*
    546 U.S. 43 (2005)...........................................................................................67

*Virtual Countries, Inc. v. Republic of S. Afr.,*
    300 F.3d 230 (2d Cir. 2002) ..........................................................................41

*Williams v. Citigroup, Inc.,*
    659 F.3d 208 (2d Cir. 2011) ..........................................................................12

**Statutes**

28 U.S.C. § 1291...................................................................................................5

28 U.S.C. § 1407...................................................................................................5

28 U.S.C. § 1602 *et seq.*......................................................................................2

28 U.S.C. § 1605A ........................................................................................10, 101

28 U.S.C. § 1605(a)(5) ...............................................................................*passim*

**Other Authorities**

Fed. R. Civ. P. 8...................................................................................................43

Fed. R. Civ. P. 54(b)..............................................................................................5

Fed. R. Civ. P. 60(b)(6) .......................................................................................11

Fed. R. Evid. 702.................................................................................................66

xiv

## PRELIMINARY STATEMENT

Plaintiffs-appellants are family members of the nearly 3,000 people killed in the September 11, 2001 terrorist attacks (the "September 11th attacks"), thousands of individuals severely injured as a result of the attacks, and commercial entities that incurred billions of dollars of property damage and other losses as a consequence of the attacks. Plaintiffs brought lawsuits to hold accountable the individuals and other parties that intended to advance al Qaeda's objectives by supporting al Qaeda for more than a decade before September 11, 2001, thereby providing al Qaeda with the means to conceive, plan, coordinate, and carry out the September 11th attacks. Such civil litigation directed against the material support of terrorism is recognized as an important component of the nation's arsenal of counter-terrorism measures.

Defendants-appellees the Kingdom of Saudi Arabia ("the Kingdom") and Saudi High Commission for Relief of Bosnia & Herzegovina ("SHC") are two of those defendants. The Kingdom is the sovereign government of Saudi Arabia, and SHC is a Saudi government component and alter-ego that conducts ostensibly humanitarian relief efforts outside of the Kingdom. Both provided material support and assistance directly and through

employees and agents to al Qaeda that enabled it to develop the network and capabilities to carry out the September 11th attacks against the United States. In the Kingdom's case, this support included assistance provided by Saudi government employees directly to the September 11th hijackers and plotters, both from within and outside the United States.

This appeal arises from the district court's dismissal of all claims against the Kingdom and SHC for lack of subject matter jurisdiction, on the ground that these defendants are immune from suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* Plaintiffs argued that the FSIA's noncommercial torts exception to sovereign immunity, 28 U.S.C. § 1605(a)(5) (the "torts exception") – which provides an immunity exception for tort claims seeking money damages "for personal injury or death, or damage to or loss of property, occurring in the United States" – provided for jurisdiction over plaintiffs' claims. To satisfy this Circuit's "entire tort" rule, which holds that the torts exception applies only when both tortious acts attributable to the defendant and resulting injury occur within the United States, plaintiffs pled and presented evidence that: (1) four individuals who were employees of the Kingdom, acting within the scope of their employment, knowingly provided critical support to two of the

September 11th hijackers through activities undertaken in the United States; (2) several ostensible "charities" that extensively funded and supported al Qaeda, including from offices in the United States, were controlled alter-egos of the Kingdom or discharged core government functions, making their U.S.-based torts attributable to the Kingdom; (3) the tortious acts of Saudi employees and alter-egos in support of al Qaeda outside of the United States were intimately related to, and thus part of the same tort as, the September 11th attacks here; and (4) the September 11th attacks were themselves an "entire tort" in the United States, attributable to the Kingdom and SHC under state law secondary liability principles.

The district court concluded that plaintiffs' claims against the Kingdom and SHC, and the factual allegations and evidence that support them, failed to satisfy the "entire tort" rule. In so holding, the district court made two fundamental errors. First, it erred in ruling that the detailed factual allegations in the complaints, plaintiffs' separate 156-page Averment of Facts,[1] and the content of the more than 4,500 pages of extrinsic evidence

---

[1] Plaintiffs also are appealing the district court's related denial of their motion to file a consolidated amended pleading as to the Kingdom and SHC (the "amended pleading"). Plaintiffs filed the motion and amended pleading on the same day the Kingdom and SHC filed their renewed motion

3

that plaintiffs submitted in opposition to the motion to dismiss are conclusory and insufficient to plausibly allege that the defendants committed tortious acts within the United States. This extrinsic evidence included the affidavit testimony of former Naval Secretary John Lehman, a member of the 9/11 Commission, and former Senator Bob Graham, the Co-Chair of the Joint Congressional Inquiry into 9/11. In particular, the district court applied erroneous legal principles in evaluating the sufficiency of plaintiffs' allegations, ignored (and did not even address) most of the extensive evidence that plaintiffs submitted in support of their allegations, and issued rulings that are inconsistent with prior holdings of this Court. Second, with respect to separate evidence and an additional legal theory supporting jurisdiction, the district court applied an unduly narrow interpretation of the "entire tort" rule.

---

to dismiss. The allegations of the amended pleading are substantively identical to those set forth in the Averment of Facts, which was separately filed in opposition to the motion to dismiss.

4

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The district court had subject matter jurisdiction over the claims against the Kingdom and SHC pursuant to 28 U.S.C. § 1605(a)(5), the FSIA's torts exception to sovereign immunity. Plaintiffs' claims against the Kingdom and SHC principally arise under common law tort theories, including theories of aiding and abetting and conspiracy liability. Actions originally filed in other courts were transferred to the Southern District of New York pursuant to 28 U.S.C. § 1407.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291. On September 29, 2015, the district court entered its order granting the defendants' motion to dismiss and denying plaintiffs' motion to file the amended pleading. Plaintiffs timely filed their notices of appeal from October 27 to October 29, 2015. On October 30, 2015, the district court issued final judgments in favor of the Kingdom and SHC pursuant to Fed. R. Civ. P. 54(b). Plaintiffs thereafter filed amended notices of appeal, reflecting the district court's entry of Rule 54(b) final judgments, between November 2 and 4, 2015.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Whether plaintiffs' factual allegations, averments, and evidentiary materials plausibly alleged, for purposes of opposing a motion to dismiss before discovery had been undertaken, that two Kingdom employees acted within the scope of their employment when they undertook acts in the United States that assisted two of the September 11th hijackers prior to the September 11th attacks and that two additional Kingdom employees undertook acts within the United States to assist the September 11th hijackers and did so within the scope of their employment.

2.    Whether plaintiffs plausibly alleged that the Kingdom controlled certain "charitable" organizations that assisted al Qaeda terrorist plots, including the September 11th attacks, through acts in the United States and abroad, to a sufficient degree to render them components or alter-egos of the Saudi sovereign (and thus attribute their acts to the Kingdom) – or that such "charities" are components of the Kingdom because they discharged the government's core functions.

6

3.     Whether, for purposes of establishing jurisdiction over SHC, plaintiffs plausibly alleged that SHC was an alter-ego or component of the Kingdom or that SHC's support for al Qaeda was sufficiently directly connected to the September 11th attacks.

4.     Whether Section 1605(a)(5)'s exception to sovereign immunity can be satisfied through acts abroad that are sufficiently related to an "entire tort" occurring in the United States or through the operation of state law principles of secondary liability related to acts occurring wholly within the United States.

**5.**     Whether the defendants' motion to dismiss can be granted, on the basis that plaintiffs did not present adequate allegations and evidence of fact, without affording plaintiffs the opportunity to undertake jurisdictional discovery.

## STATEMENT OF THE CASE

On September 11, 2001, members of al Qaeda hijacked four commercial airliners and used those planes as weapons in a coordinated attack on the United States.  Between 2002 and 2004, plaintiffs brought claims against the Kingdom and SHC, as well as certain other al Qaeda institutional and individual allies, whose collaboration and cooperation with al Qaeda made

7

the September 11th attacks possible. The claims against Saudi Arabia were predicated on the tortious acts of: (1) individual Saudi officials and employees who acted at all times within the scope of their employment with the Kingdom, (2) purported "charities" that performed core functions of the Saudi State and were alter-egos of the Kingdom, and (3) SHC, one of those ostensible "charities."

Plaintiffs brought their action pursuant to, *inter alia,* the FSIA's "torts exception" to sovereign immunity. That exception provides that a foreign state is not immune from suit in any case seeking money damages "for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment." 28 U.S.C. § 1605(a)(5). Plaintiffs alleged that their claims against each of the defendants fall within the scope of the FSIA's "torts exception," and are thus subject to the district court's jurisdiction, for the following reasons:

- The individual employees and agents of the Kingdom, while based in the United States and acting within the scope of their employment (and in fact at the direction of more senior officials of

8

the Kingdom), provided material assistance and support to the September 11th hijackers within the United States prior to the attacks, which caused death or injury to thousands of individuals, and considerable damage to property, in the United States.

- The ostensible "charities" established to perform core functions of the Saudi State and rigidly controlled by the Kingdom's Ministry of Islamic Affairs, knowingly, directly, and extensively supported al Qaeda's targeting of the United States by providing material support and funding to al Qaeda, including from offices that were located within the United States.

- SHC – which has admitted that it is an "arm" of the Saudi government – and other "charity" alter-egos of the Saudi government provided material support and resources to al Qaeda, and collaborated intimately with al Qaeda in planning attacks against America closely related to, and thus forming part of the same tort as, the September 11th attacks.

- Based on state law principles of secondary liability related to defendants' conspiring and aiding and abetting the September 11th attackers, the hijackers' actions are attributable to defendants.

9

In 2005, the district court granted the motions of the Kingdom and SHC to dismiss the claims of most groups of plaintiffs on the grounds that: (1) the alleged conduct of the Kingdom in supporting al Qaeda constituted "discretionary functions" immune from suit under the FSIA; and (2) SHC is an agency or instrumentality of Saudi Arabia under the FSIA, and SHC's "alleged misuse of funds and/or inadequate record-keeping – even if it resulted in the funds going to terrorists" also fell within the torts exception's discretionary functions provision. *See In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 802-04 (S.D.N.Y. 2005) (*Terrorist Attacks I*); *In re Terrorist Attacks on Sept. 11, 2001*, 392 F. Supp. 2d 539, 555 (S.D.N.Y. 2005) (*Terrorist Attacks II*).

On appeal, this Court affirmed the dismissals of the Kingdom and SHC, but on a different ground than that relied on by the district court: that the FSIA's inapplicable terrorism exception (currently, Section 1605A), not the torts exception, is the exclusive basis of jurisdiction under the FSIA for claims arising from acts of terrorism. *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 87-90, n.15 (2d Cir. 2008) (*Terrorist Attacks III*).

In November 2011, however, this Court overruled the holding of *Terrorist Attacks III*, concluding that it was "pellucid beyond doubt" that "the

10

terrorism exception, rather than limiting the jurisdiction conferred by the noncommercial tort exception, provides an additional basis for jurisdiction." *Doe v. Bin Laden*, 663 F.3d 64, 66, 70 & n.10 (2d Cir. 2011) (per curiam). Plaintiffs thereafter filed a motion with the district court pursuant to Fed. R. Civ. P. 60(b)(6) to vacate the judgments in favor of the Kingdom and SHC, based on *Doe,* which the district court denied. On appeal, however, this Court reversed and remanded the case for further proceedings, holding that "'extraordinary circumstances' exist warranting relief under Rule 60(b)," because its "incorrect decision in *Terrorist Attacks III* caused a disparity between the *Terrorist Attacks* plaintiffs and the *Bin Laden* plaintiff where none should ever have existed." *In re Terrorist Attacks on Sept. 11, 2001*, 741 F.3d 353, 355-56, 359 (2d Cir. 2013).

On March 19, 2014, the Kingdom and SHC filed a petition for a writ of certiorari seeking Supreme Court review of this Court's ruling restoring them as defendants. The Supreme Court denied certiorari on June 30, 2014.

Once again before the district court, the Kingdom and SHC filed a renewed motion to dismiss plaintiffs' claims against them for lack of subject matter jurisdiction under the FSIA. The district court granted the motion, concluding that plaintiffs' allegations of fact and proffers of evidence, even

11

if accepted as true, did not show that the Kingdom and SHC committed

tortious acts that would bring plaintiffs' claims within Section 1605(a)(5)'s

exception to sovereign immunity. SPA116-17.[2]  The court also denied

plaintiffs' motion to file their amended pleading as "futile," because "the

additional allegations do not strip the Defendants of sovereign immunity."

SPA118; *see infra* pp. 39-105 (detailed description of opinion).

## STATEMENT OF FACTS

In opposition to the motion to dismiss, plaintiffs filed a 156-page

Averment of Facts ("Averment"),[3] JA2113-2269, as well as over 4,500 pages

of documents supporting their particularized factual allegations (including

affidavit and sworn testimony, intelligence reports, diplomatic cables, and

other materials).  JA2270-2631; JA2675-7324.  Plaintiffs included as part of

---

[2] Citations in the form "SPA" refer to the Special Appendix.

[3] As noted, the Averment was substantively identical to the proposed amended pleading that plaintiffs filed on the same day the Kingdom and SHC filed their renewed motion to dismiss.  Accordingly, it follows from the errors described herein relating to the district court's treatment of the Averment and evidence that the district court also erred in denying the proposed amendment as "futile."  *Williams v. Citigroup, Inc.,* 659 F.3d 208, 213 (2d Cir. 2011) (amendment should be allowed "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief.").

their opposition an index showing the particular factual allegations of the Averment that each of the submitted documents supports. JA2632-53.

Plaintiffs argued that their factual allegations set forth in their complaints, Averment, and associated materials satisfied the "entire tort" rule, and that the court therefore had jurisdiction over their claims under Section 1605(a)(5), for four independent reasons. *First*, four individuals who provided material assistance to the September 11th hijackers within the United States were U.S.-based employees of the Kingdom and acted within the scope of their employment in providing support to the hijackers (and indeed did so at the direction of their superiors in the Kingdom's Ministry of Islamic Affairs). JA2150-74 (Aver. ¶¶ 149-251). *Second*, several alleged "charities" that perform core functions of the Saudi State and are rigidly controlled by the Kingdom's Ministry of Islamic Affairs, making them alter-egos whose acts are attributable to the Saudi government, knowingly and intentionally provided material assistance to al Qaeda for its terrorist attacks in the United States, from offices located within the United States. JA2182-2266 (Aver. ¶¶ 286-580). *Third*, the Kingdom's charity alter-egos, including SHC – a self-described "arm" of the Saudi government – provided material assistance to al Qaeda from abroad that was closely related to, and thus

13

formed part of the same tort as, the September 11th attacks here.  JA2250-56 (Aver. ¶¶ 519-42).  *Fourth,* the September 11th attacks were themselves an "entire tort" in the United States, attributable to the defendants under principles of secondary liability.   The material assistance and support provided by these groups of Saudi employees, agents, and alter-egos resulted in the September 11th attacks, causing extensive death, bodily injury, and property damage.  Plaintiffs further alleged – and the empirical findings and policies of U.S. counterterrorism officials confirm – that the planning, coordination and execution of the September 11th attacks would not have been possible (much less successful) without the support provided by these employees and alter-egos of the Saudi government.

Plaintiffs' complaints, Averment of Facts, and supporting evidence contained extensive factual allegations and evidence supporting their argument that the district court had jurisdiction.  Although a full recitation of the pleadings and supporting materials would be impossible here, a basic understanding of plaintiffs' allegations against the defendants provides necessary context for evaluating the district court's errors and mistreatment of the record.

14

A.    **The Kingdom**

1.    *Individual Officials, Employees and Agents of the Kingdom*

Based on dozens of declassified U.S. intelligence reports and affidavits of 9/11 Commission Members and the Co-Chair of the Congressional 9/11 Joint Inquiry, and a wealth of additional evidence, plaintiffs alleged that several individual employees of the Saudi government directly provided support to the September 11th plotters and hijackers. JA2150-74 (Aver. ¶¶ 149-251). In particular, Omar al Bayoumi, a Saudi government employee who according to U.S. intelligence reports worked as an intelligence agent for the Saudi government (JA2159-61 (Aver. ¶¶ 187-190), JA3070-77, JA3078-3108, JA3109-17, JA3318-25; *see also infra* pp. 52-54 for discussion of FBI reports identifying Bayoumi as a Saudi intelligence agent); Fahad al Thumairy, a Saudi government cleric employed in the Islamic Affairs office of the Saudi consulate in Los Angeles (JA2154-56 (Aver. ¶¶ 162-71)); and two additional employees of the Saudi Government, Saleh Ibn Abdul Rahman Hussayen and Osama Basnan (JA3109-3114; JA3318-25; *see also infra* p. 56 for discussion of FBI reports identifying Basnan as a Saudi intelligence agent), provided direct assistance to the September 11th hijackers from within the United States. *See infra* pp. 69-75; JA2162-65, JA2170-72 (Aver. ¶¶ 196-207,

15

231-41).  Plaintiffs further alleged, again based on declassified intelligence documents, that Muhammed Jaber al Fakihi, the head of the Islamic Affairs office of the Saudi embassy in Berlin, directly aided the Hamburg al Qaeda cell that coordinated the September 11th attacks.  JA2174-77 (Aver. ¶¶ 252-63).  More generally, plaintiffs alleged that Saudi officials and agents knowingly supported al Qaeda and its targeting of the United States, and intended and foresaw that those actions would cause damage in the United States.  JA2182-97, JA2266-67 (Aver. ¶¶ 286-332, 581-87).

**Bayoumi and Thumairy.**  Based on the findings of the 9/11 Commission, plaintiffs alleged that when two of the hijackers (Nawaf al Hazmi and Khalid al Mihdhar) arrived in Los Angeles to begin their preparations for the September 11th attacks, they were "ill-prepared for a mission in the United States," particularly given that "[n]either had spent any time in the West, and neither spoke much, if any, English."  JA2149 (Aver. ¶¶ 145-46) (quoting the Final Report of the National Commission on Terrorist Attacks Upon the United States ("*9/11 Commission Report*")).[4]  For

---

[4] The Final Report of the National Commission on Terrorist Attacks Upon the United States is available at http://www.911commission.gov/report/911Report.pdf.

16

these and other reasons, the 9/11 Commission specifically concluded that it was "unlikely that Hazmi and Mihdhar…would have come to the United States without arranging to receive assistance from one or more individuals informed in advance of their arrival." JA2150 (Aver. ¶ 147) (quoting *9/11 Commission Report*).

Immediately after their arrival, Hazmi and Mihdhar spent a significant portion of their critical first days in the United States at the King Fahd Mosque in Los Angeles, whose imam at the time was Thumairy. JA2154 (Aver. ¶¶ 164-66); JA3070-77 (FBI Report). Thumairy was an ultraconservative Saudi religious cleric employed by the Islamic Affairs Department of the Saudi consulate in Los Angeles, where he held diplomatic credentials. JA2154 (Aver. ¶¶ 163-64). Thumairy was appointed to serve as imam at the King Fahd Mosque by the Ministry of Islamic Affairs, and according to the 9/11 Commission, he led a particularly radical faction within the local Muslim community, including persons "supportive of the events of September 11, 2001." JA2154 (Aver. ¶ 166) (quoting *9/11 Commission Report*); JA3070-77 (FBI Report). As also detailed in the *9/11 Commission Report*, Thumairy maintained extensive ties to terrorists,

17

prompting the State Department to ban him from the United States in 2003. JA2156 (Aver. ¶ 166).

Plaintiffs alleged that on February 1, 2000, Bayoumi – the "point person" who facilitated the future hijackers' preparation in the United States – traveled from San Diego to Los Angeles, where he met with Thumairy for an hour at the Saudi consulate. JA2153-54, 2165 (Aver. ¶¶ 161-62, 208). During this meeting, plaintiffs allege that Thumairy tasked Bayoumi to assist the hijackers in settling in the United States. JA2154, 2165 (Aver. ¶¶ 162, 208); JA3070-77 (FBI Report). Immediately after the meeting, Bayoumi met with the two newly-arrived hijackers at a restaurant located in the Los Angeles area, where he promptly offered to assist the future hijackers in settling in the United States. JA2156 (Aver. ¶ 172). He thereafter undertook extensive efforts to provide the hijackers with a range of support and assistance. JA2156-58 (Aver. ¶¶ 172-80, 220); JA3070-77 (FBI Report); JA3318-25 (FBI Report); *see also infra* pp. 59-60 for discussion of FBI Reports. Bayoumi also worked on a continuing basis to ensure that the hijackers and their mission would receive significant support from members of the San Diego Muslim community, including Anwar al Aulaqi, who was covertly acting as a senior recruiter for al Qaeda and affiliated terrorist organizations

18

and advocating violent jihad against the United States.  JA2165-69 (Aver. ¶¶ 208-16, 219-25); JA3365-67 (FBI Report); JA3336-39 (FBI Report); *see also infra* p. 60, n.18 for discussion of FBI Reports.  The support rendered by Bayoumi and Thumairy enabled the hijackers to establish themselves in the United States despite their lack of preparation for that transition, and to begin their operational preparations for the September 11th attacks.  JA2172 (Aver. ¶¶ 241-42).

Throughout the time Bayoumi was providing this support to the hijackers, he maintained systematic and ongoing contacts with the Islamic Affairs Departments of the Saudi Consulate in Los Angeles and the Saudi Embassy in Washington, D.C.  JA2161-62 (Aver. ¶¶ 193-94).  According to FBI reports, telephone records indicate that Bayoumi called the Saudi Embassy 63 times between January and March of 2000, while he was assisting the hijackers in settling in San Diego.  JA3078-3108 (FBI Report); *see also infra* pp. 62-62.  Bayoumi further had multiple contacts with the Saudi Consulate during this critical period, with eleven calls to the Consulate between January 26 and February 10, 2000, the same time he was meeting with the hijackers in Los Angeles and moving them to San Diego.  *Id.*  As expressly alleged in the Averment of Facts, "[t]he extent and pattern of these

19

contacts are consistent with witness statements identifying Bayoumi as an agent of the Saudi government responsible for monitoring the activities of Saudi citizens living in the United States, a role in which he would have reported to the Islamic Affairs departments in the Kingdom's embassies and consulates." JA2162 (Aver. ¶ 194). These and other facts and evidence amply support plaintiffs' express allegations that Bayoumi was acting at the direction of the Saudi government, and elements of the Ministry of Islamic Affairs in particular, in providing support to the hijackers, and that both he and Thumairy acted "knowingly" in doing so. JA2151, JA2154 (Aver. ¶¶ 151-52, 162).

The allegations (and underlying evidence) concerning the roles Bayoumi and Thumairy played in orchestrating and providing the domestic support network for the hijackers were, in turn, directly corroborated by the affidavit testimony of former Naval Secretary Lehman, a member of the 9/11 Commission, and former Senator Graham, the Co-Chair of the Joint Congressional Inquiry into 9/11. JA2271-76 (Affidavit of Daniel Robert "Bob" Graham) ("Graham Aff."); JA2278-81 (Affidavit of John F. Lehman) ("Lehman Aff."). Both confirmed that their testimony was based on their personal knowledge and involvement in the investigations they led, and

20

their familiarity with the evidence developed in those investigations. JA2272 (Graham Aff. ¶ 2); JA2278 (Lehman Aff. ¶ 2).

Sen. Graham concluded "that there was a direct line between at least some of the terrorists who carried out the September 11th attacks and the government of Saudi Arabia, and that a Saudi government agent *living in the United States*, Omar al Bayoumi, provided direct assistance to September 11th hijackers Nawaf al Hazmi and Khalid al Mihdhar. Based on the evidence discovered by the Joint Inquiry, I further believe that al Bayoumi was acting at the direction of elements of the Saudi government and that an official from the Islamic and Cultural Affairs section of the Saudi Consulate in Los Angeles, Fahad al Thumairy, likely played some role in the support network for the September 11th attacks." JA2273-74 (Graham Aff. ¶ 7) (emphasis added); JA2151, JA2160-61 (Aver. ¶¶ 152, 190).

Secretary Lehman echoed Sen. Graham's testimony concerning the involvement of Thumairy and Bayoumi in supporting the attacks from within the United States, and also placed their tortious conduct in broader context, by explaining the close historical ties between Saudi Arabia's Wahhabi Ulema (Government Clerics) and al Qaeda, and how those clerics used government platforms under their control to support and advance al

21

Qaeda's terrorist agenda.  Secretary Lehman explained that "Wahhabism is a puritanical, intolerant and virulently anti-American strand of Islam, and the state religion of the Kingdom of Saudi Arabia," and that its "teachings form the ideological foundation for al Qaeda and a host of other jihad organizations that threaten our national security, including the so-called Islamic State of Iraq and the Levant."  JA2280 (Lehman Aff. ¶ 6).  He further testified that the links between Saudi Arabia's government clerics and al Qaeda "involved collaboration on financial and logistical fronts" and that by the time the 9/11 Commission began its work "it was already well-known in intelligence circles that the Islamic Affairs Departments of Saudi Arabia's diplomatic missions were deeply involved in supporting Islamic extremists."  *Id.* at ¶ 7; JA2164 (Aver. ¶ 202); *see also* JA3280-83 (Philip Shenon, *The Commission: The Uncensored History of the 9/11 Investigation*, p. 185) ("*The Commission*")).  The support the *9/11 Commission Report* provides for these conclusions and plaintiffs' allegations more broadly is addressed below, *infra* pp. 90-95.

Against that backdrop, Secretary Lehman affirmed that it is "implausible to suggest that the broad spectrum of evidence developed by the 9/11 Commission concerning the relationships among Omar al

22

Bayoumi, Fahad al Thumairy, the Islamic Affairs Department of Saudi diplomatic missions, and 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar can be explained away as merely coincidental. To the contrary, I believe Nawaf al Hazmi and Khalid al Mihdhar knew who to go to for support, … that Fahad al Thumairy and Omar al Bayoumi knew that al Mihdhar and al Hazmi were bad actors who intended to do harm to the United States, and that the evidence concerning the activities of these principal actors in the events surrounding the terrorist attacks of September 11, 2001 warrants further examination." JA2280-81 (Lehman Aff. ¶ 8).

**Hussayen**. Plaintiffs alleged that Saleh Ibn Abdul al Hussayen, a longtime Saudi official with extensive ties to terrorists, arrived in Virginia just days before the September 11th attacks, and then precipitously switched hotels to stay in the same hotel where three of the terrorists who hijacked American Airlines Flight 77 were staying. JA2170-71 (Aver. ¶¶ 231-37). When questioned by the FBI after the attacks, Hussayen (who filed an affidavit asserting that plaintiffs' claims against him implicated his activities as a Saudi government official) feigned a seizure and left the United States shortly thereafter. JA2172 (Aver. ¶ 239); R.83 at 6, 10 (Hussayen asserting that he "was an 'instrumentality' of the Saudi government for purposes of

23

all acts he undertook in his official capacity" during the relevant time period).[5] This Court has previously held that plaintiffs' allegations "not only suggest the possibility that [Hussayen] may have provided direct aid to members of al Qaeda, but they also raise a plausible inference that he may have intended his alleged indirect support of al Qaeda to cause injury in the United States." *O'Neill v. Asat Trust Reg.*, 714 F.3d 659, 679 (2d Cir. 2013) (*Asat Trust*); JA2171 (Aver. ¶ 238).

**Basnan and Other U.S.-Based Saudi Officials.** Plaintiffs alleged that Osama Basnan – who resided at the same California apartment complex as the two September 11th hijackers assisted by Bayoumi – supported the September 11th hijackers through his close coordination with Bayoumi and separate facilitation of the network supporting the hijackers. JA2150, JA2162-65 (Aver. ¶¶ 148, 196-207); JA3060-63 (Testimony of FBI Special Agent); JA3318-25 (FBI Report); *see also infra* pp. 71-72 for discussion of FBI Reports). In particular, Basnan is alleged, along with Washington, D.C.-based Saudi officials of the Ministry of Islamic Affairs, to have funneled approximately $150,000 from a Washington, D.C. "charity" bank account,

---

[5] Citations in the form "R.#" refer to the docket numbers on the MDL 1570 docket sheet.

24

through Bayoumi and his family, to be used in support of the hijackers. JA2163-64 (Aver. ¶ 201); JA2985-99 (Senator Bob Graham, *Intelligence Matters: The CIA, the FBI, Saudi Arabia, and the Failure of America's War on Terror*, pp. 24, 167-68) ("*Intelligence Matters*").

The complaints and Averment also set forth the factual basis for concluding that U.S.-based officials working for four Saudi government-affiliated "charities" – al Haramain, WAMY, MWL, and the IIRO – used their offices in the United States to support al Qaeda's terrorism directed at the United States, as part of the support efforts undertaken by these organizations globally. JA2197-2250 (Aver. ¶¶ 333-518). These activities led the U.S. government to designate the U.S. branch of al Haramain as a terrorist support entity, publicly confirming that its "investigation shows direct links between the U.S. branch and Usama bin Laden." JA5709-11 (Treasury Department Press Release). Similarly, the United States conducted searches of the U.S. offices of the MWL and IIRO not long after September 11th, as part of a broader investigation into sources of al Qaeda financing, and "determined that the IIRO and MWL offices in Washington, D.C. provided funding and material support to al Qaeda." JA2219 (Aver. ¶ 424). Further, State Department officials concluded that bin Laden used "the

25

entire IIRO" network for his terrorist activities. JA2213 (Aver. ¶ 399); JA4995 (State Department Diplomatic Cable).

**Fakihi.**  Plaintiffs additionally alleged that Mohammed Jaber Hassan Fakihi, another Saudi government cleric who headed the Islamic Affairs office of the Saudi embassy in Berlin, provided assistance to the Hamburg al Qaeda cell that coordinated the September 11th attacks.  JA2174-77 (Aver. ¶¶ 252-263).  In the aftermath of the attacks, international investigations revealed that Fakihi maintained extensive ties to terrorists, including members of the Hamburg al Qaeda cell, and that he had funneled hundreds of thousands of dollars to al Qaeda.  *Id.*  The investigations led U.S. authorities to conclude that Fakihi was "more than just a sympathizer of bin Laden" and was "organizationally involved" with bin Laden's al Qaeda network.  JA2176-77 (Aver. ¶ 261); JA3511; JA3516-18.  Fakihi left Germany just days after German authorities notified the Saudi government that they intended to revoke his diplomatic credentials.  JA2176 (Aver. ¶ 260).  Saudi authorities refused to cooperate with German law enforcement officials' further investigation of Fakihi, and 9/11 Commission staff members who interviewed Fakihi in Saudi Arabia found his testimony "not credible."

26

JA2177 (Aver. ¶¶ 262-63); JA3496-3502 (9/11 Commission Memorandum for the Record).

## 2. *The "Charities" Controlled by the Kingdom*

Plaintiffs also presented claims against the Kingdom based on the attributable conduct of purported "charities" (including SHC) that were agents and alter-egos of the Saudi government engaged in propagating the Wahhabi variant of Islam outside of Saudi Arabia as a core function of the Saudi State, and of government officials who used their authority to support al Qaeda's global *jihad*. JA2125-28, JA2182 (Aver. ¶¶ 37-48, 287). As this Court noted in *Terrorist Attacks III*, plaintiffs' pleadings "include a wealth of detail (conscientiously cited to published and unpublished sources) that, if true, reflect close working arrangements between ostensible charities and terrorist networks, including al-Queda." *Terrorist Attacks III*, 538 F.3d at 76.

Plaintiffs' pleadings and record submissions alleged that the charities performed a core function and obligation of the Saudi State, namely the propagation of Wahhabi Islam (da'awa in Arabic), and describe in detail the myriad ways in which the Kingdom exercised complete control over the charities, describing how the charities are headed by officials of the Saudi government, appointed in most cases by the King; are financially dependent

upon, and receive the vast majority (if not all) of their funding from, the Saudi government; work under the direction of the Kingdom's Ministry of Islamic Affairs (according to the *9/11 Commission Report*; are supervised on a day-to-day basis by the Islamic Affairs Departments of the Saudi embassies; and have described themselves as "arms" or "instrumentalities" of the Kingdom. JA2125-28, JA2143-44, JA2182-2267 (Aver. ¶¶ 37-48, 115-16, 286-587). *See infra* pp. 75-85.

In most cases, plaintiffs' factual allegations concerning the charities' alter-ego status were supported by statements and testimony of the charities and the Saudi government.[6] *See infra* pp. 76-82. Plaintiffs also supported their allegations with a broad range of extrinsic evidence, including affidavits, Congressional testimony, U.S. intelligence reports, filings in criminal proceedings, foreign government investigation materials, and investigative reports of subject matter experts.[7]

---

[6] *See* JA2198-99, JA2206-07, JA2224-25, JA2235-36, JA2250, JA2257, JA2261, JA2264-65 (Aver. ¶¶ 334-41, 372-74, 440-43, 477-78, 520-22, 544-45, 560, 576-77).

[7] *See* Affidavits of U.S. Officials (JA2271-76; 2278-81; 2283-88); U.S. Congressional Testimony (JA2687-91; JA2692-93; JA3653-3739; JA3740-42; JA3743; JA3744-78; JA3779-3975; JA3976-4013; JA4014-49; JA4050-86; JA5077-93; JA5240-72; JA5273-5317; JA6796-99); U.S. Diplomatic Cables (JA3529-31; JA3538-39; JA3547-64; JA3565-67; JA4087-90; JA4091-97; JA4098-4101;

28

Plaintiffs further alleged that these "charities" under the control of the Kingdom's Ministry of Islamic Affairs have served as the primary vehicle for raising, laundering, and distributing funds on behalf of al Qaeda from its inception.  JA2125-28, JA2143-47 (Aver. ¶¶ 37-48, 115-30).  In addition, these "charities" directly and knowingly provided al Qaeda with arms, false travel documentation, physical assets and other material support.[8]  In many cases, senior members of the al Qaeda movement have served as senior

---

JA4102-04; JA4105-09; JA4110-17; JA4118-19; JA4120-24; JA4125-26; JA4127-28; JA4129-34; JA4135-37; JA4138-40; JA4141-44; JA4465-66; JA4938-48; JA4949-50; JA4951-54; JA4955-78; JA4979-81; JA4986-88; JA4989-90; JA499194; JA4995-96; JA4997-99; JA5000-04; JA5005-07; JA5011-12; JA5013-19; JA5020-23; JA5466-76; JA5712-13; JA6320-24; JA6788-90); U.S. Intelligence Reports (JA2682-86; JA3078-3108; JA3109-11; JA3112-14; JA3115-17; JA3639-52; JA4914-33; JA5094-5110; JA5111-24; JA5125-37; JA5138-50; JA5151-62; JA5163-71; JA5172-92; JA5193-5213; JA5214-20; JA5221-30; JA5231-39; JA5410-19; JA5420-38; JA6019-33; JA6034-42; JA6043-56; JA6057-72; JA6073-86; JA6087-6107; JA6108-46; JA6147-61; JA6395-6416; JA6417-36; JA6437-55; JA6456-77; JA6478-95; JA6496-6516; JA6517-18; JA6530-59; JA6560-74; JA6575-83; JA6800-31; JA6832-51; JA7030-33); FBI Reports (JA3070-77; JA3284-86; JA3287-94; JA3295-99; JA3302-09; JA3310-17; JA3318-25; JA3326; JA3332-35; JA3336-39; JA3344-45; JA3346-53; JA3354-59; JA3360-64; JA3365-67; JA3370-76; JA3401-03; JA3403-18; JA3419-53; JA3454-60; JA3461-95; JA4789-4806; JA4807-08; JA4818-31; JA6316-19); Filings in Criminal Proceedings (JA4453-64; JA4688-4788; JA4809-17; JA5731-65; JA5766-5928; JA5929-6017); International Intelligence and Investigations (JA2782-2864; JA6210-6315; JA6325-29; JA6330-92; JA6647-71; JA6672-6721; JA6722-58; JA6791-95; JA7034-37; JA7038-7113; JA7114-7213; JA7214-7307).

[8]  *See* JA2118, JA2127-28, JA2185, JA2189, JA2207-08, JA2227, JA2229-30, JA2248-49, JA2251-52 (Aver. ¶¶ 19, 48, 298, 313, 377, 449, 455, 517, 527).

29

representatives of the "charities."[9] Facilities of the "charities" have served as safe havens for al Qaeda operatives, and bases for planning and launching operations. JA2127-28, JA2201, JA2214-15 (Aver. ¶¶ 48, 345, 404). These "charities" are fully integrated components of al Qaeda's organizational structure, and are actively involved at every level of al Qaeda's operations. JA1784 (*Federal Insurance* Complaint ¶ 79) ("*Fed. Ins.* Complaint"); JA2182-97 (Aver. ¶¶ 286-332).

Plaintiffs' factual allegations concerning the institutional partnerships between the Kingdom's "charity" agents and al Qaeda were based largely on, and corroborated by, the declarations and actions of the U.S. government, including the government's designation of several of the "charities" operating under the Kingdom's control as "fronts" for al Qaeda and affiliated terrorist organizations.[10] In addition, the U.S. government has

---

[9] *See* JA2134-35, JA2148, JA2187, JA2188-89, JA2196-97, JA2199-2200, JA2202, JA2207-08, JA2257-58, JA2262-63, JA2265 (Aver. ¶¶ 82-83, 135-36, 304-06, 312, 329-30, 342, 350, 375-77, 380-81, 548-49, 551, 564, 570, 578).

[10] *See* JA2208, JA2213-15, JA2237-42, JA2244-45, JA2261-62, JA2265-66 (Aver. ¶¶ 381, 403-04, 483-92, 502-03, 562, 580); *see also* Treasury Department evidentiary memoranda and press releases supporting the designation of certain Saudi "charities" and their officials (JA4914-33, JA5008-10, JA5640-41, JA5642-64, JA5665-69, JA5670-74, JA5675-5708, JA5709-11, JA6018, JA6639-40, JA6641-46, JA7319-22).

in various settings identified several of the other charities at issue, including SHC, as al Qaeda supporters. JA2206, JA2234-35, JA2254-56 (Aver. ¶¶ 369, 472-75, 536-42).

**B.   SHC**

Plaintiffs alleged that SHC "has long acted as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated [foreign terrorist organizations]." JA1812 (*Fed. Ins.* Complaint ¶ 182); JA2250-56 (Aver. ¶¶ 519-42). The pleadings further documented SHC's intimate collaboration with al Qaeda that prompted authorities to raid its offices in the immediate aftermath of the September 11th attacks. JA2251-54 (Aver. ¶¶ 525-34). Specifically, after the conclusion of the war in Bosnia, several al Qaeda members planned and carried out terrorist attacks from offices of SHC, while ostensibly employed by that organization. JA2254-56 (Aver. ¶¶ 535-41).

SHC's contributions were especially important in enabling al Qaeda to acquire the strike capabilities used to carry out the September 11th attacks, and plaintiffs' allegations and evidence very directly linked SHC's support to al Qaeda's efforts to launch attacks on the United States. JA2252 (Aver. ¶

31

530).  Moreover, materials discovered during a raid on SHC's offices one month after the September 11th attacks confirm that SHC served as an operational hub for al Qaeda terrorist activities, both prior to and after the September 11th attacks.  JA1812-13 (*Fed. Ins.* Complaint ¶¶ 186-87); JA2253-54 (Aver. ¶¶ 533-34).  These materials demonstrate SHC's direct involvement in the portfolio of plots al Qaeda was developing to attack the American homeland during this time period, of which the September 11th plot was a component.  JA1812 (*Fed. Ins.* Complaint ¶ 186); JA2253 (Aver. ¶ 533).  Following the raid, the Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance described SHC as a front for radical and terrorism-related activities.  JA1813 (*Fed. Ins.* Complaint ¶ 187); JA2254 (Aver. ¶ 534).  Similarly, the United States identified SHC as a "terrorist support entit[y]" in a Matrix of Threat Indicators used to evaluate enemy combatants' ties to al Qaeda.  JA2108-12 (Carter Affirmation ¶ 18); JA2505-21.  Based on this and other evidence, plaintiffs specifically alleged that the September 11th attacks were a direct, intended and foreseeable product of SHC's participation in al Qaeda's jihadist campaign.  JA1813 (*Fed. Ins.* Complaint ¶ 189).

Plaintiffs submitted various evidentiary materials (including affidavits and U.S. government reports) directly corroborating plaintiffs' factual allegations concerning SHC's deep institutional ties to, and material support of, al Qaeda.[11]

### C. The District Court's Treatment of Plaintiffs' Factual Allegations and Evidence

The district court recognized that it was required to consider the Averment of Facts and supporting evidence in conducting the FSIA analysis, and predicated its rulings on its views of the sufficiency of the record presented through those materials. Even so, the district court granted the motion to dismiss, reasoning that plaintiffs "have neither pleaded nor come forward with facts or evidence sufficient to show that their claims are for the tortious conduct of Saudi Arabia or the SHC that took place in the United States." SPA116-17. The court concluded as a result that plaintiffs had failed to establish that their claims fall within Section 1605(a)(5).[12] Based on this

---

[11] *See* JA2108-12 (Carter Affirmation ¶¶ 18-21); JA2505-21; JA2523-41; JA2543-2605; JA2607-17; JA6194-6205; JA6206-09; JA6210-6315; JA6316-19; JA6320-24; JA6325-29; JA6330-92; JA6393-94; JA6395-6416; JA6417-36; JA6437-55; JA6456-77; JA6478-95; JA6496-6516; JA6517-18; *see also* JA2254-56 (Aver. ¶¶ 535-42).

[12] Because the district court concluded that plaintiffs' allegations did not satisfy the "entire tort" rule, it did not address defendants' additional arguments that plaintiffs' claims were barred by the FSIA because the acts

33

view of the allegations in the Averment and associated materials, the district court also denied plaintiffs' motion to file their identical amended pleading as "futile." SPA118.

With respect to the Saudi employees acting in the United States, the district court concluded that plaintiffs had not established (i) that either Bayoumi or Thumairy had acted in the course of their employment when they provided support to the two hijackers; (ii) that Hussayen was a Saudi employee or acted within the scope of his employment; and (iii) that Basnan had provided support to Bayoumi with the intention that the support would go to the hijackers, or that any such actions were within the scope of Basnan's role as an employee or official of Saudi Arabia. SPA112-16.

As to the ostensible "charities" that funded al Qaeda from within the United States, the court concluded that plaintiffs' evidence and factual allegations were insufficient to show that the Kingdom "controlled the day-to-day operations" of those "charities" and thus were insufficient to establish that the "charities" should be treated as alter-egos of the Kingdom. (The district court did not address plaintiffs' separate argument that the

---

alleged were "discretionary functions" and because plaintiffs had not adequately alleged causation. SPA117, n.14.

34

charities performed core functions of the Saudi State.) The court further ruled that FSIA jurisdiction cannot be based on attribution of the tortious acts of third parties pursuant to common law principles of secondary liability. SPA109-10, 117 n.15.

As to SHC, the court concluded that plaintiffs had not alleged that SHC had committed a tort within the United States and that SHC's alleged provision of funds to entities that funded al Qaeda was "akin to" that found to be insufficient by this Court in *In re Terrorists Attacks on Sept. 11, 2001,* 714 F.3d 109 (2d Cir. 2013). SPA112.

## SUMMARY OF ARGUMENT

Plaintiffs' allegations of facts set forth in their complaints, their Averment of extensive facts, and submissions of associated government studies and reports, expert reports, government correspondence, and declarations from members of the 9/11 Commission and Congressional inquiries, all directly provided key factual support for the two central claims at issue in this case: (i) the role, in the United States, of lower-level Saudi employees of the Saudi Ministry of Islamic Affairs who, as part of their employment objective of furthering jihadist initiatives, assisted certain hijackers who carried out the September 11th attacks; and (ii) the Saudi

35

government's role in, and control over, various "charities" that, in the United States and abroad, furthered and directly supported al Qaeda's efforts leading to and causing the attacks.

As it was required to do, the district court purported to survey the entire body of allegations and associated evidence and to credit as true both the facts alleged and those set out in the accompanying materials. However, with respect to the two principal Saudi employees acting within the United States, the district court concluded that plaintiffs had not established, for purposes of surviving a motion to dismiss prior to discovery, that those employees had acted within the scope of their employment. The court's treatment of this key issue, set forth in five brief paragraphs of its decision, failed to acknowledge or address the extensive factual allegations and evidence supporting the claim, this Court's prior conclusions bearing on the issue, or any cases bearing on when an employee's acts are beyond the scope of employment. In particular, the court did not address evidence and pleadings bearing on the nature of the employment at issue: that the Ministry of Islamic Affairs employed the identified individuals on a mission of furthering jihadist activities, including those of al Qaeda, in the United States and abroad. Having failed to address plaintiffs' allegations regarding

36

the employees' "job descriptions," the court had no prospect of correctly analyzing the scope of their employment. *See infra* Part I.A.1.a.

With respect to two other Saudi agents acting in the United States, the court below concluded that plaintiffs had not established that those agents supported the September 11th hijackers or did so as part of their employment by the Kingdom. But that cryptic, unelaborated conclusion failed to address the relevant evidence and factual allegations and failed to draw the most basic inferences from the nature of those agents' actions related to the hijackers – including the inference that this Court has already deemed plausible concerning assistance provided to the September 11th hijackers. *See infra* Parts I.A.1.b&c.

Similarly, the court failed to acknowledge or address the extensive evidence and factual allegations that made plaintiffs' claims regarding the Kingdom's control over the so-called "charities" entirely plausible. Those facts established that the Kingdom and the "charities" were intertwined, often in ways acknowledged by the relevant parties, and the "charities" functioned as alter-egos of the Kingdom in supporting jihadist terrorism in the United States and elsewhere – and discharged the Kingdom's core function to spread Wahhabi Islamist ideology and practice, including

37

through support of jihadists. *See infra* Part I.A.2. And while the district court did acknowledge that one "charity," defendant SHC, is a component or alter-ego of the Saudi government, it failed to draw the appropriate conclusions from that fact for establishing jurisdiction over SHC and incorrectly characterized the nature of SHC's alleged acts. *See infra* Part I.B. Defendants introduced no materials to rebut plaintiffs' extensive factual allegations and evidence on these key points, and instead mistakenly invoked a sentence from the *9/11 Commission Report*, which predominately supports rather than undermines plaintiffs' claims. *See infra* Part C.

To address plaintiffs' allegations concerning certain acts abroad directly related to the September 11th attacks and plaintiffs' attribution to defendants of the September 11th attackers' actions based on state law principles of secondary liability, the district court relied on an unduly narrow construction of the "entire tort" rule embedded in Section 1605(a)(5). The court cited no cases in support of its displacement of state law principles and failed to acknowledge case support to the contrary. In addition, its failure to consider any acts abroad – no matter how closely related to defendants' acts in the United States or to the "entire tort" that occurred here – misread this Court's decisions. *See infra* Part II.

38

Finally, the district court found no occasion to address two arguments that defendants pressed below, related to causation and the "discretionary function" exception to Section 1605(a)(5). This Court should adhere to its usual practice of not initially addressing such arguments, which are in any event without merit. *See infra* Part III.

## STANDARD OF REVIEW

This Court reviews a district court's decision regarding subject matter jurisdiction under the FSIA "for clear error as to factual findings and *de novo* as to legal conclusions." *Swarna v. Al-Awadi*, 622 F.3d 123, 133 (2d Cir. 2010); *Robinson v. Gov't of Malay.*, 269 F.3d 133, 138 (2d Cir. 2001). All of the district court's determinations subject to this appeal involved legal conclusions.

## ARGUMENT

## I. PLAINTIFFS' FACTUAL ALLEGATIONS AND EVIDENCE WERE MORE THAN SUFFICIENT TO ESTABLISH THAT THE FSIA'S TORTS EXCEPTION PROVIDES JURISDICTION OVER PLAINTIFFS' CLAIMS

In opposition to defendants' motion to dismiss, plaintiffs proffered extensive allegations in a 156-page Averment of Facts, as well as over 4,500 pages of accompanying evidence. This evidence includes previously unavailable U.S. and foreign intelligence reports, State Department diplomatic cables, Congressional testimony of U.S. officials and

39

counterterrorism experts, government reports, filings and evidence from court and military tribunal proceedings, studies of respected think tanks and experts, internal documents of the Saudi "charity" organizations and al Qaeda, testimony of al Qaeda members, and a vast array of public reporting. In addition, plaintiffs submitted sworn testimony of three principals of the U.S. government's two primary investigations into the September 11th attacks, plus testimony of al Qaeda and September 11th insider Zacarias Moussaoui. This evidence provides compelling factual detail concerning the particular tortious acts in the United States of Saudi employees, officials, agents and alter-egos in support of the September 11th hijackers and al Qaeda; how these acts were undertaken as part of the efforts of the Saudi Ministry of Islamic Affairs to support jihadist initiatives in the United States and elsewhere; and the function of various "charitable" organizations (including defendant SHC) as components, or alter-egos, of the Kingdom itself.

The district court's treatment of these allegations and other evidence was at least facially appropriate in certain respects. The court ostensibly based its decision on a review of the entire record and allegations, emphasizing that it was considering plaintiffs' factual allegations as well as

40

the facts set out in the Averment and the volumes of studies, reports, documents, and other materials accompanying that document. *See* SPA104-05, 116-17; *see, e.g.*, *Virtual Countries, Inc. v. Republic of S. Afr.*, 300 F.3d 230, 242 (2d Cir. 2002) (court's review of motion to dismiss for lack of FSIA jurisdiction considers whether plaintiff had "sufficiently alleged or proffered evidence to support jurisdiction"); *Robinson*, 269 F.3d at 133, 140-41; *id.* at 140 (in determining whether the plaintiff has met its burden, the court must "review the pleadings and any evidence before it").[13] And, the district court repeatedly purported to treat the facts alleged and presented in evidence as true. *See, e.g.*, SPA116. That approach, if given effect in practice, would be consistent with this Court's treatment of the jurisdictional issue in the identical context in this case when considering a pre-discovery motion to dismiss filed by sovereign defendants. *See Terrorist Attacks III,* 538 F.3d at 76 ("The complaints, which we accept as true at the pleading stage, . . . allege

---

[13] Defendants asserted below that plaintiffs are required to come forward with "admissible" evidence that the Kingdom and SHC are not immune from suit based on the torts exception to the FSIA, and that plaintiffs have failed to satisfy this burden because some of the copious documents that they submitted would be "inadmissible" at a trial. R.2948 at 3, 13-19; *id.* at 13 (MTD Reply). This argument is without basis in this Court's cases, and the district court appropriately did not adopt it.

the facts set forth below.") (citation omitted); *O'Neill v. SJRC,* 714 F.3d 109, 113 (2d Cir. 2013) (appellate review of district court decision on pre-discovery motion to dismiss under FSIA proceeds by "accepting all material facts alleged in the complaint as true and drawing all reasonable inferences in plaintiff[s'] favor") (alteration in original); *see also Saudi Arabia v. Nelson,* 507 U.S. 349, 351 (1993); *In re: Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 206 (2d Cir. 2003) (per curiam) (where a plaintiff proffers an averment of jurisdictional facts in response to a jurisdictional challenge, this Court "credit[s] [the] averment[] of jurisdictional facts as true") (citing *Ball v. Metallurgie Hoboken-Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir. 1990)); *Mukaddam v. Permanent Mission of Saudi Arabia,* 136 F. Supp. 2d 257, 260 n.11 (S.D.N.Y. 2001) ("While *Ball* involved a challenge to personal jurisdiction under Rule 12(b)(2), the holding applies to all jurisdiction testing motions, including challenges to subject matter jurisdiction under Rule 12(b)(1).").

In more basic respects, however, the district court was wholly inattentive to the record and to the applicable legal standards related to review of it. As detailed below, the district court failed in several important respects to acknowledge or address very basic factual allegations presented in the Averment and facts established in the accompanying materials. The

42

decision below addresses an array of complicated issues in the course of only eight pages, devoting a curt sentence or a few summary paragraphs to each of the most complex and extensively addressed issues – including those subject to lengthy briefing, long passages in the complaints and Averment, and often hundreds of pages of expert reports, government agency documents, and primary materials. *See* SPA108-16. Worse, the court's characterization of the key facts and theories reflected in those materials it did address was considerably at odds with the actual content of the materials, and it failed to draw the most basic inferences from the complaints, Averment, and associated materials. *See id.*

Apart from ignoring or mischaracterizing the materials before it, the court's conclusions that plaintiffs at this stage of the proceedings had failed to allege facts establishing jurisdiction overlooked the basic principle that plaintiffs "need not *prove* their allegations; they must *plausibly plead* them." *Turkmen v. Hasty*, 789 F.3d 218, 240 (2d. Cir. 2015). The court's analysis of the detailed evidence before it diverged dramatically from the legal standard that Fed. R. Civ. P. 8 "does not require 'detailed factual allegations'" and that allegations are to be rejected as "conclusory" only when they merely parrot, in threadbare fashion, the general elements of the claim, without factual

43

elaboration. *See Ashcroft v. Iqbal,* 556 U.S. 662, 677-78 (2009); *see id.* (complaint will not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement'" or simply makes "an unadorned, the-defendant-unlawfully-harmed me accusation") (alteration in original) (quoting *Bell Atl. Corp. v. Twombly,* 540 U.S. 544, 557 (2007)). Nowhere did the court address the extensive facts and conclusions set forth in the various federal government reports, studies, and assessments accompanying the complaints (and invoked in and supporting the complaints and Averment). The district court utterly failed to provide those conclusions and the facts set out in those documents with the status and weight that this Court recently concluded was especially appropriate when considering a motion to dismiss. *See Turkmen,* 789 F.3d at 226 (the government reports "help orient our analysis of the Complaint"). And, certain of the court's key findings – for example, addressing the "scope of employment" – required the application of substantive state or federal law standards that the court never identified or addressed and that, in fact, further support the conclusion that plaintiffs' allegations of fact and evidence were wholly adequate.

The following subsections address, with respect to particular issues, these flaws in the district court's treatment of the allegations and evidence

44

and why plaintiffs' showing was adequate to establish jurisdiction over the Kingdom and SHC. Part I.A addresses the showing establishing that the court erred in dismissing claims against the Kingdom as not falling within Section 1605(a)(5)'s torts exception to immunity. Subparts I.A.1.a-c address the four Saudi agents who operated within the United States to assist the hijackers who undertook the September 11th attacks – the alleged actions of any one of whom would establish jurisdiction over the Kingdom under even the narrowest construction of Section 1605(a)(5). Part I.A.2 addresses the actions in the United States and abroad of Saudi "charities" and shows why plaintiffs met their burden at this stage of the litigation of establishing that the Kingdom and the "charities" were intertwined, reflecting the "charities'" status as alter-egos or components of the Kingdom whose actions could be attributed to it. Part I.B addresses SHC, and describes why the district court erred in concluding that plaintiffs had not established that claims against SHC, too, fall within Section 1605(a)(5). Part I.C addresses issues unique to the *9/11 Commission Report*.

### A. Plaintiffs' Detailed Submission Was More Than Sufficient to Satisfy Its Burden as to The Kingdom

Two of the ways plaintiffs sought to satisfy the "entire tort" rule with respect to the Kingdom included: (1) pleading and presenting evidence that

45

four individuals who were employees of Saudi Arabia, and acting within the scope of that employment, knowingly provided critical support to two of the September 11th hijackers through activities undertaken in the United States; and (2) pleading and presenting evidence that several "charities" that extensively funded and supported al Qaeda, including from offices in the United States, were controlled alter-egos of the Kingdom and engaged in the performance of core functions of the Saudi State, making their acts attributable to the Kingdom.

## 1.   Saudi Employees in the United States

### a.   Bayoumi and Thumairy

The district court did not dispute that plaintiffs' detailed factual allegations and evidence were sufficient to establish that both Bayoumi and Thumairy were employees of the Saudi government who had engaged in tortious conduct in the United States by supporting the hijackers. Indeed, it was undisputed, and the district court accepted, that Thumairy was a Saudi government cleric working in the Ministry of Islamic Affairs' office in the Kingdom's consulate in Los Angeles when he aided the September 11th hijackers and directed Bayoumi. SPA116. The district court likewise accepted that Bayoumi was stationed in California as an employee of the

46

Saudi government (ostensibly as part of the Kingdom's Civil Aviation group) when he provided critical aid to the hijackers, enabling them to settle in San Diego and begin their preparations for the attacks. SPA114-15.

Instead, the court rested its decision on the narrow ground that the allegations and evidence were insufficient to establish that Thumairy and Bayoumi provided their support to the hijackers "while acting within the scope of [their] employment." SPA114-16. As to Bayoumi, the court reasoned that none of plaintiffs' allegations "attempt to draw any connection between [Bayoumi's] role *at Civil Aviation* and his alleged material support to the hijackers." SPA115 (emphasis supplied). The district court similarly found that "there is no basis on [plaintiffs'] allegations to find that al Thumairy was acting within the scope of his employment." SPA116. The court's analysis of the scope of employment question was in each case confined to the single sentence in which it announced its holding.

1.  *Allegations and Evidence of the Nature of Employment.* Plaintiffs presented detailed factual allegations and evidence that established a very direct relationship between the positions Bayoumi and Thumairy held with the Kingdom's Ministry of Islamic Affairs and their support of the hijackers. In this regard, plaintiffs' Averment expressly alleged, on the basis of detailed

47

and unchallenged evidence, that the Ministry of Islamic Affairs was pervasively involved in promoting jihadist activities throughout the world, including those of al Qaeda, in furtherance of its core mission of spreading Wahhabi Islamist ideology. *See infra* pp. 54-55, 57, n.17, 65-66; JA2143-47, JA2164 (Aver. ¶¶ 115-130, 202); JA2279-80 (Lehman Aff. ¶¶ 6-7); JA2941-67 (Royal Decree). Plaintiffs further alleged that the Ministry's offices within the Kingdom's embassies and consulates were populated by radical clerics with documented ties to terrorists, and served as hubs for those radicals to channel support to jihadists. JA2144-45 (Aver. ¶¶ 117-20); JA2164 (Aver. ¶ 208); JA3280-83 (*The Commission*, p. 185); *infra* p. 55. Citing U.S. intelligence reports, plaintiffs asserted that Thumairy was one of those radicals, whose terrorist activities as an official of the Islamic Affairs office of the Los Angeles consulate prompted the United States to revoke his diplomatic credentials. JA2154-56 (Aver. ¶¶ 166, 171); JA3070-77 (FBI Report stating that Thumairy's "sermons at the King Fahd mosque have a militant, anti-West tone to them," and that he "is also reported to be anti-United States and Israel."); JA2273-74 (Graham Aff. ¶ 7); JA2985-99 (*Intelligence Matters*, p. 12). Plaintiffs also proffered extensive evidence in support of their allegation, previously credited by this Court (*see infra* pp. 50-52), that Bayoumi's nominal

48

employment with the Saudi Presidency of Civil Aviation was a "ghost job" further hidden through an arrangement with Dallah Avco, and that his true role with the Saudi government involved performing covert activities for the Ministry of Islamic Affairs, under Thumairy's direction.[14] The allegations and evidence further documented that Bayoumi and Thumairy closely coordinated with one another, and with other employees of the Ministry of Islamic Affairs, in furtherance of the efforts to support and assist the hijackers. JA2161-62 (Aver. ¶¶ 193-94); JA2271-76 (Graham Aff. ¶ 7); JA3078-3108 (FBI Report).

These allegations and the underlying evidence more than adequately established, at the pleading stage, that the sponsorship of jihadists was a core job function of the employees of the Ministry of Islamic Affairs and that Bayoumi and Thumairy acted squarely within the scope of their

---

[14] *See* JA2150-51, 2154, 2158-60 (Aver. ¶¶ 150, 162, 184-85, 189); JA3070-77 (FBI Report stating that Bayoumi and Thumairy spent "up to one hour at the consulate" before Bayoumi met with the hijackers at the restaurant in Los Angeles); JA3078-3108 (FBI Report identifying Bayoumi as a "ghost employee"); JA3109-17 (U.S. Intelligence Report describing Bayoumi as "a 'ghost employee' of Dallah/Avco and one of 'approximately 50 individuals carried on the books of Dallah and being paid for doing nothing'"); JA2271-76 (Graham Aff. ¶ 8); JA2985-99 (*Intelligence Matters*, pp. 24, 167); *infra* pp. 58-59.

employment with that Ministry in providing assistance to the hijackers. In concluding otherwise, the district court failed to acknowledge plaintiffs' uncontested allegations and evidence concerning the mission and purpose of the Ministry of Islamic Affairs and the true nature of Bayoumi's employment with the Saudi government. The district court clearly erred in reasoning that plaintiffs' allegations do not "attempt to draw any connection between [Bayoumi's] role at Civil Aviation and his alleged material support to the hijackers" SPA115. Of course they did not; plaintiffs' theory was that Bayoumi's "job" was to advance the work of the Ministry, not further the Civil Aviation agency's mission. The court's egregious failure was especially inappropriate given the wealth of corroborating evidence found in the FBI and intelligence reports submitted of record, directed to Bayoumi's relationship with the Ministry and its work. *See Turkmen*, 789 F.3d at 239-40; *see also* FBI Reports at JA3070-77, JA3078-31087, JA3109-17, JA3302-25, JA3326, JA3370-76; JA2271-76 (Graham Aff. ¶¶ 7-9); JA2278-81 (Lehman Aff. ¶¶ 6-8).

2. *This Court's Previous Conclusions.* This Court previously confirmed the sufficiency and plausibility of plaintiffs' allegations that Bayoumi provided assistance to the hijackers in his role as a covert employee

50

of the Saudi government, rather than a "Civil Aviation" official, through its prior ruling restoring plaintiffs' claims against Dallah Avco in an earlier phase of this litigation. *Asat Trust*, 714 F.3d at 679. Reversing the district court's dismissal of Dallah Avco for lack of personal jurisdiction, this Court held that the allegations that Dallah Avco provided "cover employment" to Bayoumi "while he was in the United States and allegedly supporting two September 11, 2001 hijackers" suggest "that Dallah Avco may have directed its activities, related to Bayoumi's cover employment, toward the United States." *Id.* The Court further held that Dallah Avco's alleged involvement in the sham employment arrangement "suggest[s] a closer nexus [than presented by allegations against other defendants] between [Dallah Avco's] alleged support of al Qaeda and the September 11, 2001 attacks." *Id.*

These holdings plainly confirmed the plausibility of plaintiffs' allegation that Bayoumi's associations with Civil Aviation and Dallah Avco were mere "ghost jobs," designed to conceal his true role as a covert employee of the Ministry of Islamic Affairs. And, they confirm that plaintiffs' pleadings drew a direct "nexus" between the "cover employment" provided by Dallah Avco and Bayoumi's tortious activities in support of the hijackers, a finding that necessarily endorsed plaintiffs' contention that

51

Bayoumi supported the hijackers in his capacity as a covert employee of the Ministry of Islamic Affairs. These conclusions are plainly inconsistent with the district court's reasoning, and that court did not even acknowledge the existence, or address the implications, of this Court's analysis (which had been addressed in briefing before it). *See* R.2947 at 15-16 (MTA Reply).

3. *Evidence Confirming the Plausibility of Plaintiffs' Allegations.* The district court's conclusion is inconsistent with and simply ignored the wealth of evidence contained in intelligence reports and similar documents presented to it.

As to Bayoumi, those materials set forth facts that supported and made entirely plausible plaintiffs' allegations concerning Bayoumi's role as a covert operative reporting to the Ministry of Islamic Affairs' offices in the Kingdom's embassy and consulates in the United States – and that he was tasked to support the hijackers by his superiors in the Ministry. For example, FBI reports submitted to the district court described Bayoumi as a Saudi "intelligence agent," whose functions included monitoring Saudis living in the United States, and reporting back on their activities to the Ministry.[15]

---

[15] *See* JA3070-77 (FBI Report indicating that Bayoumi "has extensive ties to the Saudi government" and "could be a Saudi intelligence officer based on

Another FBI report documented Bayoumi's systematic telephone contacts with the Saudi consulate in Los Angeles and embassy in Washington, D.C., which plaintiffs alleged established a pattern of communications "consistent with witness statements identifying Bayoumi as an agent of the Saudi government responsible for monitoring the activities of Saudis living in the United States, a role in which he would have reported to the Islamic Affairs departments in the Kingdom's embassies and consulates." JA2161-62 (Aver. ¶¶ 193-94); JA3078-3108 (FBI Report). Separately, the Congressional Joint Inquiry into the September 11th attacks addressed Bayoumi's role with the Saudi government, concluding for instance that Bayoumi "had access to seemingly unlimited funding from Saudi Arabia." JA2158 (Aver. ¶ 183); JA3078-3108 (FBI Report stating that Bayoumi "always had a significant source of supply of money."). These and related materials were reflected in

---

numerous factors and circumstances"); JA3078-3108 (FBI Report stating that Bayoumi "worked for the Saudi Arabian Intelligence Service and reported on dissident Saudis in the United States."); JA3109-17 (U.S. Intelligence Report, titled "Connections of San Diego PENTTBOMB Subjects to the Government of Saudi Arabia," describing Bayoumi as a "Saudi Arabian intelligence officer … having regular contact with the Saudi Arabian Consulate in LA."); JA3318-25 (FBI Report stating that "Al-Bayoumi is believed to work for the Saudi Arabian Intelligence Service and reports on dissident Saudis in the U.S.").

the affidavits of Secretary Lehman and Senator Graham and other evidence, which further confirmed that Bayoumi was a covert agent of the Saudi government who provided support to the hijackers at the direction of Thumairy. *See infra* pp. 64-66 (Lehman and Graham affidavits); JA2159-61 (Aver. ¶¶ 187-90); JA2271-76 (Graham Aff. ¶ 7); JA2278-81 (Lehman Aff. ¶ 8). The district court's failure to acknowledge, address, or give any weight to these various government documents was a particularly significant error in light of this Court's recognition, in *Turkmen v. Hasty*, of the significant importance of government reports. 789 F.3d at 218, 239-40; *see id.* (holding that Department of Justice OIG reports "ma[de] plain the plausibility of Plaintiffs' allegations").

As to both Bayoumi and Thumairy, extensive factual allegations and evidence addressed the Ministry of Islamic Affairs' deep involvement in supporting al Qaeda via the governmental platforms under its control. Those facts both provided essential context for evaluating Bayoumi's and Thumairy's roles and made entirely plausible allegations that their support of the hijackers fell squarely within the scope of their employment with the Ministry. The Averment detailed evidence that the Ministry was established to propagate the Wahhabi variant of Islam, the ideological foundation for

54

the al Qaeda movement, beyond the Kingdom's borders.  JA2143-47, JA2164 (Aver. ¶¶ 115-119, 202); JA2941-67 (Royal Decree); JA3280-83 (Lehman Aff.). It established that in the years following the Ministry's formation, its ranks swelled with radical Wahhabi clerics like Thumairy, becoming a "stronghold of zealots" according to published accounts.  JA2145 (Aver. ¶ 125).  And, it detailed the extensive collaboration between radical elements of the Ministry and terrorist organizations, including al Qaeda in particular, in pursuit of their shared goal of spreading Wahhabi ideology and attacking the West, collaboration that included extensive involvement of the Ministry's offices within the Kingdom's embassies and consulates in those activities.  JA2144-45 (Aver. ¶¶ 117-24); JA 3280-83 (Secretary Lehman stating that it was "well-known in intelligence circles that the Islamic affairs office functioned as the Saudi's 'fifth column' in support of Muslim extremists").

The conclusions of investigations by the United States and other nations, implicating representatives of the Ministry of Islamic Affairs in terrorist activity in the United States and elsewhere, further confirm the plausibility of plaintiffs' allegations.  For instance, the United States removed more than a dozen individuals associated with the Islamic Affairs offices of the Kingdom's embassy and consulates in the United States following the

55

September 11th attacks, due to their involvement in extremist activities. JA2177-79 (Aver. ¶¶ 264-72); JA3519-20; JA3521-22; JA3523-24 (Senator Charles Schumer urging the State Department to increase pressure on the Saudi government to close the Islamic Affairs offices in the United States); JA3525 (same); JA3526-28. As part of those efforts, the State Department revoked the diplomatic credentials of Thumairy himself, based on his apparent connections to terrorist activity. JA2156, 2160-61 (Aver. ¶¶ 171, 190); JA2273-74 (Graham Aff. ¶ 7); JA2985-99 (*Intelligence Matters*, p. 12); *9/11 Commission Report*, p. 217. The United States also deported Basnan, the close associate of Bayoumi and ardent bin Laden supporter who, according to FBI reports, was "another agent of the Saudi government who was being groomed to replace Bayoumi in San Diego."[16] JA2162, JA2164 (Aver. ¶¶ 196,

---

[16] *See* JA3109-3114 (U.S. Intelligence Report, titled "Connections of San Diego PENTTBOMB Subjects to the Government of Saudi Arabia," describing Basnan as having been in contact with UBL family members," an "ardent UBL [Osama bin Laden] supporter," and "associate of Omar al-Bayoumi (who aided Flight #77 hijackers Nawaf Al-Hazmi and Khalid Al-Mihdhar);" JA3318-25 (FBI Report describing Basnan as "being affiliated with the Saudi Arabian Government or Saudi Arabian Intelligence Service," and concluding that Basnan "succeeded Omar Al-Bayoumi and may be undertaking activities on behalf of the Government of Saudi Arabia."). *See also* JA2163-64 (Aver. ¶¶ 200-01) (alleging transfer of Saudi funds to hijackers through Basnan's wife); JA2165 (Aver. ¶ 206) (alleging that Basnan "made a number of in-person visits to the Saudi Consulate in Los Angeles").

203); JA2985-99 (*Intelligence Matters*, p. 24). Separately, Germany deported the head of the Islamic Affairs office of the Kingdom's embassy in Berlin, based on evidence of his extensive associations with terrorists including September 11th ringleader Mohammed Atta and other members of al Qaeda's Hamburg cell. JA2174-76 (Aver. ¶¶ 252-60); JA3503-10; JA3511; JA3512; JA3513-15; JA3516-18. This and other evidence of the numerous counterterrorism initiatives targeting the Ministry of Islamic Affairs, including in particular its employees in the United States, confirmed that facilitating Islamic extremists was a core function of the Ministry's employees in Saudi embassies and consulates in the United States and elsewhere.[17]

---

[17] Plaintiffs' allegations and evidence concerning the pervasive terrorist activities of the Kingdom's "charities," directed by the Ministry, provided yet further support for this conclusion. As confirmed by the 9/11 Commission and the charities' own submissions, those charities were regulated and supervised by the Ministry of Islamic Affairs. The *9/11 Commission Report*, p. 372 ("international relief organizations, such as the World Assembly of Muslim Youth (WAMY), are [] regulated by the Ministry of Islamic Affairs. This Ministry uses zakat and government funds to spread Wahhabi beliefs throughout the world."); JA2236 (Aver. ¶ 478) ("al Haramain operates under the supervision of the Saudi Minister of Islamic Affairs, who appoints its Board of Directors and senior management personnel."); JA5439-40 (Ind. Exh. 195) (Khalid Bin Obaid Azzahri Affirmation) ("Azzahri Aff."); JA5447; JA2241-42 (Aver. ¶ 490) (Treasury

More broadly, plaintiffs' contention that Bayoumi and Thumairy acted within the scope of their employment was based on and supported by the very circumstances surrounding their provision of support to the hijackers, which reflected precisely the close coordination among Ministry officials and jihadist terrorists described above. As set forth in the Averment and confirmed by plaintiffs' additional evidence, the two hijackers, Hazmi and Mihdhar, spent a significant portion of their critical first days in the United States at the King Fahd Mosque in Los Angeles, where Thumairy served as imam by appointment of the Ministry of Islamic Affairs. JA2154-55 (Aver. ¶¶ 164-67); JA3041-53 (9/11 Commission Interview of Fahad al Thumairy); JA3070-77 (FBI Report stating that the hijackers were seen at the King Fahd Mosque soon after their arrival in the United States); *id.* (FBI Report further stating that Thumairy's "sermons at the King Fahd mosque have a militant, anti-West tone to them," and that he "is also reported to be anti-United States and Israel."). Just days later, Bayoumi traveled from San Diego to Los Angeles for a meeting with Thumairy *at the Saudi consulate* in Los Angeles, where the two Saudi government employees "discussed the recent arrival of

---

Department officials found that al Haramain "is one of the principal Islamic NGOs providing support for the al Qaida network").

the future 9/11 hijackers in the United States." JA2154, JA2160-61 (Aver. ¶¶ 162, 190); JA2271-76 (Graham Aff. ¶ 7); JA3070-77 (FBI Report stating that Bayoumi and Thumairy spent "up to one hour at the consulate" before Bayoumi met with the hijackers at the restaurant in Los Angeles). At that meeting, Thumairy tasked Bayoumi with providing the assistance necessary to help the hijackers settle in San Diego and begin their preparations for the attacks. JA2271-76 (Graham Aff. ¶ 7); JA2278-81 (Lehman Aff. ¶ 8); JA2982-84 (FBI official stating that the FBI believed Bayoumi had prior knowledge of the 9/11 plot and that his meeting with the hijackers in Los Angeles was more than coincidence). Thus, the domestic support network for the hijackers was coordinated through a meeting between two Saudi government employees, held at a government office.

These circumstances alone give rise to a reasonable inference that the activities discussed and coordinated at the meeting involved functions within the scope of Thumairy's and Bayoumi's employment with the Saudi government, and that inference is strengthened by subsequent events. Immediately after that meeting, Bayoumi went to a restaurant where he met with Hazmi and Mihdhar, who had just arrived in the United States, spoke virtually no English, and were otherwise ill-prepared to carry out their

59

terrorist mission in this country. *Id.*; *see also* JA2149-50, JA2156 (Aver. ¶¶ 146-47, 172); *9/11 Commission Report*, p. 215. Bayoumi thereafter undertook extensive efforts to assist the future hijackers in settling in the United States without drawing the attention of law enforcement, including by giving them significant funds; assisting them in relocating from Los Angeles to San Diego (the city where Khalid Sheikh Mohammed, the mastermind of the September 11th attacks, wanted the two hijackers to settle and begin their preparations for the attacks); housing them for a period in his own apartment; helping them find an apartment in San Diego; co-signing and guaranteeing their lease; paying the rent for their apartment; helping them open a bank account with approximately $9,000 of his own money; and connecting them with Anwar al Aulaqi, the radical cleric with whom Bayoumi maintained a relationship and who would serve as the hijackers' spiritual mentor during their preparations for the attacks.[18] As a top FBI official stated in drawing

---

[18] *See* JA2156-58 (Aver. ¶¶173-180); JA3032-40 (9/11 Commission Interview of Omar al Bayoumi); JA3070-77 (FBI Report stating that Bayoumi "played a major role in getting [the hijackers] established in the community," including "finding them an apartment and providing them with financial assistance."); JA3109-17 (U.S. Intelligence Report stating that Bayoumi "arranged an apartment for the hijackers in his complex, occasionally paid rent on the hijacker's apartment, hosted a party/reception for them and cosigned their apartment lease as a guarantor."); JA3302 (FBI Report describing the

the obvious inference from these dealings: "We [the FBI] firmly believed that he [Bayoumi] had knowledge [of the 9/11 plot], and that his meeting with [Hazmi and Mihdhar] that day was more than coincidence." JA2151 (Aver. ¶ 152); JA2982.

Bayoumi also tasked Modhar Abdullah, a member of Aulaqi's San Diego mosque over whom Bayoumi exercised considerable influence, with assisting the hijackers. JA2167-69 (Aver. ¶¶ 219-25); JA3284-86 (FBI Report stating that Bayoumi introduced Abdullah to hijackers Hazmi and Mihdhar). According to the 9/11 Commission, Abdullah confirmed in an interview with law enforcement that Bayoumi specifically tasked him "to be the individual to acclimate the hijackers to the United States, particularly San Diego, CA." JA2167-68 (Aver. ¶ 219); JA3370-76 (FBI Report stating that "Bayoumi asked Abdullah to become acquainted with Al-Hazmi and Al-

---

assistance Bayoumi provided to the hijackers, including appearing as "co-signer and guarantor for Al-Hazmi and Al-Mihdhar on their rental application," and paying rent for the hijackers); JA3060-63 (FBI Special Agent testifying that four calls were placed from Bayoumi's cell phone to Aulaqi the same day Hazmi and Mihdhar arrived in San Diego on February 4, 2000); JA3365-67 (FBI Report stating that Bayoumi introduced Hazmi and Mihdhar to others in San Diego, including Aulaqi with whom they associated at the Al Ribat Mosque in San Diego); JA3336-39 (FBI Report stating that Aulaqi was the spiritual advisor to the 9/11 hijackers and "met consistently and privately with Alhazmi and Almidhir for prayers.").

Mihdhar and to acclimate them [to] the area and assist in any way in their affairs."). As instructed, Abdullah helped the hijackers locate and apply to language and flight schools and obtain fake driver's licenses with false names, and he participated with them in conducting surveillance of the Los Angeles International Airport. JA2168 (Aver. ¶¶ 220-21); JA3287-94 (FBI report describing how Abdullah "helped the hijackers obtain several false identification cards with false names."); JA3370-76 (FBI Report stating that "Abdullah assisted Al-Hazmi and Al-Mihdhar in arranging travel arrangements and flight lessons while in San Diego."); JA300-01.

FBI reports and 9/11 Commission records document a spike in Bayoumi's telephone communications with Thumairy, the Saudi consulate in Los Angeles, and the Kingdom's embassy in Washington, D.C., beginning the month immediately preceding the arrival of the hijackers and through the period when Bayoumi was providing this critical assistance to them. JA3078-3108 (FBI Report documenting Bayoumi's telephone contacts with Saudi government officials, including 63 calls to Saudi embassy and missions in Washington, D.C. between December 1999-March 2000, and eleven calls to the Los Angeles consulate between January 26-February 10, 2000); JA3041-53 (9/11 Commission Interview of Fahad al Thumairy,

indicating Commission had "[i]nformation that shows numerous phone calls between him [Thumairy] and al-Bayoumi over a short period in December 1999, from both al-Thumairy's cell and landline phones."). Particularly when viewed against the backdrop of plaintiffs' other evidence, the extent and timing of these communications give rise to a strong inference that Bayoumi's assistance to the hijackers was closely coordinated with employees of the Ministry of Islamic Affairs' separate offices in Washington, D.C. and Los Angeles, and that he reported to those officials regularly concerning that assistance. This evidence thus further establishes the plausibility of plaintiffs' allegation that Bayoumi provided assistance to the hijackers at the direction of his superiors at the Ministry of Islamic Affairs, and that both he and Thumairy were acting within the scope of their employment in providing that assistance.

The authoritative account of the 9/11 Commission's work reveals that the staff investigators who personally handled this aspect of the investigation reached this precise conclusion, confirming that they "felt strongly that they had demonstrated a *close Saudi government connection* to the two hijackers in San Diego" based on what they considered to be "explosive material" concerning the activities of Bayoumi and Thumairy.

63

JA2161, 2173 (Aver. ¶¶ 191, 246); JA3280-83 (*The Commission*, p. 398) (emphasis supplied).

    4.    *The Affidavits of Senator Graham and Secretary Lehman.*  The district court discounted in a footnote the affidavits of principals of the 9/11 Commission and 9/11 Joint Congressional Inquiry investigations, Senator Graham and Secretary Lehman.  SPA116, n.13.  These affidavits reflected both testimony of experts with direct knowledge of facts uncovered in the United States' two primary investigations into the events of September 11th and set forth facts and conclusions confirming the plausibility of plaintiffs' allegations, and the reasonableness of inferences to be drawn from them, related to Bayoumi's and Thumairy's role in supporting the hijackers as part of their work as Saudi government employees.

    Former Senator Graham's affidavit detailed his decades of experience in intelligence matters and the extensive investigation of the 9/11 Joint Inquiry, and confirmed that his testimony was based on his personal knowledge of the "evidence collected by the Joint Inquiry" and additional sources.  JA2271-76 (Graham Aff. ¶ 7).  On that basis, Senator Graham testified that "I am convinced that there was a direct line between at least some of the terrorists who carried out the September 11th Attacks and the

government of Saudi Arabia," that "a Saudi government agent living in the United States, Omar al Bayoumi, provided direct assistance" to two of the hijackers, and that "al Bayoumi was acting at the direction of elements of the Saudi government." JA2173 (Aver. ¶ 245); JA2271-76 (Graham Aff. ¶ 7).

Former Secretary Lehman likewise affirmed that his testimony was based on his personal knowledge of the 9/11 Commission's separate investigation and his work for more than four decades in the national security arena. JA2278-81 (Lehman Aff. ¶ 2). Lehman testified that "[b]y the time our Commission began its work, it was already well known in intelligence circles that the Islamic Affairs Departments of Saudi Arabia's diplomatic missions were deeply involved in supporting Islamic extremists," and that "it is implausible to suggest that the broad spectrum of evidence developed by the 9/11 Commission concerning the relationships among Omar al Bayoumi, Fahad al Thumairy, the Islamic Affairs Departments of the Saudi diplomatic missions, and 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar can be explained away as merely coincidental. To the contrary, I believe Nawaf al Hazmi and Khalid al Mihdhar knew who to go to for support" and that "Fahad al Thumairy and Omar al Bayoumi

65

knew that al Mihdhar and al Hazmi were bad actors who intended to do harm to the United States." *Id.* (Lehman Aff. ¶¶ 7-8).

The district court erred in dismissing these affidavits (as well as that of Senator Kerrey) as mere "speculative conclusions." SPA116. In fact, the affidavits reflected the testimony that these affiants would be entitled to offer at trial concerning the matters discussed in their affidavits, *see* Fed. R. Evid. 702, and at a minimum confirmed the plausibility of plaintiffs' allegations and the scope of reasonable inferences to be drawn from other facts plaintiffs presented – the sole issue before the district court at that stage of the proceedings.

5.    *No Legal Basis for the District Court's Conclusion.* The district court concluded that plaintiffs did not establish that Bayoumi and Thumairy acted within the scope of their employment, but it did so without describing what legal standard applied and without citing any case addressing what evidence is required to show action beyond the scope of employment (indeed, the issue had not been briefed and the district court did not ask the parties to supplement the briefing to address it). SPA114-16. However, the relevant cases only further confirm the adequacy of plaintiffs' allegations and evidence.

66

A choice-of-law analysis is a "necessary prelude" to evaluating the applicability of an FSIA exception to a plaintiff's claim, *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 396 (2015), and here that analysis indicates that California supplies the relevant law (although the ultimate result would be little different under other states' law).[19] California law "defines the scope of employment very broadly." *Doggett v. United States*, 875 F.2d 684, 687 (9th Cir. 1988), *abrogated on other grounds by United States v. Olson*, 546 U.S. 43 (2005). "Even 'willful and malicious torts of an employee' can be within the scope of his employment, and that may be so even where the employee's torts violate the employer's express rules and confer no benefit on the employer." *McLachlan v. Bell*, 261 F.3d 908, 911 (9th Cir. 2001). That is because an agent acts within the scope of his or her employment when the conduct at issue "was committed in the course of carrying out the employer's

---

[19] Although the federal courts disagree on whether federal or state choice-of-law and substantive law principles govern, this Court has decided that forum choice-of-law principles should be applied to determine the governing state substantive law. *Barkanic v. Gen. Admin. of Civil Aviation of China*, 923 F.2d 957, 959 (2d Cir. 1991). Under New York's "interest analysis" conflicts rules, the law of the state with the greatest interest in regulating the conduct at issue governs. *Globalnet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir. 2006). Here, that is California – where Bayoumi and Thumairy lived and worked, and engaged in the employment and tortious conduct that are at the center of this suit.

business." *Billings v. United States*, 57 F.3d 797, 800 (9th Cir. 1995). Agents create liability for their principals even when taking actions *not* in furtherance of their principal's interest if the conduct occurred "while the agent was still occupying himself with the principal's business within the scope of his employment." *Fields v. Sanders*, 180 P.2d 684, 688 (Cal. 1947); *see also Perez v. Van Groningen & Sons*, 41 Cal. 3d 962, 969 (1986) (same); *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 394 (2007) (employee's combining official and personal business is not enough to overcome *respondeat superior* unless it "clearly appears" the agent was not "directly or indirectly" serving his principal at the time).

Here, plaintiffs' allegations and evidence demonstrated that providing support to jihadists was a common function of employees of the Ministry of Islamic Affairs, and served the Ministry's interest in propagating Wahhabi Islamist ideology. *See supra* pp. 16, 17, 26-27, 47-50. Bayoumi and Thumairy thus acted squarely within the scope of their employment. Indeed, even if aiding jihadists had *not* been part of the core job functions of Ministry employees, the support Bayoumi and Thumairy provided to the hijackers was not so clearly separable from their official duties as to be beyond the

68

scope of their employment. These conclusions are especially clear in the context where plaintiffs' factual allegations and evidence are assumed to be true, and reasonable inferences are to be drawn in plaintiffs' favor.

### b.    Basnan

The district court found that "allegations that Basnan was an employee of the Saudi government are entirely conclusory," that "there are no allegations that he was acting on behalf of the Saudi government pursuant to his employment," and that the allegations did not permit the court to "even loosely infer that Basnan provided support to al Bayoumi with the intention that the support would go to the hijackers." SPA113-14. These statements likewise ignore the substance of plaintiffs' allegations, the plausible inferences that can be drawn therefrom, and the evidence that plaintiffs presented. Plaintiffs alleged particular facts in support of their allegations related to Basnan's employment. JA2150 (Aver. ¶ 150) (identifying Basnan as an agent of the Saudi government); JA2162 (Aver. ¶ 196) (alleging that Basnan was "another agent of the Saudi government who was being groomed to replace Bayoumi in San Diego" and served as "an additional source of Saudi government funding" for the hijackers); JA2165 (Aver. ¶ 206) (alleging that Basnan "made a number of in-person visits to the

69

Saudi Consulate in Los Angeles"). Basnan's status as a Saudi agent also is supported by evidence that the district court did not acknowledge, including various FBI reports reflecting the Bureau's conclusion that Basnan was a Saudi agent, as well as Senator Graham's conclusion to that effect. *See supra*, p. 56, n.16; JA2985-99 (*Intelligence Matters*, p. 12).[20]

Similarly, relevant pleadings and evidence support an inference that Basnan provided support with the intent that it go to the hijackers. Plaintiffs alleged that Basnan supported the September 11th hijackers through his close coordination with Bayoumi and separate facilitation of the network supporting the hijackers. JA2162-65 (Aver. ¶¶ 196-207); JA3318-25 (FBI Report stating that Basnan "has also been determined to have known Osama Bin Laden's family in Saudi Arabia and to have telephonic contact with members of Bin Laden's family who are currently in the U.S."); *id.* (stating that Basnan "has had telephonic contact with Anwar N. Aulaqi"). FBI reports indicate that Basnan was "being groomed" as Bayoumi's

---

[20] Thus, as with Bayoumi and Thumairy, plaintiffs' allegations establish that Basnan was a Saudi official acting either in furtherance of his official duties, or taking action in the course of those duties that cannot be so clearly separated from his responsibilities as to immunize defendants for his conduct. *See supra* pp. 66-69 (regarding scope of employment analysis).

70

replacement, and that Basnan was in direct contact with Ramzi Binalshibh, a senior al Qaeda figure and key facilitator of the September 11th plot. JA2162-63 (Aver. ¶¶ 196, 199); JA2985-99 (Sen. Graham stating that Basnan was "another Saudi spy who was suspected of being groomed to replace al-Bayoumi in San Diego."); JA3060-63 (Testimony of FBI Special Agent confirming that Basnan was in contact with Binalshibh); JA3318-25 (FBI Report concluding that Basnan "succeeded Omar Al-Bayoumi and may be undertaking activities on behalf of the Government of Saudi Arabia."). Like Bayoumi, Basnan and his family resided at the same California apartment complex as the two hijackers, and Basnan's relationship with Bayoumi directly and through family members is reflected in common acts, joint arrests, and more than 700 phone calls over a relevant one-year period. JA2164-65 (Aver. ¶¶ 204-05); JA3063-63 (FBI Special Agent testifying that "Bayoumi and Basnan are the closest of friends."). Basnan is alleged, along with Washington, D.C.-based Saudi officials of the Ministry of Islamic Affairs, to have funneled approximately $150,000 from a Washington, D.C. bank "charity" under their control, through Bayoumi and his family, to be used in support of the hijackers. JA2163-64 (Aver. ¶¶ 200-01); JA2985-99 (*Intelligence Matters*, pp. 167-68); JA2278-81 (Lehman Aff. ¶ 5). In addition,

71

Basnan reportedly boasted to the FBI that he had supported the September 11th hijackers even more than Bayoumi. *Id.* Taken together, these allegations and evidence more than support a plausible inference that Basnan knowingly provided material support to the hijackers.

At a minimum, these allegations and evidence related to Basnan also confirmed the plausibility of plaintiffs' theories relating to Bayoumi, Thumairy, and the Ministry of Islamic Affairs. For example, FBI reports documented Basnan's extensive dealings with Bayoumi and status as Bayoumi's successor, suspicious financial transactions with employees of the Islamic Affairs office of the Saudi embassy in Washington, D.C., and associations with senior al Qaeda members. JA2162-65 (Aver. ¶¶ 196-207); JA3060-63 (Testimony of FBI Special Agent); JA3109-17 (FBI Report describing Basnan as having "been in contact with UBL family members," an "ardent UBL supporter," and "associate of Omar al-Bayoumi (who aided Flight #77 hijackers Nawaf Al-Hazmi and Khalid Al-Mihdhar.")); JA3302-09 (FBI Report indicating Basnan is "affiliated with the Saudi Arabian Government or the Saudi Arabian Intelligence Service" and "succeeded Omar Al-Bayoumi."). All of this evidence reinforces the plausibility of plaintiffs' central claim that the Ministry of Islamic Affairs offices in the

United States included a roster of radicals with deep terrorist connections, whose functions included collaboration with jihadists.

### c.     Hussayen

The district court found that plaintiffs "allege no facts and provide no evidence to support that Hussayen was a Saudi official acting in any official capacity at the relevant time," "do not allege . . . that Hussayen specifically provided any . . . support to the hijackers," and proffered "no allegation – let alone evidence – that he assisted the hijackers within the scope of his employment or otherwise." SPA112-13.

These statements ignore the pleadings and evidence that the district court should have considered, as well as this Court's own prior determinations with respect to Hussayen. Plaintiffs alleged that Hussayen, a longtime Saudi official with extensive ties to terrorists, traveled to the United States in the weeks before the September 11th attacks. JA2170 (Aver. ¶ 232) ("Hussayen, a member of the Saudi Ulema, had maintained a long career as a government official for the Kingdom"); JA2170-71 (Aver. ¶¶ 234-37). Plaintiffs further alleged that after arriving in Herndon, Virginia, just days before the September 11th attacks, Hussayen precipitously switched hotels to stay in the same hotel as three of the terrorists who hijacked

American Airlines Flight 77.  JA2171 (Aver. ¶ 237); JA3377-81; JA3382-83. When questioned by the FBI after the attacks, he feigned a seizure and was allowed to leave the United States shortly thereafter.  JA2172 (Aver. ¶ 239); JA3382-83.

In addition, the district court's findings are incompatible with Hussayen's own affidavit filed in this case, in which he sought to be dismissed on sovereign immunity grounds.  R.83-2 (Affidavit of Saleh Al-Hussayen, *In re Terrorist Attacks of September 11, 2001,* Memorandum of Law in Support of Motion to Dismiss (Apr. 8, 2004)).  In this affidavit, Hussayen stated that he "was a government official during the entire period in question," that "the allegations against him concern matters within his capacity as an official of the Saudi Government," and that his 2001 visit to Islamic charities in the United States "was related to his government work." *Id.* at 6, 10.[21]

Nor is the district court's finding consistent with this Court's interpretation of plaintiffs' pleadings in *Asat Trust*, 714 F.3d at 679, which

---

[21] Again, as with the other agents, these allegations establish that Hussayen was acting within the scope of his employment in providing support for the hijackers.  *See supra* pp. 67-68 (regarding relevant scope of employment law).

74

restored Hussayen to the case. This Court held that the allegations concerning Hussayen's travels to and activities in the United States shortly before the September 11th attacks "not only suggest the possibility that he may have provided direct aid to members of al Qaeda, but they also raise a plausible inference that he may have intended his alleged indirect support of al Qaeda to cause injury in the United States." *Id.* This Court thus found that plaintiffs' allegations were sufficient to establish that Hussayen took actions in the United States to provide material support to the hijackers, at least for purposes of defeating a motion to dismiss. Although this Court's conclusions and determination of reasonable inferences were briefed to the district court, that court did not address or acknowledge them.

### 2. The Ostensible "Charities"

Apart from plaintiffs' allegations and evidence canvassed above concerning the four Saudi employees who acted in the United States, plaintiffs separately argued, based on factual allegations and submitted evidence, that the so-called "charities" undertook actions in the United States in support of the September 11th attacks that should be attributed to the Kingdom. The district court rejected this argument, finding that plaintiffs "fail[ed] to implicate Saudi Arabia under an alter ego theory"

because they "fail[ed] to allege facts that sufficiently show that Saudi Arabia controlled the day-to-day operations of these charities." SPA110. Without discussing either of the two documents collecting facts addressing the Kingdom's control over the charities, the court simply stated that one, the Averment of Facts, "falls short as to the charities alleged to have had offices in the United States" and that the other, the affirmation of expert Evan Kohlmann, "is not sufficient for this Court to even reasonably infer that Saudi Arabia controls each of the charities at issue." SPA111. However, a review of these documents, along with plaintiffs' other pleadings and evidence, makes plain that plaintiffs fully satisfied their burden at this stage of the proceedings. *See First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611, 629 (1983) (where an instrumentality is extensively controlled by the state, creating a principal-agent relationship, the acts of the entity are attributable to the state).

Plaintiffs' pleadings and supporting evidence set forth a plausible factual basis for concluding that U.S.-based officials working for four Saudi government-affiliated "charities" – al Haramain, WAMY, MWL, and the IIRO – undertook fundraising and related activities in the United States designed to support al Qaeda's terrorism directed at the United States,

76

JA2197-2250 (Aver. ¶¶ 333-518), and that each of the "charities" acted as an agent and alter-ego of the Kingdom.[22]  This Court had already found, in *Terrorist Attacks III*, that plaintiffs' pleadings even in 2008 included "a wealth of detail (conscientiously cited to published and unpublished sources) that, if true, reflect close working arrangements between ostensible charities and terrorist networks, including al-Queda." *Terrorist Attacks III*, 538 F.3d at 76. Plaintiffs' additional pleadings and evidence show in painstaking detail the myriad ways in which the Kingdom exercised complete control over the charities, describing how the charities (1) are headed by officials of the Saudi government, appointed in most cases by the King; (2) are financially dependent on, and receive the vast majority (if not all) of their funding from, the Saudi government; (3) work under the direction of the Kingdom's Ministry of Islamic Affairs (according to the *9/11 Commission Report*, p. 372); (4) are supervised on a day-to-day basis by the Islamic Affairs Departments of the Saudi embassies; and (5) have filed affidavits and pleadings in this litigation describing themselves as "arms" or "instrumentalities" of the

---

[22] *See* JA2126-27, JA2144, JA2146-47, JA2182, JA2197-98, JA2206-07, JA2224, JA2235, JA2250, JA2257, JA2261, JA2266 (Aver. ¶¶ 43, 116, 126, 128-29, 286, 332, 334-35, 372, 440, 477, 520, 544, 560, 581).

Kingdom. JA2182-2266 (Aver. ¶¶ 286-580). These "charities" provided "the vast majority of the funding that allowed al Qaeda to build and sustain its massive global infrastructure over the thirteen years leading up to the September 11th Attacks." JA2127-28 (Aver. ¶ 48).

For example, plaintiffs' factual allegations of control by the Kingdom in many cases reflected statements and testimony of the "charities" and the Saudi government itself. For example, a senior official of the Muslim World League and International Islamic Relief Organization testified in court:

> Let me tell you one thing, the Muslim World League, which is the mother of IIRO, is a fully government funded organization. In other words, I work for the government of Saudi Arabia. I am an employee of that government. Second, the IIRO is the relief branch of that organization which means that we are controlled in all of our activities and plans by the government of Saudi Arabia. Keep that in mind, please … I am paid by my organization which is funded by the [Saudi] government … The [IIRO] office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia. If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League.

JA2199 (Aver. ¶ 340); JA4242-4339 (Testimony of Arafat El Asahi, *Minister of Citizenship and Immigration v. Mahmoud Jaballah*, Federal Court of Canada, Docket DES-6-99 (Nov. 2, 1999)).[23]

SHC described its relationship to the Saudi government in similar terms in two affidavits it submitted in support of its claim that it was a "foreign state" within the meaning of the FSIA. In one of those affidavits, a senior Saudi official unambiguously attests that "[t]he Saudi High Commission is an arm of the Saudi Arabian government. Actions taken by the Saudi High Commission may be viewed as actions of the government of Saudi Arabia." JA6162-68 (Decl. of Dr. Mutlib Bin Abdullah Al-Nafissa ¶ 3). A separate affidavit of an official of SHC affirms that SHC was headed at all

---

[23] Plaintiffs' allegations as to the al Haramain Islamic Foundation, a Saudi charity the U.S. government designated as a primary al Qaeda front, are to like effect. *See* JA2235-50 (Aver. ¶¶ 476-518). In particular, the Averment cited the affidavit testimony of a senior al Haramain official that "al Haramain operates under the supervision of the Saudi Minister of Islamic Affairs, who appoints its Board of Directors and senior management personnel," and public statements of al Haramain officials that "we work under the supervision of [the] Saudi government" and that offices outside of the Kingdom were under the "direct supervision" of the Saudi embassies in their host countries. JA2236 (Aver. ¶ 478); JA5439-41 (Aff. of Khalid bin Obaid Azzahri); JA5447; *see also* JA2241-42 (Aver. ¶ 490) (Treasury Department officials found that al Haramain "is one of the principal Islamic NGOs providing support for the al Qaida network").

times by a senior Saudi government official, staffed principally by Saudi civil servants on detail from other government ministries and organs, and that the treasury of the Kingdom of Saudi Arabia was the "largest source of funding for" SHC.  JA6169-74 (Decl. of Saud Bin Mohammad Al-Roshood ¶ 24).

Plaintiffs further supported their allegations with a broad range of extrinsic evidence, including an affidavit from Evan Kohlmann, a counter-terrorism expert who has testified for the United States government in more than 31 terrorism prosecutions.  JA2417-61 (Affirmation of Evan Francois Kohlmann, Feb. 3, 2015 ("Kohlmann Aff.")).  Kohlmann's affidavit spanned 46 pages and included over 220 citations to primary and secondary source documents concerning the Kingdom's control over the charities, including public statements by senior Saudi government and charity officials, the charities' own internal documents, U.S. Congressional testimony, U.S. intelligence reports, filings in criminal proceedings, foreign government investigation materials, and investigative reports of subject matter experts. *Id.*  According to Kohlmann, the evidence he collected established that the da'awa organizations serve as the primary "governmental arms" through which the Kingdom fulfills its self-described duty to propagate Islam

80

throughout the world under the direct supervision of the Ministry of Foreign Affairs. *Id.* (Kohlmann Aff. ¶ 23).

In addition, plaintiffs proffered the Kingdom's own laws and filings, which confirm that the da'awa organizations perform core functions and obligations of the Saudi State under the direction of the Ministry of Islamic Affairs and government officials who head those individual da'awa organizations. Indeed, the Kingdom's Basic Law of Governance expressly provides that "[t]he State shall . . . undertake its duty regarding the propagation of Islam (Da'wa)," JA2463-70 (Article 23), and senior Saudi officials have affirmed in this litigation that such da'awa activities have been a "*core policy and function of the Kingdom since its founding.*" JA2417-61 (Kohlmann Aff. ¶ 18) (emphasis supplied). The Ministry of Islamic Affairs is the *operational* body responsible for executing the Kingdom's da'awa activities outside of the Kingdom, and the individual da'awa organizations serve as tools for implementing those core functions in those countries. *Id.* (Kohlmann Aff. ¶¶ 21-23); JA2501-02. The Kingdom oversees the activities of those da'awa organizations "through the government officials who head those organizations," and cites the work of those organizations as achievements of the state. JA2417-61 (Kohlmann Aff. ¶ 24, n.7). This

81

evidence shows that the Ministry of Islamic Affairs and individual da'awa organizations are part of the Saudi State itself.

As in the case of its scope of employment rulings, the district court's wholesale rejection of plaintiffs' alter-ego allegations contains no discussion of the extensive allegations and evidence plaintiffs offered in support of those theories, as summarized above. Particularly in a procedural setting where the Kingdom did not submit any affidavit challenging plaintiffs' alter-ego allegations, and where plaintiffs requested but were not afforded the opportunity to conduct discovery in support of their alter-ego theories, the impressive and detailed factual and *evidentiary* record plaintiffs offered was more than sufficient to satisfy plaintiffs' burden at the pleading stage to allege that the charities are alter-egos of the government.

The district court's ruling concerning the sufficiency of plaintiffs' alter-ego allegations and evidence also conflicts with this Court's holding in *Terrorist Attacks III.* In that decision, this Court acknowledged at the outset that the pleadings alleged that "the Kingdom exercises complete oversight and control over the charities, making them alter-egos whose deeds can be imputed to the Kingdom." *Terrorist Attacks III,* 538 F.3d at 77. Plainly

82

crediting those allegations, this Court elsewhere stated that "the allegations about the charities provide the necessary background here." *Id.* at 76.

Jurisdiction was also appropriate under plaintiffs' separate theory that the "charities'" activities in the United States were attributable to the Kingdom under the core functions test -- an analysis which should have been conducted initially, before turning to plaintiffs' separate alter-ego theory of attribution. As this Court explained in *Garb v. Republic of Poland*, 440 F.3d 579, 590-94 (2d Cir. 2006), an agency or instrumentality of a foreign state will be treated as the state itself, and not as a separate legal entity, where it performs "core functions" of the state. This rule applies even where, unlike here, the entity maintains administrative and financial independence from its government. In determining whether an entity engages in such core functions, this Court has traditionally looked to, and taken judicial notice of, the foreign state's own laws and constitution. *Id.* at 594-95; *SerVaas Inc. v. Republic of Iraq*, 2011 U.S. App. LEXIS 2709, at *6 (2d Cir. Feb. 16, 2011). And, as discussed *supra*, plaintiffs expressly alleged and presented evidence that the charities perform core functions and obligations of the Saudi government, citing the Kingdom's Basic Law of Governance, and statements and affidavit testimony of Saudi officials. Even though plaintiffs plainly

83

invoked the core functions test as an *additional* basis for treating the charities as the Saudi State itself, R.2926 at 27-28, the district court did not even mention, much less address, plaintiffs' core functions argument.

Had the district court attributed the "charities'" actions to the Kingdom under either of these theories, jurisdiction would have clearly existed under Section 1605(a)(5). The district court has itself, in earlier phases of this case, confirmed that plaintiffs' allegations concerning the terrorist activities of the U.S. branches of these "charities" are sufficient to establish that they engaged in tortious acts in support of the September 11th attacks. *See Terrorist Attacks II,* 392 F. Supp. 2d at 569 (denying motion to dismiss of U.S. branch of IIRO); *In re Terrorist Attacks on Sept. 11, 2001,* 740 F. Supp. 2d 494, 519-20 (S.D.N.Y. 2010) (denying motions to dismiss of U.S. branches of WAMY and al Haramain). And this result is plainly correct. Plaintiffs' pleadings and evidence set forth the factual bases for concluding that U.S.-based Saudi officials working in the four "charities" at issue undertook fundraising, money laundering and related activities in the United States having the purpose and effect of supporting al Qaeda's terrorism directed against the United States. JA2197-2250 (Aver. ¶¶ 333-518). These activities led the U.S. government to designate the U.S. branch

84

of al Haramain as a supporter of terrorism, in part based on investigations "show[ing] direct links between the U.S. branch and Usama bin Laden." JA5709-11 (Treasury Department stating that "Al Haramain has been used around the world to underwrite terror."); JA5670-74 (U.S. Treasury officials stating that al Haramain "field offices and representatives operating throughout Africa, Asia, Europe and *North America* appeared to be providing financial and material support to the al Qaida network.") (emphasis supplied); *see also* JA2242 (Aver. ¶ 492). U.S. officials raided the U.S. offices of the IIRO and MWL as part of an investigation into financing of al Qaeda from within the United States. JA2219 (Aver. ¶ 424). State Department officials similarly concluded that "Usama bin Laden used the entire IIRO network for his terrorist activities." JA2213 (Aver. ¶ 399); JA4995 (State Department Diplomatic Cable). Indeed, the IIRO is alleged to have operated on a global basis to use all its fundraising capabilities, including those undertaken by officials in the United States, to function "as the principal sponsor of terrorist training camps in Afghanistan," JA2196-97 (Aver. ¶ 330); JA4138-40 (State Department Diplomatic Cable), including camps where the September 11th hijackers received training for the attacks. JA2127-28 (Aver. ¶ 48); JA3639-5246 (1996 CIA Report).

85

**B.  Plaintiffs' Detailed Submission Was More Than Sufficient to Satisfy Its Burden as to SHC**

The district court found that plaintiffs failed to satisfy the "entire tort" rule with respect to SHC because "[t]he actions allegedly taken by the SHC took place outside the United States" and were "akin to [the conduct] alleged as to the SRC and SJRC:  providing funding to entities that allegedly funded al Qaeda."  SPA112.  The district court's ruling concerning SHC, limited to four sentences, erred in two basic respects.

*First*, the allegations pertaining to SHC were hardly "akin" to the conduct alleged as to SRC and SJRC (two other ostensible "charities") in *O'Neill v. SJRC,* 714 F.3d 109 (2d Cir. 2013).  In *SJRC*, this Court found that the "entire tort" rule was not satisfied with respect to SJRC and SRC because plaintiffs' allegations related only to "allegedly contributing financial and other resources to support Osama Bin Laden and al Qaeda."  *Id.* at 116.  The Court emphasized that the support provided by SJRC and SRC to Osama Bin Laden and al Qaeda was unrelated to any plans to commit attacks on the American homeland.  Instead, the Court noted that these charities' support pertained to "terrorist attacks in Albania, Kosovo, Egypt, Tanzania and Kenya."  *Id.* at 116 n.9.  It expressly confirmed that acts in relation to those

86

attacks were torts that were "distinct and separate" from the September 11th attacks. *Id.* at 117 n.10.

Plaintiffs' allegations and evidence concerning SHC are quite different and bear a quite different relation to a tort in the United States. Far from suggesting that SHC merely provided "funding and other aid to entities that purportedly supported al Qaeda," *id.* at 117, plaintiffs' allegations and evidence described SHC's intimate and direct collaboration with al Qaeda, including in relation to the development of plots to attack the American homeland during the periods immediately before and after the September 11th attacks. In support of these allegations, plaintiffs offered evidence including the testimony of Ali Ahmed Ali Hamad, a convicted al Qaeda member who was himself an employee of SHC. JA2251-52 (Aver. ¶¶ 525-28). Hamad testified that numerous al Qaeda members were embedded in SHC and paid by the organization, and were actively engaged in developing terrorist attacks against the United States for al Qaeda using SHC resources and facilities. JA2251-52 (Aver. ¶ 527); JA6175-93 (Dec. of Ali Ahmed Ali Hamad); JA6194-05 (Witness Statement of Ali Ahmed Ali Hamad); JA6316-19 (FBI Interview of Ali Ahmed Ali Hamad). These facts were corroborated by U.S. intelligence reports and records submitted by plaintiffs and

87

pertaining to Guantanamo Bay detainee review proceedings, which confirmed that numerous al Qaeda members and affiliates were on the payroll of SHC immediately before and after the September 11th attacks, and actively engaged in developing and carrying out terrorist attacks during those periods. JA6395-6516 (Department of Defense Detainee Evidentiary Reports); JA6517-18 (U.S. Intelligence Report). The government records further documented that the United States detained several SHC employees as enemy combatants following the September 11th attacks, and had formally labeled SHC as an al Qaeda affiliate. JA2254-56 (Aver. ¶¶ 534-41); JA5094-5110 (Department of Defense Matrix of Threat Indicators identifying SHC as an al Qaeda support entity at JA5108-10); JA6395-6516.

Plaintiffs' complaints and Averment further allege that, just one month after the September 11th attacks, U.S. counter-terrorism officials conducted a raid of SHC's Sarajevo headquarters in collaboration with UN stabilization forces, which uncovered a trove of evidence of SHC's direct involvement in plotting attacks against the American homeland. JA2253-54 (Aver. ¶ 533). This evidence included "computer hard-drives with photographs of the World Trade Center before and after its collapse, as well as photographs of the United States embassies in Kenya and Tanzania and the U.S.S. Cole," as

88

well as "files on deploying chemical agents with crop dusters, information about how to make fake State Department badges, and photographs and maps of Washington, marking prominent government buildings." JA2253-54 (Aver. ¶ 533); JA6393-94. The subject matter of these materials, recovered in the weeks immediately after the September 11th attacks, mirrors several of the plots Zacarias Moussaoui testified he was sent to the United States by al Qaeda to pursue. *E.g.*, JA2398-2415 (Testimony of Zacarias Moussaoui ("Moussaoui Testimony")) (describing plot to use crop dusting plane in a terrorist attack on U.S. soil at JA2405).

Plaintiffs' facts and evidence, which SHC did not challenge through an affidavit or otherwise, plainly established for purposes of the pre-discovery FSIA immunity analysis that SHC directly and intimately collaborated with al Qaeda in relation to the development of plots to attack the American homeland that were closely related to, and therefore part of the same tort as, the September 11th attacks. These allegations and the related evidence thus satisfied this Court's formulation of the "entire tort" rule.

*Second*, a separate basis exists for FSIA jurisdiction over SHC: SHC is an alter-ego of the Saudi government engaged in the performance of core functions of the Saudi State. *See, e.g.*, R.2926 at 25-28 (MTD Opp.). Because

89

plaintiffs adequately alleged that SHC is an alter-ego of the Saudi government engaged in the performance of core functions, SHC is a part of the state itself.  As a result, the U.S.-based torts of the Kingdom's individual employees and other charity alter-egos are attributable to SHC.  *First Nat'l City Bank*, 462 U.S. at 632-34 (attributing acts of Cuba to its instrumentality); *Liu Bo Shan v. China Constr. Bank Corp.*, 421 F. App'x. 89, 93 (2d Cir. 2011) (stating that if it had found the instrumentality to be an alter-ego of a foreign sovereign, the instrumentality "could be held liable for any violations of customary international law perpetrated by the [foreign] government or its instrumentalities"); *EM Ltd. v. Banco Cent. de la República Arg.*, 800 F.3d 78, 91 n.56 (2d Cir. 2015) ("Our precedent supports the view, however, that once an instrumentality of a sovereign state has been deemed to be the alter ego of that state under *Bancec*, the instrumentality and the state are to be treated as one and the same for all purposes.").  Accordingly, the U.S.-based torts of the Kingdom's individual employees and other charity alter-egos also sufficed to satisfy the "entire tort" rule with respect to SHC.

### C.    Defendants' Submissions and the *9/11 Commission Report*

In the proceedings below, the Kingdom did not submit any affidavit or other evidence challenging any material aspects of plaintiffs' factual

90

allegations and evidence. Most notably, the Kingdom did not offer any affidavit contesting plaintiffs' allegations and evidence relating to the status of Bayoumi, Thumairy, Basnan, and Hussayen as employees of the government, the roles plaintiffs' pleadings ascribed to them as employees of the government, or the detailed record plaintiffs presented concerning their activities in support of the September 11th attacks. The Kingdom and SHC likewise did not offer any affidavit contesting plaintiffs' allegations and evidence that the so-called charities performed core functions of the Saudi government, or rebutting plaintiffs' allegations that those charities were dominated and controlled by the Saudi government, making them alter-egos of the Kingdom. Nor did they offer any affidavit disputing plaintiffs' facts and evidence demonstrating the pervasive terrorist activities of those charity alter-egos. Thus, this case comes before this Court in the same procedural posture as it did when the Court initially considered the claims against these defendants in *Terrorist Attacks III.*

As was the case in that prior proceeding, the Kingdom and SHC asserted in the district court that the 9/11 Commission "concluded that the government of Saudi Arabia had no role in the attacks of September 11, 2001." R.2542 at 1. The Kingdom predicated this argument on a single

91

sentence in the *9/11 Commission Report* that the Commission found "no evidence that the Saudi government *as an institution* or *senior* Saudi officials individually funded" al Qaeda. R.2928 at 13 (MTA Opp.) (quoting *9/11 Commission Report*, p. 171) (emphasis supplied). The Kingdom and SHC asserted that this isolated sentence represents an "emphatic, considered finding" that required the district court to ignore plaintiffs' allegations and evidence, including the affidavit testimony of actual members of the 9/11 Commission. *Id.* This is inaccurate. In fact, the *9/11 Commission Report* lends support to plaintiffs' claims as confirmed by the text of the Report itself, and affirmations of Commission Members Bob Kerrey and John Lehman, and 9/11 Joint Inquiry Chair Bob Graham. JA2172-73 (Aver. ¶¶ 243-47); JA2970-75 (Graham Aff. in Support of 60(b) Motion ¶ 11); JA2271-76 (Graham Aff. ¶ 14); JA2278-81 (Lehman Aff. ¶ 4); JA2283-88 (Kerrey Aff.).

Responding directly to the Kingdom's characterizations of the 9/11 Commission's Report, Senator Kerrey testified that "it is fundamentally inaccurate and misleading for the Kingdom and SHC to suggest that the 9/11 Commission's investigation exonerated them for the events of September 11, 2001, or that the 9/11 Commission's investigation directly rebutted Plaintiffs' claims." JA2283-88 (Kerrey Aff. ¶ 18). Secretary Lehman

92

echoed these points in his affidavit, testifying that "[c]ontrary to the view advocated by the Kingdom, the 9/11 Commission did not exonerate Saudi Arabia of culpability for the events of September 11, 2001, or the financing of al Qaeda in the years leading up to the September 11th attacks. In addition, the Kingdom is fundamentally incorrect in suggesting that our Commission in some way 'considered and rejected as factually untrue' the allegations or claims that have been advanced by the 9/11 plaintiffs against Saudi Arabia." JA2278-81 (Lehman Aff. ¶ 4). Interviewed in the wake of the filing of the Lehman and Kerrey Affirmations, 9/11 Co-Chair Lee Hamilton joined the chorus of Commissioners rejecting Saudi Arabia's misrepresentations concerning the Commission's findings and report, stating, according to CNN, that "the commission never claimed to give the final word on Saudi involvement and that sentence was written in [Hamilton's] words very carefully to allow for the remaining questions." R.2947 at 11 (MTA Reply).

The record before the district court confirmed that the "remaining questions" the sentence was "very carefully" drafted "to allow" include those raised by plaintiffs' claims against the Kingdom of Saudi Arabia. Indeed, the plain text of the sentence clearly and conspicuously leaves open

93

the possibility that elements of the Saudi government and less than senior Saudi government employees (like Thumairy, Bayoumi, Basnan and al Hussayen, as well as a range of Ministry officials) did provide support to al Qaeda and the September 11th plot. JA2161, 2173 (Aver. ¶¶ 191, 246); JA3280-83 (authoritative account of the Commission's proceedings, characterizing staff members crediting materials concerning Bayoumi and Thumairy). Further, plaintiffs' theories based on the attributable conduct of the Kingdom's charity alter-egos are fully supported by the 9/11 Commission's finding that there was a substantial "likelihood that charities *with significant Saudi government sponsorship* diverted funds to al Qaeda." *9/11 Commission Report*, p. 171.

Thus, far from reflecting a "minority view, rejected by the 9/11 Commission," as characterized by the district court, the testimony of Senator Kerrey and Secretary Lehman is entirely consistent with, and reflects the proper understanding of, the 9/11 Commission's investigation and Report.[24]

---

[24] At a minimum, these affidavits and related evidence show the limits of the 9/11 Commission's reports and the sort of expert and opinion testimony that plaintiffs could secure concerning the Kingdom's involvement in the September 11th attacks.

And, for purposes of addressing a motion to dismiss (especially before discovery), the Report certainly cannot justify dismissing the complaints.

### D. Plaintiffs Were Entitled to Jurisdictional Discovery

Because plaintiffs' allegations and evidence at a minimum clearly provided "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence," *Twombly,* 550 U.S. at 556, plaintiffs should be given the opportunity to undertake jurisdictional discovery if this Court were to determine, contrary to the arguments set out above, that plaintiffs had not sufficiently alleged, for purposes of defeating a motion to dismiss, that jurisdiction exists over defendants. *See First City, Texas-Houston, N.A. v. Rafidain Bank,* 150 F.3d 172, 177 (2d Cir. 1998).

## II. THE DISTRICT COURT'S INTERPRETATION OF THE "ENTIRE TORT" RULE IS UNDULY NARROW AND INCONSISTENT WITH THE RULE'S APPLICATION BY THIS AND OTHER COURTS

Apart from erroneously faulting the adequacy of plaintiffs' allegations and evidence establishing defendants' actions within the United States, *see supra* Section I, the district court narrowly and incorrectly construed the "entire tort" exception to Section 1605(a)(5). That error led the Court to disregard important allegations and evidence of actions undertaken by defendants abroad but directly linked to the "entire tort" committed in the

95

United States and to reject plaintiffs' jurisdictional theories based on secondary liability.

*First*, plaintiffs made allegations and presented evidence establishing that the September 11th attacks, an "entire tort" committed in the United States, were an integral and intended part of the ongoing course of conduct of defendants abroad – and could thus form the basis for establishing jurisdiction over defendants. In particular, plaintiffs' Averment details how the ostensible charities (including among others the MWL, IIRO, al Haramain, WAMY, and SHC itself) "provided the vast majority of the funding that allowed al Qaeda to build and sustain" the global infrastructure required to plan and execute the September 11th attacks. JA2127-28 (Aver. ¶ 48). The financial contributions of these "charities" funded the very al Qaeda camps where the September 11th hijackers received their training for the attacks, and the safe haven and facilities in Afghanistan where senior officials of al Qaeda, including Osama bin Laden and Khalid Sheikh Mohammed, planned and coordinated the attacks. JA2122, JA2127-28, JA2134, JA2187, JA2189-90, JA2196-97, JA2208-09, JA2211-12, JA2218 (Aver. ¶¶ 33, 48, 81, 306, 315, 330-31, 382, 393-94, 422); JA2314-15 (Moussaoui Testimony) ("It was crucial. I mean, without the money of the – of the Saudi

96

you will have nothing, I mean, that you would have like a Kalashnikov, it was absolutely fundamental, because at the time – at the end there was hundred (sic) of people coming, you have to feed them, you have to pay for – for Kalashnikov, or all the military equipment . . ."); JA2336-37 (Moussaoui Testimony) ("money was used to . . . buy all the supply for the feeding the camp" and also for "ammunition," "medical supplies," and to "transfer people"); JA2339-40 (Moussaoui Testimony) (money used to sustain al Qaeda operations); JA3639-52 (CIA Report stating the IIRO funds six terrorist training camps in Afghanistan); JA4141-44 (State Department Diplomatic Cable) ("IIRO has been cited as the principal sponsor of terrorist training camps in Afghanistan" and "as the conduit for funds from Usama bin Laden to terrorist organizations."). Plaintiffs' allegations and evidence draw a very direct connection between the "charities'" overwhelming financial support for al Qaeda abroad, and the planning and execution of the September 11th attacks themselves. And, as shown *supra*, at Part I.B, SHC's contributions were especially important to al Qaeda acquiring the strike capabilities used to carry out the September 11th attacks, and the evidence very directly links SHC's support to al Qaeda's efforts to launch attacks against the American homeland.

Plaintiffs also proffered statements and empirical findings of U.S. counterterrorism officials that further demonstrate the direct link between the support provided by the ostensible charities abroad and the September 11th attacks. As the 9∕11 Commission concluded, a "complex international terrorist operation aimed at launching a catastrophic attack cannot be mounted by just anyone in any place," but rather requires sufficient resources to sustain a command infrastructure; facilities and opportunity to recruit, train and indoctrinate operatives with needed skills and dedication; and sophisticated logistics and communications networks. JA2122-23 (Aver. ¶ 34); *9/11 Commission Report*, pp. 365-66. For organizations like al Qaeda, the maintenance of these essential resources and infrastructures "is expensive" and requires a steady stream of funding "to pay operatives and their families, arrange for travel, train new members, forge documents, pay bribes, acquire weapons and stage attacks." JA2123-24 (Aver. ¶ 35); JA2687-93 (Testimony of Stuart A. Levey); JA2694-95 (Testimony and Daniel L. Glaser).[25] For these reasons, the United States made the disruption of al

---

[25] Plaintiffs' Averment and evidence confirm that the "charities" also assisted al Qaeda in each of the functions U.S. officials have identified as essential to a sophisticated terrorist organization's operations: recruitment of new members; facilitation of travel and communications; the acquisition

98

Qaeda's financial support infrastructure a centerpiece of our nation's post-9/11 counterterrorism strategy, concluding that disrupting these essential money flows would undermine its ability to carry out sophisticated attacks like September 11th. The empirical findings and policies of U.S. counterterrorism officials thus affirm plaintiffs' express claim that al Qaeda "could not have successfully mounted" the September 11th attacks absent the lavish funding and support provided by defendants overseas. JA2121 (Aver. ¶ 32).

The district court rejected arguments based on these allegations and supporting evidence on the ground that they were foreclosed by a footnote in *O'Neill v. SJRC*. *See* JA7468 n.15 (citing *O'Neill v. SJRC*, 714 F.3d at 117 n.10). That conclusion, however, ignores this Court's reasoning in *O'Neill v. SJRC* and the clear implication of that footnote.[26] In *O'Neill v. SJRC*, this

---

and shipment of weapons; and provision of false identification documents. JA2182-97 (Aver. ¶¶ 286-332).

[26] This Court adopted the "entire tort" rule in *SJRC* (albeit in a considerably narrower form than applied by the district court here), and plaintiffs reserve the right to challenge that determination in any further proceedings. The plain language of the FSIA's torts exception requires only that the plaintiff suffer "personal injury or death, or damage to or loss of property, occurring in the United States," 28 U.S.C. § 1605(a)(5), and does not provide that the conduct causing the tort must also take place in the United States. *Arg. Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989), does not establish

Court acknowledged that the September 11th attacks satisfied the "entire tort" rule and focused on whether the alleged acts abroad of the two charity defendants at issue were directly related to the attacks or constituted separate, distinct torts. 714 F.3d at 117 n.10. The Court held that FSIA jurisdiction did not exist over the two charities because the "torts" allegedly committed by those defendants "involved giving money and aid to purported charities that supported al Qaeda" and were unrelated to any plans to commit attacks against the American homeland, making the tort of the September 11th attacks "distinct and separate from the 'torts' allegedly committed by [defendants]." *Id.* Thus, the Court resolved the FSIA jurisdiction question on the factual basis that the two defendants at issue were not alleged to have participated in the "tort" that occurred in the United States.

Here, by contrast, the allegations are different and directly tie even the acts of defendants undertaken abroad to the September 11th attacks themselves. Through the ostensible charities' acts that directly supported

_____

such a requirement and instead points to the need for a tort that causes damage in the United States. *Id.* at 440 (addressing tort committed on the high seas).

100

the camps used to train the September 11th attackers and that provided other material and funds necessary to al Qaeda's achieving the particular capabilities used to plan and execute the September 11th attacks, the defendants are here alleged to have played an integral role in the attacks themselves, and thus in the "entire tort" committed in the United States. JA2147, JA2182-2265 (Aver. ¶¶ 130, 286-580). They are alleged to have done so directly, not just through separate "charitable" officials. JA2150-74 (Aver. ¶¶ 149-251).

Plaintiffs' allegations are equivalent to those made against Afghanistan in *Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011) (per curiam), where the Court's conclusion that FSIA Section 1605A did not displace Section 1605(a)(5) rested on Section 1605(a)(5) otherwise being satisfied – subject to confirmation following discovery that the acts alleged could be attributed to Afghanistan and were not discretionary. *See id.* at 66-67. The allegations made against Afghanistan included that it provided Osama bin Laden and al Qaeda "with a safe haven and base of operation from which to conduct their activities" and that it allowed bin Laden and al Qaeda to "operate training camps inside Afghanistan from which they plan, train for, and carry out terrorist attacks against the United States." *Doe v. Bin Laden*,

101

580 F. Supp. 2d 93, 98-99 (D.D.C. 2008), *aff'd*, 663 F.3d 64 (2d Cir. 2011); *see also id.* at 98 n.5 (plaintiff alleged that "at least four of the nineteen hijackers from the September 11, 2001 attacks received training at camps in Afghanistan run by Bin Laden and Al Qaeda"). This Court's conclusion in *Doe* that the allegations of conduct abroad could be sufficient to satisfy Section 1605(a)(5) makes sense: Afghanistan's actions (and the similar actions of defendants here) are akin to the initiation of a foreign-launched missile that strikes the United States or a viral attack started across U.S. borders that sets in motion further transmissions causing death here. Nothing in the "entire tort" doctrine bars jurisdiction over such claims.[27]

*Second*, the district court separately construed Section 1605(a)(5) narrowly as the basis for rejecting plaintiffs' claims that state law principles of secondary liability (related to conspiracy and aiding and abetting)

---

[27] The district court's interpretation of the FSIA also is at odds with the rulings of other federal courts finding FSIA jurisdiction over claims against foreign state defendants for their acts undertaken abroad which caused intended injuries in the United States. *See, e.g., Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989) (political killing in California undertaken at the direction and with the aid of foreign state's senior intelligence officer acting in Taiwan); *Letelier v. Republic of Chile*, 488 F. Supp. 665 (D.D.C. 1980) (political killing in Washington, D.C. undertaken at the direction and with the aid of foreign state defendants acting in Chile).

supported the attribution of liability for the September 11th attacks, an "entire tort" committed in the United States, to defendants. In this respect, the district court did not rest its decision on whether the defendants' actions amounting to conspiracy or aiding and abetting occurred in the United States or abroad (and could not have done so, because the basis for secondary liability arose in the United States as well as abroad, *see* R.2926 at 19-20 (MTD Opp.)). Instead, the district court adopted a broader exclusion from liability, and held that the actions of third parties could *never* be attributed to a sovereign for purposes of creating liability for claims under Section 1605(a)(5). *See* SPA109-110, 117. The court cited no law or cases in support of this conclusion and instead invoked only a statement in an amicus brief filed by the United States. SPA109-110.

Nothing about Section 1605(a)(5) or cases applying it precludes the normal operation of state laws related to secondary liability where, as here, an "entire tort" occurs in the United States. Plaintiffs allege that defendants' agents and officials conspired with and aided and abetted the September 11th attackers, both in the United States and abroad. *See supra*, pp. 15-16, 46-75. As a result, basic state law tort principles attribute the attackers' U.S.-based actions to defendants. *See, e.g., Halberstam v. Welch*, 705 F.2d 472, 479-

103

86 (D.C. Cir. 1983); *see Doe v. Bin Laden*, 580 F. Supp. 2d at 98-99.   The complaints and Averment set out detailed allegations that satisfy state law conspiracy and aiding and abetting liability, including the underlying agreement to undertake terrorist activities against U.S. targets and acts taken by Saudi officials and charities in furtherance of that agreed course.   This Court did not address this basis of liability in *O'Neill v. SJRC*.

The only court that has addressed that issue, the district court in *Doe*, concluded that even though the "entire tort" doctrine limits the scope of Section 1605(a)(5), that doctrine is satisfied when foreign state officials are alleged to have conspired with others acting within the United States – and the court found specifically that, under this theory, Section 1605(a)(5) could support a claim based on allegations that Afghanistan conspired with the September 11th hijackers, including (as for the Saudi defendants here) through the provision of training camps.   *See Doe v. Bin Laden*, 580 F. Supp. 2d at 98 n.5*; see also Doe v. Bin Laden,* 663 F.3d at 66-67 (analysis based on allegations otherwise satisfying Section 1605(a)(5)).   Indeed, because this Court in *Doe* was reviewing and affirming the district court's decision upholding discovery and dismissing a motion to dismiss on this basis, the predicate for this Court's analysis – that Section 1605(a)(5) applies –

104

apparently rested on its approval of this attribution of U.S. actions by operation of state conspiracy law.

## III.  THIS COURT SHOULD NOT REACH THE ALTERNATIVE GROUNDS FOR THE MOTION THAT THE DISTRICT COURT DID NOT ADDRESS

The Kingdom and SHC also argued in their motion to dismiss that plaintiffs' claims are barred under the FSIA pursuant to the discretionary function exception to the torts exception, and because plaintiffs have failed to allege causation.  R.2894 at 19-22 (MTD).  Although this Court has the power to affirm a judgment based on any ground presented in the record, *Olsen v. Pratt & Whitney Aircraft Div. of United Techs. Corp.*, 136 F.3d 273, 275 (2d Cir. 1998), its established practice dictates that it should not reach defendants' alternative arguments, which are meritless in any event.

This Court's "settled practice" is "to allow the district court to address arguments in the first instance." *Farricielli v. Holbrook*, 215 F.3d 241, 246 (2d Cir. 2000) (per curiam); *see also Merchants Ins. Grp. v. Mitsubishi Motor Credit Ass'n*, 356 F. App'x 548, 552 (2d Cir. 2009) (this "settled practice" trumps the doctrine that the Court may affirm the district court on alternative grounds appearing in the record).  The district court did not address either of

defendants' alternative arguments.  SPA117.  Accordingly, this Court should not address them in the first instance.

## CONCLUSION

The Court should reverse the district court's grant of the motion to dismiss the claims against the Kingdom and SHC and reverse the district court's denial of the motion to file the Averment of Facts.

Dated:  March 10, 2016          Respectfully submitted,

 /s/  Stephen A. Cozen
Stephen A. Cozen
Elliott R. Feldman
Sean P. Carter
J. Scott Tarbutton
COZEN O'CONNOR
1650 Market Street
Philadelphia, PA 19103
(215) 665-2000

- and -

Carter G. Phillips
Richard Klingler
Jacqueline G. Cooper
Richard E. Young
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000

Attorneys for *Federal Insurance* Plaintiffs-Appellants

106

Robert T. Haefele
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9000

- and -

Andrea Bierstein
SIMMONS HANLY CONROY, LLC
112 Madison Avenue
New York, NY 10016
(212) 784-6400

Attorneys for *Burnett* Plaintiffs-Appellants and *Euro Brokers* Plaintiffs-Appellants

James P. Kreindler
Andrew J. Maloney, III
Kreindler & Kreindler LLP
750 Third Avenue
New York, NY 10017
(212) 687-8181

Attorneys for *Ashton* Plaintiffs-Appellants

107

Jerry S. Goldman
Nicholas R. Maxwell
Bruce Strong
ANDERSON KILL, P.C.
1251 Avenue of the Americas
New York, NY 10020
(212) 278-1000

Attorneys for *O'Neill* Plaintiffs-Appellants

Chris Leonardo
ADAMS HOLCOMB LLP
1875 Eye Street NW
Suite 810
Washington, DC 20006
(202) 580-8803

Attorneys for *Cantor Fitzgerald* Plaintiffs-Appellants

Robert M. Kaplan
FERBER CHAN ESSNER & COLLER, LLP
60 East 42nd Street, Suite 2050
New York, New York 10165
(212) 944-2200

Attorneys for *Continental Casualty* Plaintiffs-Appellants

108

## CERTIFICATE OF COMPLIANCE PURSUANT TO FRAP 32(a)

I, J. Scott Tarbutton, attorney for plaintiffs-appellants, hereby certify that the preceding brief complies with the type-volume limitations set forth in FRAP 32(a)(7)(B) and this Court's order issued on February 1, 2016. As indicated by the word-count function of Microsoft Word 2007, this brief contains 21,866 words, excluding the parts of the brief exempted by FRAP 32(a)(7)(B)(iii).

Dated: March 10, 2016

/s/   J. Scott Tarbutton
J. Scott Tarbutton, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2016, I electronically filed with the Clerk's Office of the U.S. Court of Appeals for the Second Circuit this brief of plaintiffs-appellants, and further certify that the parties' counsel will be notified of, and receive, this filing through the Notice of Docket Activity generated by this electronic filing.

/s/   Jerry S. Goldman
Jerry S. Goldman, Esq.
ANDERSON KILL, P.C.
1251 Avenue of the Americas
New York, NY 10020
(212) 278-1000

LEGAL\26073965\1