# 15-3426-cv(L),

15-3442-cv(CON), 15-3505-cv(CON), 15-3509-cv(CON),
15-3524-cv(CON), 15-3542-cv(CON), 15-3583-cv(CON), 15-3605-cv(CON)

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

---

IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001

---

On Appeals from the United States District Court
for the Southern District of New York

---

### BRIEF OF DEFENDANTS-APPELLEES
### THE KINGDOM OF SAUDI ARABIA AND
### THE SAUDI HIGH COMMISSION FOR RELIEF
### OF BOSNIA & HERZEGOVINA

---

LAWRENCE S. ROBBINS
ROY T. ENGLERT, JR.
ROBBINS, RUSSELL, ENGLERT,
  ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411
Washington, D.C. 20006
(202) 775-4500
(202) 775-4510 (fax)

*Attorneys for the Saudi High
Commission for Relief of Bosnia
& Herzegovina*

MICHAEL K. KELLOGG
GREGORY G. RAPAWY
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (fax)

*Attorneys for the Kingdom of
Saudi Arabia*

June 8, 2016

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................iv

INTRODUCTION ...........................................................................................1

JURISDICTIONAL STATEMENT ..................................................................4

ISSUES PRESENTED.....................................................................................4

STATEMENT ................................................................................................5

SUMMARY OF ARGUMENT .......................................................................22

STANDARD OF REVIEW ............................................................................27

ARGUMENT ................................................................................................27

I.    Plaintiffs Failed To Bring Their Claims Within the Noncommercial-Tort Exception to Foreign Sovereign Immunity ........................................................................27

    A.    The District Court Correctly Held Plaintiffs to Their Dual Burden To Present Well-Pleaded Allegations and To Come Forward with Evidence Supporting Those Allegations..................................27

    B.    The Entire-Tort Rule Required Plaintiffs To Establish a Tortious Act or Omission by an Official or Employee of Saudi Arabia or the SHC Within the United States ...............................34

    C.    Plaintiffs Failed To Satisfy the Entire-Tort Rule as to Saudi Arabia..........................................................38

        1.    Putative Officials and Employees ..................................38

            a.    Omar Al Bayoumi ...............................................38

                i.    Nature and Scope of Employment.............38

                ii.    Alleged Assistance....................................46

i

iii.   Knowledge or Intent ...................................49

b.   Fahad Al Thumairy ...............................51

c.   Osama Basnan ......................................52

d.   Saleh Al Hussayen ...............................54

2.   Governmental and Nongovernmental
Charities .........................................................57

a.   Lack of Alter-Ego Status.....................57

i.   The SHC....................................................59

ii.   The SJRC ...................................................61

iii.   The Red Crescent......................................61

iv.   The MWL....................................................62

v.   The IIRO ....................................................63

vi.   WAMY........................................................64

vii.   Al Haramain...............................................65

b.   Lack of Tortious Acts in the United
States ....................................................68

i.   The Governmental Charities.....................68

ii.   The Nongovernmental Charities...............68

3.   The Moussaoui Statement .............................70

D.   Plaintiffs Failed To Satisfy the Entire-Tort Rule as
to the SHC ................................................................72

II.   Plaintiffs' Claims Are Also Barred by the FSIA's
Discretionary-Function Exception and Causation
Requirement ...................................................................75

A.   Plaintiffs Seek To Hold Saudi Arabia and the SHC
Liable for Policy Decisions.....................................76

       B.     Plaintiffs Cannot Establish That Any Conduct by
Saudi Arabia or the SHC Caused the 9/11 Attacks ..................81

   III.   The District Court Was Well Within Its Discretion To
Deny Jurisdictional Discovery .............................................................84

CONCLUSION .......................................................................................................87

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

## CASES

*Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek*, 600 F.3d 171
(2d Cir. 2010)........................................................................29, 30, 33

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428
(1989)...........................................................................................27

*Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528 (5th Cir. 1992).......................84

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..................................... 28, 38, 39, 40, 46, 69

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194
(2d Cir. 1990)...............................................................................31

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).............. 13, 22, 28, 40, 57, 69

*Bigio v. Coca-Cola Co.*, 675 F.3d 163 (2d Cir. 2012)............................................35

*Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72
(2d Cir. 2013).................................................................................29

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9
(D.D.C. 2003) ........................................................................5, 81, 82

*Burrage v. United States*, 134 S. Ct. 881 (2014) ......................................................81

*Cabiri v. Government of the Republic of Ghana*, 165 F.3d 193
(2d Cir. 1999)................................................................................29

*Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012 (2d Cir. 1993)................29

*Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011) .....................................10, 12, 36, 37

*Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009) ......................................................59

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003)................................................28

*Drexel Burnham Lambert Grp. Inc. v. Committee of Receivers for
Galadari*, 12 F.3d 317 (2d Cir. 1993) ......................................................29, 33

iv

*EM Ltd. v. Banco Cent. de la Republica Argentina*, 800 F.3d 78
(2d Cir. 2015), *cert. dismissed*, 136 S. Ct. 1731 (2016).............20, 57, 58, 59,
62, 63, 64, 65, 66

*EM Ltd. v. Republic of Argentina*, 473 F.3d 463 (2d Cir. 2007) ...........21, 33, 84, 86

*Federal Ins. Co. v. Kingdom of Saudi Arabia*, 557 U.S. 935 (2009) .....................12

*First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172
(2d Cir. 1998).........................................................................33, 84, 86

*First Inv. Corp. of Marshall Islands v. Fujian Mawei Shipbuilding,
Ltd.*, 703 F.3d 742 (5th Cir. 2012)......................................... 58-59

*First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*,
462 U.S. 611 (1983)..................................................................20, 57, 58,
62, 64, 65, 66

*Freund v. Republic of France*, 592 F. Supp. 2d 540 (S.D.N.Y. 2008),
*aff'd*, 391 F. App'x 939 (2d Cir. 2010) ........................................84

*Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006) .....................................67

*Greene v. United States*, 13 F.3d 577 (2d Cir. 1994) .............................................73

*Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006 (2d Cir. 1986)........................33

*Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147 (2d Cir. 2007)..................................29

*Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976)...................41

*Magnetic Audiotape Antitrust Litig., In re*, 334 F.3d 204 (2d Cir. 2003) ..............31

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290
(2d Cir. 2008)........................................................................................42

*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013),
*cert. dismissed*, 135 S. Ct. 42 (2014)............................................................60

*Meisel v. Grunberg*, 651 F. Supp. 2d 98 (S.D.N.Y. 2009) .....................................35

*Mortimer Off Shore Servs., Ltd. v. Federal Republic of Germany*,
615 F.3d 97 (2d Cir. 2010) ................................................................33, 34, 75

*Mukaddam v. Permanent Mission of Saudi Arabia to the United Nations*, 136 F. Supp. 2d 257 (S.D.N.Y. 2001)............................................31

*NML Capital, Ltd. v. Banco Cent. de la Republica Argentina*, 652 F.3d 172 (2d Cir. 2011) ....................................................28, 33

*OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390 (2015) .......................76, 77, 80

*Platinum & Palladium Commodities Litig.*, *In re*, 828 F. Supp. 2d 588 (S.D.N.Y. 2011)....................................................................41

*Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748 (2d Cir. 1998)................................................................28, 75

*Robinson v. Government of Malaysia*, 269 F.3d 133 (2d Cir. 2001)......9, 27, 28, 29, 32, 41, 75, 83

*Rogers v. Petroleo Brasileiro, S.A.*, 673 F.3d 131 (2d Cir. 2012)..........................29

*RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010) .........................................32-33, 41-42

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)....................................................29, 31

*SerVaas Inc. v. Republic of Iraq*, No. 10-828-cv, 2011 WL 454501 (2d Cir. Feb. 11, 2016)..............................................................67, 68

*Stanfield Offshore Leveraged Assets, Ltd. v. Metropolitan Life Ins. Co.*, 883 N.Y.S.2d 486 (App. Div. 2009).......................................................47

*Swarna v. Al-Awadi*, 622 F.3d 123 (2d Cir. 2010) ....................................27, 76, 77

*Terrorist Attacks on September 11, 2001*, *In re*:

349 F. Supp. 2d 765, *on recon. in part*, 392 F. Supp. 2d 539 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir. 2008).....................................79

538 F.3d 71 (2d Cir. 2008) ("*Terrorist Attacks III*")....... 10, 30, 31, 36, 66, 67

718 F. Supp. 2d 456 (S.D.N.Y. 2010), *aff'd in part and vacated and remanded in part*, 714 F.3d 659 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2870 (2014)............................................................55

714 F.3d 109 (2d Cir. 2013) ("*Terrorist Attacks IV*") ..............17, 23, 29, 30, 31, 34, 35, 36, 37, 68, 72, 73, 75, 81

714 F.3d 659 (2d Cir. 2013) ("*Terrorist Attacks V*"), *cert. denied*, 134 S. Ct. 2870 (2014)..................................................44, 45, 56

*Turkmen v. Hasty*, 789 F.3d 218 (2d Cir. 2015), *petitions for cert. pending*, Nos. 15-1358 et al. (U.S. filed May 9, 2016) .................................31

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008)...............................60

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797 (1984).................................9, 76, 79

*USAA Cas. Ins. Co. v. Permanent Mission of Republic of Namibia*, 681 F.3d 103 (2d Cir. 2012) .........................................................76

*Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983) ..........................27

*Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230 (2d Cir. 2002)..................................................8, 27, 29, 32, 34

*Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247 (2d Cir. 2000).................................................32

## CONSTITUTION, STATUTES, AND RULES

U.S. Const.:

Preamble ..................................................................67

Art. III ...................................................................40

Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.* ..........*passim*

28 U.S.C. § 1604......................................................27

28 U.S.C. § 1605(a)(5)..............................2, 3, 4, 9, 34-35, 38, 81

28 U.S.C. § 1605(a)(5)(A) ......................................9, 76, 79

28 U.S.C. § 1605A ....................................................10

28 U.S.C. § 1291 ....................................................................4

Fed. R. Civ. P.:

    Rule 8 ...........................................................................57

    Rule 12(b)(6) ...............................................................30

    Rule 54(b) ................................................................4, 21

    Rule 56 .........................................................................32

Fed. R. Evid.:

    Rule 702 .......................................................................42

    Rule 804(b)(1)(B) .................................................48, 64

## OTHER MATERIALS

9/11 Review Commission, *The FBI: Protecting the Homeland in the 21st Century* (Mar. 2015), http://www.fbi.gov/stats-services/ 8publications/protecting-the-homeland-in-the-21st-century .........8, 49, 51, 86

Addendum to Evaluation of Adjudicative Competence, attached as Exh. C to Standby Counsel's Memorandum Regarding Rule 11 Considerations, *United States v. Moussaoui*, No. 1:01-cr-455 (E.D. Va. filed July 24, 2002) (Dkt. 356) .....................................70

Aff. of Zacarias Moussaoui, attached to Def.'s Mot. To Withdraw Guilty Plea, *United States v. Moussaoui*, No. 1:01-cr-455 (E.D. Va. filed May 8, 2006) (Dkt. 1857) ...........................................71

Br. for the United States as Amicus Curiae, *Federal Ins. Co. v. Kingdom of Saudi Arabia*, No. 08-640 (U.S. filed May 29, 2009), 2009 WL 1539068 ......................................................11, 38, 43

Br. of Defendant-Appellant, *Doe v. Bin Laden*, No. 09-4958 (2d Cir. filed June 4, 2010) .....................................................37

Dan Christensen & Anthony Summers, BrowardBulldog.org, *Graham: FBI report raises questions about who helped 9/11 terrorists*, Miami Herald (FL), Apr. 18, 2013, 2013 WLNR 9467587 ..........................50

Joint Appendix, *In re Terrorist Attacks on September 11, 2001*, Nos. 11-3294-cv(L) et al. (2d Cir. filed Jan. 20, 2012)..................................44

Kingdom of Saudi Arabia, Ministry of Foreign Affairs, *Custodian of the Two Holy Mosques Condoles King of Belgium on Victims of Terrorist Attacks in Brussels*, http://www.mofa.gov.sa/sites/mofaen/ServicesAndInformation/news/statements/Pages/ArticleID201632220404173.aspx (last updated Mar. 22, 2016)...................78

Oral Arg., *In re Terrorist Attacks on September 11, 2001*, Nos. 11-3294-cv(L) et al. (2d Cir. Dec. 4, 2012) ..........................................37

Reply Br. of Appellants to Br. of the SJRC and the Red Crescent Regarding the FSIA, *In re Terrorist Attacks on September 11, 2001*, Nos. 11-3294-cv(L) et al., Dkt. No. 579 (2d Cir. filed June 25, 2012)..........................................................................36, 37

Reply Br. of Defendant-Appellant, *Doe v. Bin Laden*, No. 09-4958 (2d Cir. filed July 21, 2010) ...........................................................37

John Roth et al., National Commission on Terrorist Attacks Upon the United States, *Monograph on Terrorist Financing: Staff Report to the Commission* (2004), http://govinfo.library.unt.edu/911/staff_statements/911_TerrFin_Monograph.pdf.................8, 46, 47, 52, 54, 65

Barbara Slavin, *U.S., Saudis plan to shut down charity's branches*, USA Today, Mar. 11, 2002, at 10A, 2002 WLNR 4501819 .......................75

*The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States* (July 2004), http://govinfo.library.unt.edu/911/report/911Report.pdf......2, 6, 7, 38, 41, 46, 48, 49, 51, 52, 54, 81

The White House, Office of the Press Secretary, *Remarks by President Obama and His Majesty King Salman bin Abd al Aziz of Saudi Arabia Before Bilateral Meeting* (Sept. 4, 2015), https://www.whitehouse.gov/the-press-office/2015/09/04/remarks-president-obama-and-his-majesty-king-salman-bin-abd-alaziz-saudi ..........................11

Trial Tr., *United States v. Moussaoui*, No. 1:01-cr-455 (E.D. Va. Mar. 27, 2006) (Dkt. 1755) ....................................................................................70

Brian Whitmore, *Charity's Files Hold US Data, Bosnians Say*, Boston Globe, Feb. 17, 2002, at A26, 2002 WLNR 2569194...................................74

## INTRODUCTION

Plaintiffs accuse the government of Saudi Arabia of sending spies into the United States who conspired with the terrorist organization al Qaeda to commit the worst terrorist attack in history against this country. Those sensational claims would roil the world if Plaintiffs had even a shred of support for them. They do not. Instead, they rely on conclusory assertions, speculation, hearsay, and rumor. The district court correctly concluded (for the second time) that Plaintiffs had not met their burden under settled procedural and substantive law to invoke the jurisdiction of the federal courts against a foreign sovereign. In the 12-year history of this litigation, no court has disagreed.

The district court's ruling is further supported by (though it does not depend on) the findings of the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission"), which in its 2004 report "found no evidence that the Saudi government as an institution or senior Saudi officials individually funded" al Qaeda, and which further specifically considered and rejected speculation that particular Saudi citizens in the United States were conduits for funds to the hijackers or knowingly aided the plot. Those findings were reaffirmed last year by an independent, congressionally mandated commission (the "9/11 Review Commission"), which found "no new evidence to date that would change the 9/11 Commission's findings regarding responsibility for the 9/11 attacks."

Plaintiffs' criticisms of the district court's ruling reflect dissatisfaction with settled law but identify no error. Because Saudi Arabia and its instrumentality the Saudi High Commission for Relief of Bosnia and Herzegovina (the "SHC") are undisputedly foreign sovereigns, the burden on Plaintiffs was clear from the outset: they were required both to plead facts and to come forward with evidence showing that their claims could fit within an exception to sovereign immunity. Here, the relevant exception was the noncommercial-tort exception, 28 U.S.C. § 1605(a)(5). This Court has already interpreted § 1605(a)(5) to incorporate the entire-tort rule, which requires that Plaintiffs seek relief for a tortious act or omission of a foreign state official or employee that occurred within the United States.

Applying that governing law, the district court properly reviewed Plaintiffs' lengthy submissions to determine whether they had met their burden. It correctly concluded that they have not shown knowing assistance to the 9/11 hijackers by any official or employee of Saudi Arabia or the SHC acting within the scope of employment on United States soil. Further, that court correctly focused on Plaintiffs' inability to allege and establish relevant facts. It refused to give weight to legally irrelevant matters such as affirmations by former 9/11 Commission members who signed the 9/11 Report but now urge further investigation; and it refused to give weight to Plaintiffs' unsupported assertions that unnamed FBI officials agree with their claims. Those refusals were proper.

2

The district court also appropriately rejected Plaintiffs' contentions that Saudi Arabia can be held liable for the actions of governmental and nongovernmental Islamic charities that Plaintiffs assert are "alter egos" of the Saudi Arabian government because it purportedly controls them. Again, the law is clear: the control necessary to establish alter-ego status is day-to-day control by the sovereign over the activities of an instrumentality. Here, Plaintiffs' allegations of day-to-day control were conclusory, and their evidence nonexistent. Accordingly, the charities were and remain legally distinct from Saudi Arabia.

The remainder of the district court's rulings were equally unimpeachable. It properly rejected Plaintiffs' claims against the SHC for lack of any allegation whatsoever that any SHC officials or employees committed any tortious act in the United States, the same defect this Court has already held was fatal to Plaintiffs' materially identical claims against other Saudi Arabian instrumentalities. It also acted well within its discretion in denying Plaintiffs' improper and hopelessly unfocused request (raised only in a footnote of their responsive brief) for jurisdictional discovery of "any disputed fact the Court deems material." And its rulings can also be upheld on the alternative grounds (which this Court need not reach, but should consider if necessary) that Plaintiffs' claims are barred by the discretionary-function exception to the noncommercial-tort exception to foreign sovereign immunity, as well as by the causation requirement of § 1605(a)(5).

## JURISDICTIONAL STATEMENT

On September 29, 2015, the district court dismissed Plaintiffs' claims against Saudi Arabia and the SHC for failure to establish subject-matter jurisdiction under 28 U.S.C. § 1605(a)(5), the noncommercial-tort exception to foreign sovereign immunity. SPA99-119. On October 30, 2015, that court ordered its Clerk to enter partial final judgment under Federal Rule of Civil Procedure 54(b), which the Clerk did later that day. SPA120-21. Plaintiffs filed notices of appeal no later than November 4, 2015. A7488-504. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Whether Plaintiffs met their burden to plead facts and come forward with evidence showing, as an exception to the presumptive immunity from suit created by the Foreign Sovereign Immunities Act of 1976 ("FSIA"), that an official or employee of either Saudi Arabia or the SHC committed a nondiscretionary tortious act or omission in the United States that caused Plaintiffs' injuries.

2.      Whether the district court abused its discretion by denying Plaintiffs' amorphous request for jurisdictional discovery into "any disputed fact the Court deems material."

4

**STATEMENT**

1.      Plaintiffs are insurance companies, businesses, individuals, and estates seeking damages from the terrorist attacks on September 11, 2001.  They accuse a vast array of defendants of knowingly aiding and intentionally conspiring with the hijackers.  Their complaints name as purported conspirators a number of foreign sovereigns – including Iran, Iraq, Saudi Arabia, Sudan, and Syria – as well as hundreds of foreign government agencies, nongovernmental organizations, private companies, and individuals.  *See* A307-438 (current docket listing 965 defendants).

Plaintiffs allege that the sovereign (and many private) defendants provided direct or indirect funding or support for terrorist organizations and are therefore all liable for the 9/11 attacks.  As one district judge put it in an early opinion dismissing claims against members of the Saudi royal family, Plaintiffs' theory is that defendants had "(i) . . . funded (ii) those who funded (iii) those who carried out the September 11th attacks."  *Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9, 20 (D.D.C. 2003).

On December 9, 2003, the Judicial Panel on Multidistrict Litigation consolidated Plaintiffs' cases in the Southern District of New York – initially before Judge Casey, and then later before Judge Daniels.  As of today, no case in the resulting MDL has proceeded to summary judgment, let alone to trial.  Default judgments have been entered against some defendants, including Iran, and

Plaintiffs have obtained discovery sanctions against others. No default or sanction has been issued against Saudi Arabia or any of its instrumentalities, including the SHC. Saudi Arabia and the SHC first moved to dismiss on the grounds of foreign sovereign immunity on June 24 and August 4, 2004. A477, A489. At no time has any court ruled that Plaintiffs have established any exception to that immunity.

**2.** While this litigation was in its earliest stages, the United States government conducted an extensive investigation of the 9/11 attacks and found no evidence that any foreign sovereign played any role in funding them. The National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission" or "Commission") – as explained in its report[1] – pursued its "sweeping" mandate to investigate the attacks by "review[ing] more than 2.5 million pages of documents and interview[ing] more than 1,200 individuals in ten countries." 9/11 Report xv. Among other things, the Commission investigated sources of funds for the attacks. It found "no credible evidence that any person in the United States gave the hijackers substantial financial assistance" and "no evidence that any foreign government – or foreign government official – supplied any funding" to them. *Id.* at 172. With regard to Saudi Arabia, the Commission "found no evidence

---

[1] *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States* (July 2004) ("9/11 Report"), http://govinfo. library.unt.edu/911/report/911Report.pdf.

6

that the Saudi government as an institution or senior Saudi officials individually funded" al Qaeda, *id.* at 171, the terrorist group behind the attacks.

The Commission further looked specifically at the conduct of Omar Al Bayoumi, a Saudi citizen who had been "[t]he object of considerable media speculation" because of reports that he had helped two of the 9/11 hijackers find an apartment in San Diego. *Id.* at 218. It found "no credible evidence that [Al Bayoumi] believed in violent extremism or knowingly aided extremist groups"; noted that "investigators who ha[d] dealt directly with him and studied his background f[ou]nd him to be an unlikely candidate for clandestine involvement with Islamist extremists"; and further found that he did not "give money" to the hijackers. *Id.* at 218-19. The Commission also considered and rejected allegations that the hijackers had received assistance from two other Saudi citizens: Fahad Al Thumairy[2] and Osama Basnan.[3]

A monograph published by the Commission's staff provided detail about the "[e]xtensive investigation" supporting those findings and reiterated the finding of "no evidence that any person in the United States, or any foreign government,

---

[2] *See id.* at 217 ("[A]fter exploring the available leads, we have not found evidence that Thumairy provided assistance to the [hijackers].").

[3] *See id.* at 516 n.24 ("Contrary to highly publicized allegations, we have found no evidence that [the hijackers] received money from another Saudi citizen, Osama Bassnan."). Basnan's name is spelled differently by different sources.

provided any substantial funding to the hijackers."[4]  More recently, in March 2015, a congressionally mandated review (conducted with the assistance of the FBI) found "no new information . . . [that] would change the 9/11 Commission's findings regarding responsibilities for the 9/11 attacks."[5]

**3.**     More than 11 years ago, in early 2005, Judge Casey dismissed Plaintiffs' case against Saudi Arabia under the FSIA.  SPA26-27.  As there was "no dispute that . . . Saudi Arabia is a foreign state" and presumptively immune, he considered whether Plaintiffs had met their "'burden of going forward with evidence that, under exceptions to the FSIA, immunity should not be granted.'" SPA26 (quoting *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 241 (2d Cir. 2002)).  He concluded that the "only possible applicable exception," *id.*, was the noncommercial-tort exception, which applies to claims

> in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that

---

[4] John Roth et al., National Commission on Terrorist Attacks Upon the United States, *Monograph on Terrorist Financing:  Staff Report to the Commission* 13, 138 (2004) ("Financing Monograph"), http://govinfo.library.unt.edu/911/staff_statements/911_TerrFin_Monograph.pdf; *see also id.* at 138 ("[d]espite persistent public speculation, there is no evidence that the hijackers who initially settled in San Diego . . . received funding from Saudi citizens Omar al Bayoumi and Osama Bassnan").

[5] 9/11 Review Commission, *The FBI:  Protecting the Homeland in the 21st Century* 107 (Mar. 2015) ("9/11 Review Report"), http://www.fbi.gov/stats-services/publications/protecting-the-homeland-in-the-21st-century.

foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment[,]

28 U.S.C. § 1605(a)(5), but not to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused," *id.* § 1605(a)(5)(A).

Judge Casey found that Plaintiffs had "not met their burden of demonstrating" that this exception applied to Saudi Arabia here. SPA27. Disregarding the "conclusory" portion of Plaintiffs' allegations, *id.* (citing *Robinson v. Government of Malaysia*, 269 F.3d 133, 146 (2d Cir. 2001)), he concluded that at most they had alleged "treatment of and decisions to support Islamic charities" made at the "planning, as opposed to operational, level of government" and "'grounded in social, economic, and political policy,'" *id.* (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)). He further determined that Plaintiffs had failed to raise any "factual disputes" that required "jurisdictional discovery." *Id.*

Later in 2005, Judge Casey likewise dismissed Plaintiffs' case against the SHC. After considering declarations and supporting materials submitted by the SHC to establish its sovereign status, A1560-632, he concluded that the SHC had made a "prima facie showing that it is a foreign sovereign" based on that "undisputed evidence" and that Plaintiffs had not "identified a factual dispute that would require jurisdictional discovery." SPA74. He then ruled, as he had with

9

respect to Saudi Arabia, that the SHC's "decisions regarding the distribution of humanitarian relief funds" were discretionary and could not form the basis for liability under the noncommercial-tort exception. SPA76.[6]

4.  This Court affirmed. *See In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71 (2d Cir. 2008) ("*Terrorist Attacks III*"), *overruled by Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011) (per curiam). As a threshold matter, it affirmed Judge Casey's ruling that the SHC had established its sovereign status. *See id.* at 85-86. It then held as to both Saudi Arabia and the SHC that Plaintiffs' allegations fell outside the scope of the FSIA's noncommercial-tort exception. Unlike Judge Casey, the 2008 panel did not rely on the discretionary nature of the alleged conduct in reaching its conclusion. Instead, it held that claims based on terrorist acts had to be brought under the provision of the FSIA dealing specifically with such acts, 28 U.S.C. § 1605A, and not under the broader and more general noncommercial-tort exception. *See* 538 F.3d at 86-90. As Plaintiffs did not and could not invoke § 1605A,[7] that disposed of their claims.

---

[6] Judge Casey's dismissal order disposed of the claims of only some Plaintiffs against Saudi Arabia, but the parties later stipulated that there were no material differences as to the claims of the remaining Plaintiffs, and Judge Casey dismissed those claims as well. SPA63-66. By a similar stipulation, Judge Casey's later order disposed of all Plaintiffs' claims against the SHC. A1706-11.

[7] Section 1605A applies only to foreign states designated by the U.S. State Department as state sponsors of terrorism. Saudi Arabia has never been so designated. To the contrary, it has in the past cooperated and continues today

Plaintiffs sought certiorari.  The Supreme Court called for the views of the United States, which recommended that certiorari be denied.[8]  The government disagreed with this Court's holding that the noncommercial-tort exception did not apply to acts of terrorism.  *See* U.S. Amicus Br. 12-13.  Nevertheless, it agreed that the exception did not apply in this case, because Plaintiffs had failed to "allege that officials or employees of the Kingdom of Saudi Arabia personally committed tortious acts in the United States or directed others to do so"; thus, they could not satisfy the requirement that "jurisdiction under the tort exception must be based entirely on acts of the foreign state within the United States."  *Id.* at 13-15.

In her brief, the Solicitor General urged the Supreme Court to reject Plaintiffs' conclusory allegations that Al Bayoumi had been a "'Saudi intelligence official . . . [who] provided direct assistance to . . . two of the September 11th hijackers'" and that various Islamic charities were "sufficiently controlled by Saudi Arabia that their" alleged actions in the United States "should be ascribed to Saudi Arabia itself."  *Id.* at 16-17 n.4 (third alteration in original).  The Court

---

"to cooperate extremely closely" with the United States "in countering terrorist activity . . . around the world."  The White House, Office of the Press Secretary, *Remarks by President Obama and His Majesty King Salman bin Abd al Aziz of Saudi Arabia Before Bilateral Meeting* (Sept. 4, 2015) (remarks of President Obama), https://www.whitehouse.gov/the-press-office/2015/09/04/remarks-president-obama-and-his-majesty-king-salman-bin-abd-alaziz-saudi.

[8] *See* Br. for the United States as Amicus Curiae, *Federal Ins. Co. v. Kingdom of Saudi Arabia*, No. 08-640 (U.S. filed May 29, 2009), 2009 WL 1539068 ("U.S. Amicus Br.").

denied certiorari.  *See Federal Ins. Co. v. Kingdom of Saudi Arabia*, 557 U.S. 935 (2009).

**5.**      In 2011, in a case out of the same MDL involving Afghanistan, this Court revisited and overruled its holding that claims based on terrorist acts were outside the scope of the noncommercial-tort exception.  *See Doe*, 663 F.3d at 70-71 & n.10.  Plaintiffs then moved to reopen the final judgments in favor of Saudi Arabia and the SHC.  Judge Daniels denied the motion, but this Court reversed, holding that its different rulings in 2008 and 2011 had led to such "disparate treatment of two sets of litigants suing for the same underlying tort" as to render "this case . . . extraordinary" and require the district court to reopen the final judgment.  A1944.

In directing Judge Daniels to reopen the case, the Court did not decide – and made clear that it was leaving open – (a) whether Judge Casey's original ruling applying the discretionary-function exception was correct; (b) whether the Solicitor General had correctly concluded that Plaintiffs' claims failed for want of any tortious act by an official or employee of Saudi Arabia or the SHC in the United States; and (c) whether, as Saudi Arabia and the SHC had argued in the alternative, Plaintiffs had failed to plead or prove causation.  *See* A1947 ("[a]ll these issues may be considered by the District Court on remand").

**6.**     On remand, Saudi Arabia and the SHC again moved to dismiss.  They contended that Plaintiffs' claims were barred by each of the three grounds left open by this Court's ruling:  the entire-tort rule, the discretionary-function exception, and the FSIA's jurisdictional causation requirement.  Defendants contended that Plaintiffs' claims could not withstand either legal or factual challenges under the FSIA – that is, Plaintiffs' claims failed both as a matter of pleading, because their claims were conclusory under the standard set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and as a matter of proof, because they could not come forward with evidence to support their claims.

Plaintiffs cross-moved for leave to file a "Consolidated Amended Pleading," A1949-2104, containing 587 paragraphs of purportedly new allegations.[9]  They also submitted an "Averment of Facts and Evidence," A2114-269, in support of their opposition to Defendants' motion to dismiss.  Except for its title and its opening paragraphs, the Averment was word-for-word identical to the Pleading.  It was signed by Plaintiffs' counsel and did not purport to be based on personal knowledge.  *See* A2114, A2268.

---

[9] The Pleading was actually mostly recycled.  Most of it (416 out of 587 paragraphs, which is 70.9%) consists of allegations that Plaintiffs could have made based on publicly available sources in 2004 or earlier.  A2654-73 (chart submitted by Defendants to the district court).

The Averment begins with an extended, vitriolic attack on Saudi Arabia's foreign and domestic policies of supporting the Islamic religion, accusing Saudi Arabia and its officials, among other things, of "promot[ing] and implement[ing]" a strategy of "jihad and worldwide indoctrination into Wahhabi Islam," A2127 (¶ 46), of "advocat[ing] intensely anti-American views," A2145 (¶ 120), and of giving conservative religious leaders "access to a vast governmental platform to pursue their Islamist agenda," *id.* (¶ 124). Plaintiffs then attempted in two main ways to allege that officials or employees of Saudi Arabia committed tortious, nondiscretionary acts in the United States that caused the 9/11 attacks.

*First*, Plaintiffs attempted to allege support for the attacks by individuals who they claimed were officials or employees of the Saudi government. Mainly, they asserted that – contrary to the findings of the 9/11 Commission and the FBI, *see supra* pp. 6-8 – two hijackers had received funds and other assistance from Al Bayoumi, who they claimed was a Saudi "intelligence agent." A2150-54, A2156-62, A2165 (¶¶ 149-161, 172-195, 208). They also asserted that Al Bayoumi had been acting at the direction of Al Thumairy, A2154-56 (¶¶ 162-171); that Basnan was another purported Saudi "agent" who gave money to Al Bayoumi, who in turn purportedly gave it to the hijackers, A2162-65 (¶¶ 196-207); and that the hijackers had received some unspecified form of assistance from Saleh Al Hussayen, who allegedly stayed in the same hotel with three hijackers shortly

before the attacks and who was later appointed to a post in the Saudi government. A2170-72 (¶¶ 231-241).[10]

*Second*, Plaintiffs attempted to allege misconduct by certain nongovernmental Islamic charities with branch offices in the United States: the Muslim World League ("MWL"); the International Islamic Relief Organization ("IIRO"); the World Assembly of Muslim Youth ("WAMY"); and the Al Haramain Islamic Foundation ("Al Haramain"). A2182-250 (¶¶ 286-518). Plaintiffs contended that the charities were "alter egos" of Saudi Arabia because the Saudi Arabian government set policy for the charities, provided them with funding, or appointed their management or directors.[11] Almost all of Plaintiffs' allegations concerning the nongovernmental charities concerned alleged acts by officials or employees of nongovernmental charities that occurred outside the United States. Plaintiffs also included a few allegations that those charities' U.S. offices had provided unspecified amounts of funding to terrorist organizations at an unspecified time. A2213 (¶ 399), A2219 (¶ 424), A2242 (¶ 492).

---

[10] Plaintiffs also alleged that Mohammed Jaber Hassan Fakihi, a former Saudi diplomat, met in Germany with an individual who was later among the 9/11 hijackers, and that Fakihi had purportedly sent funds to unspecified mosques and other recipients at the request of Al Qaeda. A2174-77 (¶¶ 252-263). They did not allege that Fakihi did anything in the United States or that any funds he purportedly diverted went to support the 9/11 plot.

[11] *See* A2198-99 (¶¶ 334-341) (MWL); A2206-07 (¶¶ 371-374) (IIRO); A2224-25 (¶¶ 440-443) (WAMY); A2235-36 (¶¶ 477-479) (Al Haramain).

15

The Averment did not allege any act within the United States by any official or employee of the SHC.  A2250-56 (¶¶ 519-542).  Similarly, although Plaintiffs asserted that two other governmental charities – the Saudi Red Crescent ("Red Crescent") and the Saudi Joint Relief Committee ("SJRC") – were alter egos of Saudi Arabia and had provided funding or aid to terrorists, A2257-60 (¶¶ 543-558) (Red Crescent); A2260-64 (¶¶ 559-574) (SJRC), they did not allege any act in the United States by any official or employee of either organization.

With their opposition to Saudi Arabia's motion to dismiss, Plaintiffs submitted a large volume of documents that they held out as evidence supporting their claims.  The most significant were (a) affirmations from three retired politicians (former Senators Bob Graham and Robert Kerrey, and former Secretary of the Navy John Lehman) who offered opinions based on their government service (which, in Kerrey's and Lehman's cases, included service on the 9/11 Commission) that more investigation was needed into allegations concerning Al Bayoumi and Al Thumairy, A2270-88; (b) partial transcripts of an interview of convicted terrorist conspirator Zacarias Moussaoui stating primarily that in Afghanistan, in or around 1998, he had made a computerized list of alleged "donors" to Osama bin Laden that included the SHC and certain members of Saudi Arabia's royal family (but not Saudi Arabia itself), A2289-415; and (c) an affirmation from Evan Francois Kohlmann, a self-styled "International Terrorism

Consultant" who opined on the relationship between the governmental and nongovernmental charities and Saudi Arabia, A2417-61.

Plaintiffs also submitted more than 4,000 pages of documentary material, all of which they have included in the Joint Appendix, A2675-7324, that they asserted supported the statements in the Averment. Although Plaintiffs refer to the 4,000 pages as "evidence," they did not before the district court and do not now contend that those pages would be admissible at trial. In response to Plaintiffs' massive pile of papers, Saudi Arabia and the SHC submitted a document-by-document discussion explaining why each of the 273 documents that make up the 4,000 pages was inadmissible, immaterial, or both. A7325-65. Among other things, the pages include many hearsay documents such as newspaper articles, web pages, blog posts, and purported government memoranda (apparently obtained through FOIA requests) with heavy redactions.

7. The district court granted the motion to dismiss and denied (as futile) the motion for leave to amend. SPA99-120. The court found that Plaintiffs' allegations and evidence did not satisfy the requirement that "'the "entire tort" must be committed in the United States'" in order "[f]or the noncommercial tort exception to apply." SPA106 (quoting *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 109, 115 (2d Cir. 2013) ("*Terrorist Attacks IV*")). As to the SHC, the court found at the outset that Plaintiffs had clearly failed to allege any action in

17

the United States, observing that Plaintiffs had "made no effort to defend their claims as to the SHC" at oral argument.  SPA112 & n.11.

As to Saudi Arabia, the district court conducted a detailed analysis that reached the same result.  It concluded that Plaintiffs had not "met th[eir] burden" to show that any of the four Saudi individuals (Al Bayoumi, Al Thumairy, Basnan, and Al Hussayen) were "officials or employees of Saudi Arabia who, while acting within the scope of their office or employment, engaged in non-discretionary tortious conduct in the United States."  SPA112.  Under the entire-tort rule, that was fatal to their claims.

The district court examined and found wanting Plaintiffs' allegations and evidence as to each individual.  It assumed that Plaintiffs could show that Al Bayoumi had been an employee of Saudi Arabia's Presidency of Civil Aviation at the relevant time, and further assumed that they could show he had assisted the hijackers.  SPA114-15.  But even on those very generous assumptions (which the court did not find to be supported by evidence) the court still found that Plaintiffs had failed "to draw any connection between his role at Civil Aviation and his alleged material support to the hijackers" and that it would be "improper[] speculati[on]" to conclude that he had been "acting within the scope of his employment" when he allegedly committed tortious acts.  SPA115 (emphasis omitted).  It added that the former politicians' declarations that urged the court

18

to permit discovery into Al Bayoumi's purported status as an intelligence agent of Saudi Arabia were mere "speculative opinions" that could not serve as a "basis for application of the noncommercial tort exception."  SPA116 & n.13.[12]

For the other Saudi citizens whom Plaintiffs charged with helping the hijackers in the United States, the district court found Plaintiffs' allegations and evidence even more deficient.  As to Al Thumairy, who had allegedly met with Al Bayoumi before Al Bayoumi allegedly met with two of the hijackers, it again saw "no basis" in Plaintiffs' allegations "to find that [A]l Thumairy was acting within the scope of his employment."  SPA116.  As to Basnan, it observed that Plaintiffs' allegations that he was an "employee of the Saudi government [we]re entirely conclusory" and also provided no basis "even loosely [to] infer that Basnan provided support" intended for the hijackers.  SPA113-14.  Finally, as to Al Hussayen, the court concluded that Plaintiffs "allege[d] no facts and provide no evidence to support" their assertion that he "was a Saudi official acting in any official capacity at the relevant time," and further that "there [was] no allegation – let alone evidence – that he assisted the hijackers within the scope of his employment or otherwise."  SPA112-13.

---

[12] The court likewise rejected without extended discussion Plaintiffs' interview of Zacarias Moussaoui.  SPA116 n.13.

The district court also considered and rejected Plaintiffs' contentions that Saudi Arabia could be held liable as a purported alter ego of various charities that allegedly supported terrorist activities. Relying on the foundational case *First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"), and this Court's recent application of *Bancec* in *EM Ltd. v. Banco Central de la Republica Argentina*, 800 F.3d 78 (2d Cir. 2015), *cert. dismissed*, 136 S. Ct. 1731 (2016), the court found that Plaintiffs had failed to present even allegations – necessary for an "alter-ego theory" – sufficient to "show that Saudi Arabia controlled the day-to-day operations of these charities." SPA110. It also observed, considered, and rejected their expert Kohlmann's testimony as "[in]sufficient for this Court to even reasonably infer that Saudi Arabia controls each of the charities at issue" because it contained "conclusory, largely boilerplate, allegations." SPA111 n.9. The court also observed that Plaintiffs' allegations about the charities' "overseas activity" were "irrelevant under the entire tort rule." *Id.*

Taking the allegations as a whole, the district court found that Plaintiffs had "neither pleaded nor come forward with facts or evidence sufficient to show that their claims are for the tortious conduct of Saudi Arabia or the SHC that took place in the United States." SPA117. It further considered whether they were entitled to jurisdictional discovery, bearing in mind this Court's admonition that, "'in the

20

FSIA context, discovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination.'" *Id.* (quoting *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 486 (2d Cir. 2007)). Noting that Plaintiffs had failed, both in their papers and at oral argument, to identify any specific facts as to which discovery was likely to be fruitful, SPA118 & n.16, the district court concluded that they had "not established a prima facie case that this Court has jurisdiction over Defendants, and jurisdictional discovery is not warranted." SPA118.

The district court entered a partial final judgment under Rule 54(b). SPA121. This appeal followed.

## SUMMARY OF ARGUMENT

**I.**     Plaintiffs cannot bring their case within the noncommercial-tort exception to foreign sovereign immunity.  The district court correctly concluded that they had neither pleaded facts nor presented evidence sufficient to do so.

**A.**     The FSIA protects foreign sovereigns not only from liability, but also from the burdens of litigation in United States courts – including the burden of discovery that a plaintiff claims is necessary to prove speculative and unsubstantiated allegations.  The importance of that policy is well-illustrated here, where Plaintiffs (after more than a decade of litigation) seek to pry into the diplomatic and intelligence files of a longstanding ally of the United States based on sensational but unfounded claims – already investigated and rejected by the 9/11 Commission and the FBI – that employees of that ally, acting within the scope of their employment, conspired to commit a horrific attack on the United States. Consistent with the FSIA's purpose, a plaintiff seeking to overcome foreign sovereign immunity must plead with specificity (under the *Twombly* standard) facts that bring its case within an exception to that immunity, and *also* come forward with evidence sufficient to support a finding that those facts are true. The district court properly required Plaintiffs to meet their dual pleading and evidentiary burdens and held that they had met neither.

**B.**     Plaintiffs had the burden to plead and to come forward with evidence showing that their case satisfied the entire-tort rule.  Under that rule, which this Court held to be the law of this Circuit in a related case involving two Saudi governmental charities, Plaintiffs were required to establish that their injuries were caused by a tortious act or omission within the United States, committed by an officer or employee of Saudi Arabia or the SHC, acting within the scope of that employment.  *See Terrorist Attacks IV*, 714 F.3d at 111.  They cannot premise liability on acts or omissions that occurred on foreign soil or that were committed by individuals who held no position in the government of Saudi Arabia or the SHC.  Contrary to their suggestions, both of those points are clearly established by binding precedent.

**C.**     Applying the entire-tort rule, the district court properly found insufficient Plaintiffs' allegations against Saudi Arabia.  It correctly concluded that they may proceed with neither their contention that Saudi Arabia is liable for the actions of four Saudi citizens nor their claim that various Islamic charities are alter egos of Saudi Arabia.

**1.**     As the district court observed, Plaintiffs offer only conclusions and speculation that Al Bayoumi was acting within the scope of any employment relationship with the Saudi government when he purportedly helped the hijackers.  Their assertion that he knew what the hijackers were plotting at the time is likewise

23

purely speculative. There is also no evidence that Al Bayoumi did help the hijackers in any meaningful way. Plaintiffs' contentions that he did are based on mere conjecture. Their case is even weaker as to the other three individuals they groundlessly accuse of complicity in the 9/11 plot. They have neither any plausible allegation nor any evidence whatsoever that Al Thumairy, Basnan, or Al Hussayen did anything to help the hijackers, much less that those individuals did so knowingly or on behalf of the Saudi government.

**2.** Plaintiffs also failed either to plead or to prove a basis to attribute the actions of any of the Islamic charities (governmental or nongovernmental) to Saudi Arabia. There is a strong presumption that a foreign sovereign is separate from its own instrumentalities, such as the governmental charities; and the presumption is at least as strong that a sovereign is separate from nongovernmental organizations. To overcome that presumption, Plaintiffs had to allege and to come forward with evidence to show that Saudi Arabia exercised day-to-day control over the charities. They failed to do so. Further, they cannot point (except in a purely conclusory way) to any tortious act within the United States by any of the charities, which is an independent reason to reject their claims.

**D.** Plaintiffs' allegations against the SHC are even more clearly insufficient under the entire-tort rule. Despite the great length of their Averment, nothing in it suggests (even as a conclusion, much less as a plausible allegation)

24

that any of its officers or employees did anything relevant in the United States. Nor is any of their purported evidence against the SHC remotely material.

**II.** The district court's dismissal of Plaintiffs' complaint is also correct for the alternative reasons that Plaintiffs' claims are barred by the FSIA's discretionary-function exception and fail to satisfy its causation requirement. Although this Court need not (as Judge Daniels did not) reach those issues, it should do so if it finds them helpful to sustain the district court's judgment after all these years of litigation in derogation of the purpose of the FSIA.

**A.** The FSIA's discretionary-function exception prevents the U.S. courts from being used as a forum to scrutinize the policy decisions of foreign governments, including their decisions about social and economic policy. That concern is amply present here. As Judge Casey correctly concluded when he dismissed Plaintiffs' complaint 11 years ago, the real gravamen of their claims is not direct assistance from Saudi Arabia to terrorist actors (which they have not plausibly alleged and of which there is no evidence). The claim that Plaintiffs really press – as their pleadings and their brief before this Court make clear – is that Saudi Arabia's historical policy of supporting international Islamic charities and the spread of Islam led indirectly to the funding of terrorist organizations. That is an impermissible attack on a sovereign's discretionary choices.

**B.** The FSIA's causation requirement, applied by Judge Robertson to dismiss related claims against certain members of the Saudi royal family before the MDL consolidation, requires that a wrongful act or omission of the foreign state have caused the injury for which a plaintiff seeks relief. The causation required by the FSIA includes (at a minimum) a showing that, but for the wrongful act, the plaintiff's injury would not have occurred. That requirement seals the insufficiency of Plaintiffs' case. Even if they could show (which they cannot) some knowing act of assistance to the 9/11 plot by an official or employee whose actions are attributable to Saudi Arabia or the SHC, they have no evidence whatsoever that any such action caused the 9/11 attacks.

**III.** Finally, the district court did not abuse its discretion by denying Plaintiffs' vague, open-ended request for jurisdictional discovery into "any disputed fact the Court deems material." To protect a sovereign's immunity from the burdens of litigation, jurisdictional discovery under the FSIA is in the discretion of the district court and must be limited to specific facts. The district court properly took into account Plaintiffs' failure to come forward with a *prima facie* case; their failure to request any properly limited discovery; and the fact that they have already seen the results of the 9/11 Commission's investigation – including interview memoranda for the key witnesses. On such a record, the court properly concluded that no further discovery was warranted.

26

**STANDARD OF REVIEW**

This Court reviews *de novo* the district court's rulings that Plaintiffs failed to plead an exception to foreign sovereign immunity, *see Virtual Countries*, 300 F.3d at 235, and that they failed to come forward with evidence to support any such exception, *see Robinson*, 269 F.3d at 135-36, 138. It reviews for abuse of discretion the district court's denial of jurisdictional discovery. *See Swarna v. Al-Awadi*, 622 F.3d 123, 143-44 (2d Cir. 2010).

**ARGUMENT**

I. **Plaintiffs Failed To Bring Their Claims Within the Noncommercial-Tort Exception to Foreign Sovereign Immunity**

A. **The District Court Correctly Held Plaintiffs to Their Dual Burden To Present Well-Pleaded Allegations and To Come Forward with Evidence Supporting Those Allegations**

The FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604. Its clear language makes the FSIA the "sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). A determination whether the FSIA's requirements are met is mandatory "at the 'threshold of every action' against a foreign state." *Robinson*, 269 F.3d at 139 (quoting *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493-94 (1983)). That threshold serves the FSIA's purpose of "giv[ing] foreign states and

27

their instrumentalities some protection from the inconvenience of suit as a gesture of comity between the United States and other sovereigns." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 479 (2003); *see NML Capital, Ltd. v. Banco Cent. de la Republica Argentina*, 652 F.3d 172, 194 (2d Cir. 2011) ("'FSIA immunity is immunity not only from liability, but also from the costs, in time and expense, and other disruptions attendant to litigation.'"); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 756 (2d Cir. 1998) ("'[s]overeign immunity is an immunity from trial and the attendant burdens of litigation'" that is effectively lost once the "sovereign . . . is required to litigate a case on the merits").

A foreign sovereign moving to dismiss under the FSIA "may challenge either the legal or factual sufficiency or the plaintiff's assertion of jurisdiction, or both." *Robinson*, 269 F.3d at 140. A challenge to legal sufficiency is similar to a contention that the complaint fails to state a claim when measured under the standard of *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). That is, a court assumes "well-pleaded factual allegations" to be true, but disregards allegations "that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. Pleadings in FSIA cases are scrutinized with special care: this Court has cautioned against "invit[ing] plaintiffs to circumvent the jurisdictional hurdle of the FSIA by inserting vague and conclusory allegations of tortious

28

conduct in their complaints" in the hopes of ultimately proving some "conceivable non-discretionary tortious act." *Robinson*, 269 F.3d at 146.

A challenge to factual sufficiency goes beyond the pleadings. The foreign sovereign must initially show that it *is* a foreign sovereign (or the instrumentality of one), *see Virtual Countries*, 300 F.3d at 241, which makes it "presumptively immune from the jurisdiction of United States courts[,] unless a specified exception applies," *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). Once that presumption is established, the plaintiff trying to pierce immunity has the "'burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted.'" *Terrorist Attacks IV*, 714 F.3d at 114 (quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993)).[13] If, and only if, the plaintiff meets that burden by identifying evidence that would permit a finding that a particular FSIA exemption applies, then the district court

---

[13] *Terrorist Attacks IV* and *Cargill* do not stand alone: this Court has many times recognized that the plaintiff in an FSIA case bears a "'burden of going forward with evidence'" when proceeding against a defendant whose sovereign status either is undisputed or has been established by a *prima facie* showing. *Rogers v. Petroleo Brasileiro, S.A.*, 673 F.3d 131, 136 (2d Cir. 2012) (quoting *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007), in turn quoting *Cabiri v. Government of the Republic of Ghana*, 165 F.3d 193, 196 (2d Cir. 1999)); *see also Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 83 (2d Cir. 2013); *Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek*, 600 F.3d 171, 176 (2d Cir. 2010) (citing *Robinson*, 269 F.3d at 141); *Virtual Countries*, 300 F.3d at 241; *Drexel Burnham Lambert Grp. Inc. v. Committee of Receivers for Galadari*, 12 F.3d 317, 325 (2d Cir. 1993).

proceeds to "'resol[ve] . . . disputed issues of fact[],'" with the "ultimate burden of persuasion [on] . . . the party seeking sovereign immunity." *Anglo-Iberia*, 600 F.3d at 175 (quoting *Terrorist Attacks III*, 538 F.3d at 80).

Here, Saudi Arabia and the SHC raised both types of challenges to Plaintiffs' assertions of jurisdiction under the FSIA: a legal challenge that focused on the insufficiency of Plaintiffs' pleading, and a factual challenge that called on Plaintiffs to come forward with evidence to support their allegations. There was no dispute about Defendants' sovereign status and presumptive immunity: Plaintiffs agreed before the district court, as they do now (at 1), that Saudi Arabia is a "sovereign government" and the SHC is a "component" of that government.[14] Accordingly, Plaintiffs bore the "burden of going forward with evidence," *Terrorist Attacks IV*, 714 F.3d at 114, to fit their claims within the noncommercial-tort exception.

Plaintiffs make three arguments that the district court erred in its procedural approach. All lack merit. *First*, Plaintiffs incorrectly assert (at 40-44) that the district court was required to assume all of their well-pleaded allegations to be true, as it would in an ordinary Rule 12(b)(6) motion against a defendant not

---

[14] *See* A2116 (¶ 4) (admission of Saudi Arabia's sovereign status); *id.* (¶ 5) (same for the SHC, coupled with an inaccurate assertion of alter-ego status). The SHC also submitted evidence to prove its status as an instrumentality of Saudi Arabia. A1560-632; A2675-81.

presumptively immune from suit.  Even if Plaintiffs' key allegations had been

well-pleaded (which they were not), it is settled that an FSIA claim should be

dismissed where a plaintiff fails to meet its burden of going forward with evidence

in response to a factual challenge.  *See supra* pp. 29-30 & n.13.  The cases on

which Plaintiffs rely are not to the contrary.  Instead, they cite cases assessed

purely on the pleadings in response to a legal challenge under the FSIA (which

everyone agrees is one way to proceed under that statute)[15] or cases that did not

involve foreign sovereign immunity at all.[16]

   *Second*, Plaintiffs argued below and now incorrectly contend in a footnote

(at 41 n.13) that their evidence did not have to be "admissible."  The district court

did not need to resolve this dispute because key parts of Plaintiffs' voluminous

submissions were "not evidence at all" – "not even inadmissible evidence."  A7410

---

[15] *See Nelson*, 507 U.S. at 351; *Terrorist Attacks IV*, 714 F.3d at 113; *Terrorist Attacks III*, 538 F.3d at 75-76; *Mukaddam v. Permanent Mission of Saudi Arabia to the United Nations*, 136 F. Supp. 2d 257, 259-60 (S.D.N.Y. 2001). *Mukaddam*, the only case Plaintiffs cite that allowed a case to proceed under the FSIA without an evidentiary showing, did so because the defendant had not challenged the factual sufficiency of the complaint, *see* 136 F. Supp. 2d at 260 ("Defendant sought dismissal on the complaint alone."), and is in any event not binding on this Court.

[16] *See Turkmen v. Hasty*, 789 F.3d 218, 225 (2d Cir. 2015) (constitutional claims against federal law-enforcement officers), *petitions for cert. pending*, Nos. 15-1358 et al. (U.S. filed May 9, 2016); *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 205-06 (2d Cir. 2003) (per curiam) (personal jurisdiction over antitrust defendants); *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 195-98 (2d Cir. 1990) (personal jurisdiction over employers in suit alleging workplace exposure to toxic fumes).

(court's statement during hearing, discussing the former politicians' affirmations).
Judge Daniels was correct that the precise evidentiary rule does not matter here.
No reasonable articulation of such a standard could be satisfied by materials such
as affirmations in which former government officials express conclusory opinions
(without personal knowledge of the underlying facts) that Plaintiffs' theories
warrant further investigation. *See infra* pp. 40-44.

In any event, the correct rule is that plaintiffs opposing a factual challenge
under the FSIA must proffer evidence that could be offered against the foreign
sovereign at an evidentiary hearing (if the district court were to hold one) and
would create a genuine dispute of fact to be resolved at such a hearing. That
is consistent with this Court's instruction that district courts should determine
whether "the plaintiff [has] come[] forward with sufficient evidence to carry its
burden of production" and – if so – "resolve disputed issues of fact." *Robinson*,
269 F.3d at 141; *see Virtual Countries*, 300 F.3d at 241; *Zappia Middle East
Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000) (affirming
district court's rejection of "conclusory allegations in [an] affidavit [as] not
sufficient to create a material issue of fact"). The inquiry is similar to a summary
judgment analysis under Rule 56.[17]

---

[17] *See RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 396 n.9 (S.D.N.Y.
2009) ("This Circuit has recognized that 'the body of decisions under [Rule] 56

*Third*, Plaintiffs wrongly suggest (at, *e.g.*, 41), without supporting argument, that their burden to go forward with evidence is reduced or eliminated because the district court was considering a "pre-discovery motion to dismiss." Unlike jurisdictional discovery against a non-immune defendant, discovery under the FSIA is not a matter of right. It involves a "'delicate balancing between permitting discovery to substantiate exceptions to statutory foreign sovereign immunity and protecting a sovereign's or sovereign agency's legitimate claim to immunity from discovery.'" *EM Ltd.*, 473 F.3d at 486.[18] Here, the district court reasonably concluded that the balance weighed against discovery. *See infra* Part III. That ruling did not relieve Plaintiffs of their evidentiary burden.

*Fourth*, Plaintiffs are also wrong (at 90-91) that Saudi Arabia was required to submit an "affidavit" contesting their version of the facts in order to challenge their version of the facts. It is settled that a foreign sovereign defendant's initial burden is only "to show it is a foreign sovereign." *E.g.*, *Mortimer Off Shore Servs., Ltd. v. Federal Republic of Germany*, 615 F.3d 97, 105 (2d Cir. 2010); *Anglo-Iberia*, 600 F.3d at 175; *Drexel Burnham*, 12 F.3d at 325. That is not contested

---

offers guidelines in considering evidence submitted outside the pleadings.'") (quoting *Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)), *aff'd*, 387 F. App'x 72 (2d Cir. 2010); *see id.* (rejecting for lack of personal knowledge declarations offered to oppose an FSIA motion to dismiss).

[18] *See also NML Capital*, 652 F.3d at 194 (same); *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998) (same).

here as to either Saudi Arabia or the SHC. *See supra* p. 30 & n.14. Once that initial burden is met, "the burden then shifts to the plaintiff to show that an FSIA-enumerated exception to sovereign immunity applies." *Mortimer Off Shore*, 615 F.3d at 105. The district court thus properly disposed of this case by observing that Plaintiffs had received an "opportunity to come forward with evidence to meet [their] burden of production," but "failed to provide sufficient evidence for [their] contentions." *Virtual Countries*, 300 F.3d at 241.

### B. The Entire-Tort Rule Required Plaintiffs To Establish a Tortious Act or Omission by an Official or Employee of Saudi Arabia or the SHC Within the United States

The district court correctly applied the entire-tort rule, set forth by this Circuit most recently in *Terrorist Attacks IV*. That appeal involved claims by the same Plaintiffs against the SJRC and the Red Crescent, two governmental charities and instrumentalities of the Saudi Arabian government. Plaintiffs' claims against the SJRC and the Red Crescent, like their claims here, rested on "alleg[ations]" that those charities "contribut[ed] financial and other resources to support Osama Bin Laden and al Qaeda." *Terrorist Attacks IV*, 714 F.3d at 116. Construing the statutory requirement of "'personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment,'" *id.* at 115 (quoting 28 U.S.C.

34

§ 1605(a)(5)), this Court held that the allegations were insufficient because "*all of the tortious conduct* allegedly committed by the SJRC and the [Red Crescent]" – that is, the alleged "funding and other aid to entities that purportedly supported al Qaeda" – "occurred abroad," not in the United States. *Id.* at 117.

The requirement that the act in the United States be "tortious" also requires in the present context that it be knowing and intentional. That is because Plaintiffs are seeking to hold Saudi Arabia and the SHC liable on a (baseless) theory that they knowingly and intentionally conspired with or assisted al Qaeda in preparing a terrorist attack on the United States. *See* A1913-24 (charging paragraphs of complaint). Those types of vicarious liability are the only types at issue here; knowledge and intent are required for each.[19] Accordingly, Plaintiffs were required to plead plausibly and to come forward with evidence that an official or employee of Saudi Arabia or the SHC, while in the United States and acting within the scope of employment, knowingly or intentionally helped the hijackers commit an act of terrorist violence. As set forth below, they have not come close.

---

[19] *See Bigio v. Coca-Cola Co.*, 675 F.3d 163, 172 (2d Cir. 2012) (aiding-and-abetting liability under New York law requires "knowledge of" an underlying tort and "substantial assistance to advance [that tort's] commission"); *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 119 (S.D.N.Y. 2009) (civil conspiracy under New York law requires "intentional participation in the furtherance of a plan or purpose").

Plaintiffs make two arguments that the entire-tort rule does not require them to establish a tortious act by an official or employee of Saudi Arabia or the SHC in the United States. Both are foreclosed by *Terrorist Attacks IV*. *First*, Plaintiffs contend (at 100-01) that Saudi Arabia and the SHC through their overseas actions are "alleged to have played an integral role in the attacks themselves" and assert that they did not rely on similar conclusory allegations as to the SJRC and Red Crescent when they lost that case before this Court. But they did – arguing that the purported extraterritorial funding and support of the SJRC and Red Crescent were "part of a continuous course of conduct that culminated in attacks which physically occurred in the United States."[20] This Court rejected that argument, holding that

> the "torts" allegedly committed by the SJRC and the [Red Crescent] only involve giving money and aid to purported charities that supported al Qaeda. The September 11, 2001 attacks thus are distinct and separate from the "torts" allegedly committed by the SJRC and the [Red Crescent].

714 F.3d at 117 n.10 (citation omitted). Plaintiffs offer nothing that supports a different result here.

Plaintiffs also err in claiming (at 101-02) that their position is supported by *Doe*, the case that overruled *Terrorist Attacks III*. In doing so, they rely on a portion of the *Doe* opinion stating that, "at the pleading stage," the plaintiffs' claim

---

[20] Reply Br. of Appellants to Br. of the SJRC and the Red Crescent Regarding the FSIA at 12, *Terrorist Attacks IV*, Nos. 11-3294-cv(L) et al., Dkt. No. 579 (2d Cir. filed June 25, 2012) ("*Terrorist Attacks IV* Reply").

36

of extraterritorial funding and support by the former government of Afghanistan "appear[ed] to fit within the noncommercial tort exception." 663 F.3d at 66-67. That observation does not address the entire-tort rule, which Afghanistan had not raised anywhere in its cursory briefs on appeal.[21] To the contrary, this Court made clear in *Doe* that it was not deciding "whether the allegations in the complaint are sufficient to state a claim or even to provide jurisdiction." *Id.* at 70-71. Plaintiffs also urged the same misreading of *Doe* on the *Terrorist Attacks IV* panel,[22] which rejected the argument without discussion.

*Second*, Plaintiffs argue (at 102-05) that they can satisfy the entire-tort rule by alleging that "state law tort principles attribute the [9/11] attackers' U.S.-based actions to defendants." This argument, too, was presented to and failed to persuade the *Terrorist Attacks IV* panel.[23] The district court thus did not err by concluding

---

[21] *See* Br. of Defendant-Appellant at 4-8, *Doe v. Bin Laden*, No. 09-4958 (2d Cir. filed June 4, 2010) (four pages of argument, no mention of entire-tort rule); Reply Br. of Defendant-Appellant at 2-6, *Doe v. Bin Laden*, No. 09-4958 (2d Cir. filed July 21, 2010) (same).

[22] *See Terrorist Attacks IV* Reply at 10-11 (arguing that "this Court's decision in *Doe* necessarily rejected defendants' 'entire tort' theory"); *id.* at 12-13.

[23] *See id.* at 12 (arguing that "defendants are . . . responsible for [the 9/11 attacks] as a matter of secondary liability because they allegedly 'aided and abetted [and] conspired with . . . al-Qaeda'"); Oral Arg. at 16:38:14-16:38:33, *Terrorist Attacks IV*, Nos. 11-3294-cv(L) et al. (2d Cir. Dec. 4, 2012) (argument of Plaintiffs' counsel) ("It's a claim arising under state common law, including embedd[ed] principles of aiding and abetting and conspiracy liability under state common law. And so as aiders and abettors of al Qaeda, [the SJRC and the Red Crescent] are chargeable for its acts in the United States and attacking the United States on September 11th.").

that the entire-tort rule bars an attempt to hold a foreign sovereign liable unless the plaintiff can establish a tortious act or omission by that sovereign's "official or employee," 28 U.S.C. § 1605(a)(5), in the United States.

### C. Plaintiffs Failed To Satisfy the Entire-Tort Rule as to Saudi Arabia

#### 1. Putative Officials and Employees

##### a. Omar Al Bayoumi

**i.** **Nature and Scope of Employment.** The district court correctly concluded that Plaintiffs had failed to offer either competent allegations or evidence that, when he allegedly assisted two of the 9/11 hijackers, Al Bayoumi was an employee of Saudi Arabia acting within his scope of employment. The 9/11 Commission also found that Al Bayoumi was "an unlikely candidate for clandestine involvement with Islamist extremists," 9/11 Report 218; and the United States, in its brief to the Supreme Court, dismissed Plaintiffs' contrary allegations as conclusory, U.S. Amicus Br. 16-17 n.4. Plaintiffs have still offered no plausible reason to doubt the 9/11 Commission's finding and have raised no genuine dispute about its correctness.

Plaintiffs' description of Al Bayoumi's employment status is heavy on colorful descriptions, but reduces to the following "well-pleaded factual allegations," *Iqbal*, 556 U.S. at 679: that Al Bayoumi was an employee of the Saudi Arabian Presidency of Civil Aviation ("PCA"), A2151 (¶ 153); that the PCA

seconded him to the Saudi contractor Dallah Avco to work with it in the United States, A2152 (¶ 156); that Dallah Avco paid his salary and was reimbursed for it by Saudi Arabia, *id.* (¶ 157); that Dallah Avco has asserted that Al Bayoumi remained an employee of Saudi Arabia at this time, *id.*; that Al Bayoumi pursued higher education within the United States, and while doing so identified himself as an employee of the PCA, A2152-53 (¶ 158); that Al Bayoumi did not show up for work at Dallah Avco, A2158 (¶ 184); that, in 1999, Dallah Avco sought to terminate Al Bayoumi's secondment and was instead told by the PCA to renew his contract, A2159 (¶ 185); and that Al Bayoumi was frequently in touch with Saudi embassies and consulates, A2161-62 (¶¶ 193, 195). They further allege that, on February 1, 2000, Al Bayoumi met for an hour with Al Thumairy at the Saudi Consulate, A2154 (¶ 162), and that later that day he met at lunch two of the 9/11 hijackers (Al Hazmi and Al Mihdhar), whom he later allegedly helped to find an apartment and in other ways, A2156-58 (¶¶ 172, 177-180).

It is not plausible to draw from those core well-pleaded facts the conclusion that, as Plaintiffs would have it (at 52), Al Bayoumi was a "covert operative reporting to the Ministry of Islamic Affairs[ ]" who was "tasked to support the hijackers by his superiors in the Ministry." Instead, the facts as Plaintiffs have alleged them are "not only compatible with, but indeed . . . more likely explained by," *Iqbal*, 556 U.S. at 680, a conclusion that Al Bayoumi was merely a well-

connected Saudi expatriate pursuing an education in the United States at government expense. Nothing else in Plaintiffs' Averment about Al Bayoumi's relationship with Saudi Arabia is "entitled to the assumption of truth." *Id.* at 679.

Plaintiffs cannot salvage their insufficient allegations by relying on the affirmations submitted by former Senators Graham and Kerrey, A2270-76, A2282-88, or former Secretary Lehman, A2277-81. As the district court correctly observed, those affirmations could be useful only if they set forth facts that might support the plausibility of Plaintiffs' contentions.[24] It does not matter that those individuals may agree with some of the conclusions that Plaintiffs draw or may believe that "[t]he American public deserves a more robust inquiry into these issues," A2275 (Graham). A conclusion in an affirmation gets no more weight under *Twombly* and *Iqbal* than one in a complaint; and Judge Daniels properly concluded that he, not Senator Graham, was the one who had to decide whether Plaintiffs had put forth enough to survive a motion to dismiss.[25]

---

[24] *See* A7409 ("I'm not sure that it's sufficient for me to simply rely on their opinions. I have to rely on the facts which would support such a thing.").

[25] Further, federal courts exist to decide cases and controversies. *See* U.S. Const. art. III. They do not exist to conduct public inquiries. Other parts of the government fulfill that function, and in the case of the 9/11 terrorist attacks they have done so extensively. The fact that a few politicians want still more extensive inquiry is a point that should be urged on the political Branches, not the Judiciary. And it would be even less appropriate to make a foreign sovereign and ally continue to defend itself for years and years in a U.S. court just because those

Nor can Plaintiffs prevail by claiming that unnamed "FBI officials" and "intelligence officials" agree with them. As it happens, Plaintiffs' own proffered materials make clear that the FBI ultimately "concluded that [Al] Bayoumi was not a Saudi intelligence officer." A2987 n.* (excerpt from a book published by Senator Graham).[26] Even if the FBI had found otherwise, its mere conclusion would not augment Plaintiffs' factual allegations. There is ample authority that "preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits . . . are, as a matter of law, immaterial." *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593 (S.D.N.Y. 2011) (discussing *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976), and its progeny). The alleged beliefs of unnamed law-enforcement officers that never led even to such preliminary steps are likewise immaterial.

The district court's judgment was even more clearly correct when one takes into account (as that court properly did) the lack of evidentiary support for Plaintiffs' assertions. The politicians' affirmations do not help Plaintiffs not only because they are themselves conclusory, *see Robinson*, 269 F.3d at 146, but also because they were admittedly made without personal knowledge, *see RSM*, 643 F.

---

politicians desire still more investigation of perhaps the most-investigated incident in the history of the United States.

[26] *See also* 9/11 Report 516 n.19 (describing an earlier FBI investigation of Al Bayoumi that was "clos[ed]" because it had been "prompted by allegations about him that appear to have been groundless").

Supp. 2d at 396 n.9.[27]  As for the purported views of "the FBI," even if such views

could be entitled to evidentiary weight, Plaintiffs fail to show that the FBI actually

reached the conclusions they say it did.  Consider Plaintiffs' key contention that

> U.S. officials have concluded that Thumairy and Bayoumi discussed
> the recent arrival of future 9/11 hijackers Nawaf al Hazmi and Khalid
> al Mihdhar in the United States, and Bayoumi was tasked with getting
> them welcomed and assimilated into the San Diego Muslim
> community.

A2154 (¶ 162).  That impressive-sounding statement turns out to be based on a

heavily redacted, unauthenticated memorandum that states the following:

> *It is unknown* at this time whether this meeting between
> [REDACTED] and the hijackers, in LA, was a planned event or a
> "chance meeting." . . . . There is *speculation* that [REDACTED] could
> be a Saudi intelligence officer based on numerous factors and
> circumstances.  Therefore, there remains the *possibility* that the
> meeting was planned or [REDACTED] was directed by someone at
> the Saudi Consulate to meet the two hijackers at the restaurant in LA.

A3072 (emphases added).[28]  Even assuming in Plaintiffs' favor that the document

is authentic and that the redacted name was Al Bayoumi's, the document shows

---

[27] Plaintiffs suggest in passing (at 66) that the former politicians' lack of knowledge does not matter because they could offer expert opinion under Federal Rule of Evidence 702.  Even if Plaintiffs could have qualified their affirmants as experts, which they make no effort to show, the district court could still properly have rejected their opinions as based on "speculation or conjecture" and as "conclusory."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (such opinions do not create a genuine dispute of fact).

[28] *See* A2635 (identifying the above memorandum as support for Averment ¶ 162).  In support of the same allegation, Plaintiffs cite an excerpt from a book published by Senator Graham that also admits that the content of any discussions

that the unnamed FBI agent who wrote it agreed that Plaintiffs' theory about Al Bayoumi was mere "speculation" and no more than a "possibility." Plaintiffs' characterization of it as a "conclu[sion]" that supports their theory is flatly misleading. The other purported "FBI Reports" that they cite to support their claim that Al Bayoumi had some covert relationship with the Saudi government similarly fail to support their claims.[29]

The Executive Branch does not speak to the courts through unnamed agents of a bureau located within the U.S. Department of Justice ("DOJ"). Instead, specific DOJ officials are authorized by law to present the position of the Executive Branch to the courts. When then-Solicitor-General Elena Kagan was asked to state the definitive views of the Executive Branch years ago, she addressed the view the United States took of the Al Bayoumi allegations. U.S. Amicus Br. 16-17 n.4. The Al Bayoumi allegations were insufficient then and are

---

Al Bayoumi may have had with Al Thumairy are "unknown," A2635, A2988, and an anonymous blog post in 2013 that is evidence of nothing, A2636, A3327-31.

[29] *See, e.g.*, A3078-108 (heavily redacted memorandum with list of phone calls by individuals whose identities have been redacted and speculation from anonymous witnesses). Plaintiffs also quote (at 60-61) a "top FBI official" who purportedly stated that Al Bayoumi's meeting with the hijackers was "more than coincidence." That conclusory statement comes from an anonymous quote in a magazine article, which is not evidence and which further states that after an "intense investigation" the FBI "[u]ltimately" did not "find enough evidence" of Al Bayoumi's involvement to charge him. A2983-84.

insufficient now.  Certainly no employee of the Executive Branch has the authority to undermine that conclusion.

Plaintiffs err in contending that *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659 (2d Cir. 2013) ("*Terrorist Attacks V*"), *cert. denied*, 134 S. Ct. 2870 (2014), supports their position.  In that case, this Court held that Plaintiffs' allegations that Dallah Avco provided "cover employment" for Al Bayoumi were sufficient to warrant jurisdictional discovery against Dallah Avco.  *Id.* at 679.  Contrary to Plaintiffs' characterization, *Terrorist Attacks V* neither considered nor addressed whether Plaintiffs had plausibly alleged Al Bayoumi to be an intelligence agent working for Saudi Arabia.  To the contrary, this Court was addressing allegations (which, to be clear, Plaintiffs have come forward with no evidence to support) that *Dallah Avco* – not Saudi Arabia – knew of and assisted with Al Bayoumi's purported support for terrorist activities.[30]  This Court's conclusion that Plaintiffs' allegations warranted jurisdictional discovery against a non-sovereign, non-immune defendant does not imply that their different allegations at issue here are sufficient against a sovereign, presumptively immune

---

[30] *See Terrorist Attacks V*, 714 F.3d at 679 (citing pages 6158-61 of the Joint Appendix in that case); A6158-61, *Terrorist Attacks V*, Nos. 11-3294-cv(L) et al. (2d Cir. filed Jan. 20, 2012) (no allegation that Al Bayoumi was a Saudi intelligence agent or acting on behalf of Saudi Arabia).

44

defendant. Further, in *Terrorist Attacks V*, Plaintiffs had no burden to go forward with evidence, as they must do here.

In sum, the district court correctly concluded that Plaintiffs had failed to offer either well-pleaded allegations or any competent evidence that Al Bayoumi was on Saudi government business when he allegedly met and helped Al Hazmi and Al Mihdhar. Plaintiffs do not even challenge on appeal that court's conclusion that Plaintiffs have shown no connection between Al Bayoumi's alleged employment relationship with the PCA[31] and his allegedly tortious actions. Instead, they base their argument (at 68-69) on the remarkable premise that "providing support to jihadists" was among Al Bayoumi's "core job functions" or was not "separable from [his] official duties" – neither of which they have come close to alleging plausibly and of which they have provided no evidence.[32] Like

---

[31] Plaintiffs have not properly alleged, and Saudi Arabia does not concede, that Al Bayoumi was even an employee of the PCA at the relevant time, in light of his admitted secondment to Dallah Avco. *See* A7375; *see also* A2152 (¶ 156). Nevertheless, as the district court concluded, SPA115, and as Plaintiffs do not now dispute, any employment relationship Al Bayoumi may have had with the PCA does not matter because it has no connection to his allegedly tortious acts.

[32] Plaintiffs argue (at 66-67) for the first time on appeal that the district court should have considered the California standard on scope-of-employment issues. The court did not err by declining to consider cases that Plaintiffs never cited and that were in any event irrelevant based on its accurate view of Plaintiffs' allegations and evidence. As for Plaintiffs' contention that this issue was not briefed below, that is not so: Saudi Arabia clearly raised the argument that Al Bayoumi did not take any action within his alleged scope of employment, *see* Dist. Ct. ECF 2928, at 11, but Plaintiffs chose not to respond to it. Instead, their reply

45

the allegations rejected in *Iqbal*, Plaintiffs' spy story fails not just because it is "extravagantly fanciful" (though it is exactly that) but because it and the purported evidence supporting it are nakedly "conclusory." 556 U.S. at 681.

**ii. Alleged Assistance.** Plaintiffs also failed to allege or come forward with evidence that Al Bayoumi actually provided any material assistance to Al Hazmi and Al Mihdhar. Again, the findings of the 9/11 Commission provide guidance by soundly rejecting "speculation" that Al Bayoumi was a conduit of funds to the hijackers. *See* 9/11 Report 219 ("Neither then [on February 4, 2000] nor later did Bayoumi give money to either Hazmi or Mihdhar . . . ."); Financing Monograph 138 ("[d]espite persistent public speculation, there is no evidence that . . . Mihdhar and Hazmi[] received funding from Saudi citizen[] Omar al Bayoumi"). Plaintiffs referred to both the 9/11 Report and the Financing Monograph in their pleadings. *E.g.*, A2118 (¶ 17); A2126 (¶ 41). Those materials squarely undermine the plausibility of Plaintiffs' assertions that Al Bayoumi gave money to the two men.[33]

---

brief argued that it was "irrelevant" whether Al Bayoumi was a "Saudi intelligence agent" because his alleged employment by the PCA was sufficient. Dist. Ct. ECF 2947, at 13 (emphasis omitted). The court reasonably responded by focusing on Plaintiffs' failure to address the scope-of-employment problem.

[33] Plaintiffs' own materials also show that the FBI memoranda on which Plaintiffs rely for this point (at 60 n.18) reflected early conclusions later found inaccurate. *See* A3164 (report by DOJ Inspector General: "[An] apartment manager told the FBI that Bayoumi paid Hazmi and Mihdhar's first month's

Plaintiffs also claim (at 60-62) that Al Bayoumi helped the two men in other ways, such as by helping them find an apartment and by introducing them to other members of the Muslim community in San Diego. For those acts to qualify as "aiding and abetting" the hijackers' later terrorist acts, Plaintiffs would need to show that the acts constituted "substantial assistance" in the underlying tort, which in turn requires a showing that they "proximately caused" the 9/11 attacks. *See Stanfield Offshore Leveraged Assets, Ltd. v. Metropolitan Life Ins. Co.*, 883 N.Y.S.2d 486, 476 (App. Div. 2009) (explaining that "[s]ubstantial assistance" under New York law requires a showing that "the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated"). Plaintiffs' conclusory assertions that Al Bayoumi helped the two hijackers "assimilate[ ]," A2156 (¶ 173), or "acclimate," A2168 (¶ 219), into the San Diego Muslim community do not satisfy this requirement.[34]

---

rent and security deposit because they had not yet established a local bank account and the apartment complex would not accept cash. A review of Bayoumi and Mihdhar's financial records after September 11, 2001, indicate[s] that Bayoumi was reimbursed for this expense on the same day it was paid."); *see also* Financing Monograph 138 ("A number of internal FBI documents state without reservation that Bayoumi paid rent on behalf of Mihdhar and Hazmi, a claim reflecting the initial view of some FBI agents. More thorough investigation, however, has determined that Bayoumi did not pay rent or provide any funding to the hijackers.").

[34] Plaintiffs' assertion (at 60) that Al Bayoumi "connect[ed]" the hijackers with Anwar al Aulaqi, an alleged member of al Qaeda who was later killed by the United States in a drone strike, is unsupported. It is based on a statement by an

That point is again reinforced by considering that, in response to Saudi Arabia's factual challenge, Plaintiffs had the burden:  they could not merely rest on their allegations but had to come forward with evidence.  *See supra* pp. 29-30 & n.13.  The FBI memoranda on which they rely, in addition to being contradicted by findings from more thorough investigation, *see supra* pp. 46-47 & n.33, are not evidence because of their preliminary character, *see supra* p. 41.  To the extent those memoranda refer to the statements of other witnesses, those statements are inadmissible against Saudi Arabia as hearsay (specifically, double or triple hearsay) without an opportunity for cross-examination.  *See* Fed. R. Evid. 804(b)(1)(B).[35]

_____

unnamed FBI agent that there were four telephone calls made from Al Bayoumi's cell phone to Aulaqi on the day that Al Bayoumi met Al Hazmi and Al Mihdhar. A2156 (¶ 173); A2635 (identifying support for ¶ 173); A3062 (redacted memorandum showing statement).  But the same source states that the FBI agent "was 98% sure that the hijackers were likely using Bayoumi's cell phone" at the time, A3062, which negates any inference that Al Bayoumi introduced the hijackers to Aulaqi.  There is also no allegation that Al Bayoumi knew that Aulaqi was associated with al Qaeda.  *See* A2156 (¶¶ 173-174); A2165 (¶ 209) (alleging that Aulaqi's relationship with al Qaeda was "covert[ ]" at the time).

[35] For example, Plaintiffs rely on a statement by Modhar Abdullah to the FBI that Al Bayoumi asked him to "acclimate [the hijackers]" to the United States. *See* A3370-76 (redacted memorandum purportedly setting forth statements by Abdullah to unnamed FBI agents).  The 9/11 Commission declined to credit Abdullah's statements in several respects.  *See* 9/11 Report 218-19 ("The stories attributed to Abdullah are not entirely consistent with each other. . . . We have been unable to corroborate [his] account. . . . [N]either we nor the FBI have been able to verify Abdullah's alleged jailhouse statements . . . .");  *see also id.* at 516 n.20 (noting that Al Bayoumi denied Abdullah's statement).  The 9/11 Review

    **iii.    Knowledge or Intent.**  Even if Plaintiffs had shown that Al Bayoumi

had provided substantial assistance to Al Hazmi and Al Mihdhar, they would still

have to show that he had done so with the knowledge that the two men were

planning a terrorist attack on the United States and the intent to assist them in

doing so.  *See supra* p. 35 & n.19 (standards for secondary liability under state

tort law).  Once more, the 9/11 Commission and the FBI have found otherwise.

*See* 9/11 Report 218 ("[W]e have seen no credible evidence that [Al Bayoumi]

believed in violent extremism or knowingly aided extremist groups."); 9/11

Review Report 102 (discussing FBI's July 2004 findings of no "'evidence [or]

intelligence'" to show that Al Bayoumi had "'advance knowledge of the terrorist

attacks'" or of the hijackers' "'status as Al Qaeda operatives'" and that his

"'assistance'" to them was not "'witting'"); *see also id.* at 103 (finding no new

evidence as of 2013 "to change the 9/11 Commission's original findings regarding

the presence of witting assistance" to the hijackers).  Even Plaintiffs' own witness

---

Commission further noted that the 9/11 Commission had not "identif[ied]
Abdullah as a witting supporter of the hijackers"; that Abdullah had been
interviewed repeatedly in 2007, 2008, and 2011; and that nothing "new in [those]
interviews . . . would definitively change the 9/11 Commission's conclusions"
about Abdullah.  9/11 Review Report 102-03.  Plaintiffs do not suggest that they
could produce Abdullah as a witness (he was deported to Yemen in 2004, *see* 9/11
Report 220), and it would have been improper for the district court to give weight
to an anonymous FBI agent's paraphrase of a statement Abdullah made in 2001
without any opportunity for Saudi Arabia to cross-examine him.

Senator Graham publicly stated in 2013 that there is "'no evidence that [Al] Bayoumi knew what was going on.'"[36]

Once more, Plaintiffs have no plausible allegations or competent evidence to the contrary. Instead, their contentions that Al Bayoumi knew Al Hazmi and Al Mihdhar were planning a terrorist attack rest on the same irrelevant material already discussed: a conclusory and vague statement by former Secretary Lehman that he "believe[s]" that Al Bayoumi knew the two men were "bad actors who intended to do harm to the United States," A2280-81; a heavily redacted memorandum that admits their allegations are speculative, *see supra* pp. 42-43 (discussing A3070-77); and an anonymous quote from a former FBI official in a magazine, *see supra* p. 43 n.29 (discussing A2983-84). When pressed in the district court, Plaintiffs argued that Al Bayoumi's knowledge could be inferred from the totality of the assistance he purportedly provided to the two men. *See* Dist. Ct. ECF 2947, at 16-17. But no such inference is reasonably available to them because their allegations about such assistance are conclusory, inflated, and unsupported by evidence. *See supra* pp. 46-48.

---

[36] Dan Christensen & Anthony Summers, BrowardBulldog.org, *Graham: FBI report raises questions about who helped 9/11 terrorists*, Miami Herald (FL), Apr. 18, 2013, 2013 WLNR 9467587. Plaintiffs included several other articles from the same source as purported "evidence" in support of their allegations, A3384-400, but omitted the article in which their own lead witness admitted that he thought their key allegations lacked evidentiary support.

### b.    Fahad Al Thumairy

Plaintiffs' allegations concerning Al Thumairy require less discussion.

There is no well-pleaded allegation about anything that Al Thumairy did to help

Al Hazmi or Al Mihdhar, and the 9/11 Commission found no evidence that he

had done so.  *See* 9/11 Report 217 ("[W]e have not found evidence that Thumairy

provided assistance to the two operatives."); *see also* 9/11 Review Report 102, 103

(acknowledging this finding and further finding that no new evidence had emerged

to change it).  Instead, Plaintiffs rely on their conclusory claim that Al Thumairy

"tasked" Al Bayoumi to help the two men, inadequately pleaded in itself and

ultimately based on mere speculation.  *See supra* pp. 42-43.  The district court

probed these issues extensively before concluding that Plaintiffs had no concrete

facts about Al Thumairy to offer.[37]

Plaintiffs' Averment also makes a number of attacks on Al Thumairy's

character:  that he gave fundamentalist sermons and associated with radicals,

A2154-55 (¶ 166); that he denied knowing Al Bayoumi when that was not

plausible, A2155-56 (¶¶ 168-170); that he in fact spoke with Al Bayoumi

frequently, A2156 (¶ 170); and that the United States revoked his visa for

---

[37] *See* A7402 ("THE COURT:  All right, but that conclusion that these are
the things that [Al Thumairy] directed Bayoumi to do, the factual basis on which
you base that is the fact that he was at the mosque, that he met with Bayoumi.  You
don't have any evidence as to what conversations he might have had with Bayoumi
or any contacts that he might have had with the hijackers.").

what Plaintiffs term "apparent terrorist ties," *id.* (¶ 171). None of that is tortious

conduct; and none of it supports an inference that Al Thumairy, acting within the

scope of his employment, committed a nondiscretionary tortious act in the United

States that caused the 9/11 attacks.

### c. Osama Basnan

Plaintiffs' assertions about both Basnan's purported relationship with the

government of Saudi Arabia and his purported assistance to the hijackers are

similarly conclusory and without evidentiary support. Further, like their assertions

about Al Bayoumi and Al Thumairy, their assertions about Basnan have been

investigated and rejected. *See* 9/11 Report 516 n.24 ("Contrary to highly publicized

allegations, we have found no evidence that Hazmi or Mihdhar received money

from another Saudi citizen, Osama Bassnan."); Financing Monograph 138 (same).

The district court correctly observed that Plaintiffs' allegations and evidence did

not permit it "even loosely [to] infer," SPA114, that Basnan knowingly aided the

hijackers or that he did so within the scope of an employment relationship with

Saudi Arabia.

For Basnan, unlike Al Bayoumi, Plaintiffs cannot offer even an insufficient

core of well-pleaded facts from which they could argue for an inference that

Basnan was an intelligence agent for Saudi Arabia. There is no allegation (much

less evidence) that Basnan held a Saudi civil service position or that he received

any salary directly or indirectly from the Saudi Arabian government.[38]  Instead,

Plaintiffs rely on one conclusory, unsworn statement from Senator Graham[39] and

speculative, heavily redacted statements by unnamed FBI agents,[40] without any

underlying facts.

Nor do Plaintiffs offer competent allegations or evidence that Basnan gave

money to Al Hazmi and Al Mihdhar.  They allege that Basnan's wife, who was

suffering from thyroid cancer and needed surgery, received monthly charity

payments from Princess Haifa al Faisal, the wife of the Saudi ambassador to the

---

[38] Allegations that Basnan and Al Bayoumi were friends who spoke often, A2164-65 (¶ 205), or that Basnan "made a number of in-person visits to the Saudi Consulate in Los Angeles," A2165 (¶ 206), do not support a plausible inference that Basnan was an intelligence agent of the Saudi Arabian government.

[39] Plaintiffs cite (at 56-57) a statement from Senator Graham's book that describes Basnan as a "Saudi spy who was suspected of being groomed to replace al-Bayoumi in San Diego." A2994.  The book does not state who suspected this or why.  Senator Graham's sworn affirmation does not mention Basnan, A2270-76, presumably indicating he was unwilling to repeat this statement under oath.

[40] Plaintiffs cite (at 56 n.16) a heavily redacted FBI memorandum, A3318-25, that describes a "possibility" that an individual whose name has been redacted could "be[] affiliated with the Saudi Arabian Government or the Saudi Arabian Intelligence Service" and that redacted information "could indicate" the redacted individual "succeeded Omar Al-Bayoumi and may be undertaking activities on behalf of the Government of Saudi Arabia." A3322.  Their selective quotation from the document misleadingly omits the words "possibility" and "could" to make it appear less speculative.  In the same footnote, they cite a document they call a "U.S. Intelligence Report," A3109-14, that appears to contain a discussion of Basnan that has been completely redacted, A3112-13.

United States.  A2163 (¶ 200).[41]  They further allege that Basnan's wife signed

some of those checks over to Al Bayoumi's wife.  A2163-64 (¶ 201).  But they do

not allege that the money actually went to Al Hazmi or Al Mihdhar.  Instead, they

again rely on unsworn speculation by their politician-affirmants that the money

might have been meant for that purpose.[42]  The district court did not err in rejecting

such speculation as insufficient.

### d.   Saleh Al Hussayen

Finally, Plaintiffs' assertions that Al Hussayen provided some unidentified

form of assistance to the hijackers are insufficient on their face.  The district court

correctly observed that Plaintiffs failed either to allege or to offer evidence that

Al Hussayen was a Saudi Arabian official at the relevant time; that he was acting

within the scope of any purported official responsibilities; or indeed that he took

any relevant action in the United States at all.  Their allegations are limited to

---

[41] Plaintiffs do not name Princess Haifa in their brief.  The 9/11 Commission investigated and rejected speculation that her charitable gifts were diverted to support the hijackers.  *See* 9/11 Report 498 n.122 ("We have found no evidence that Saudi Princess Haifa al Faisal provided any funds to the conspiracy, either directly or indirectly."); Financing Monograph 138 (same).

[42] *See* A2998 (statement in Senator Graham's book that the charity payments "looked suspiciously like [a] backdoor way of channeling money to al-Hazmi and al-Mihdhar"); A3281 (third-party author's statement in a popular history that former Secretary Lehman was "intrigued" by this issue).  Senator Graham's sworn affirmation does not mention the charity payments, A2270-76, and Lehman's affirmation says only that he was "disturbed" by them, A2279.  The Averment quotes Senator Graham's statement, but does not actually allege that any of the money went to Al Hazmi or Al Mihdhar.

Al Hussayen having been in "close proximity" to the hijackers when they stayed at the same hotel in September 2001.  A2170 (¶ 231).

As for Al Hussayen's purported official status, Plaintiffs allege in general terms that he was a "member of the Saudi Ulema," which means merely that he was an Islamic religious scholar, who had "maintained a long career as a government official for the Kingdom."  *Id.* (¶ 232).  They do not allege what position they think he held in 2001, and an affidavit he submitted early in the litigation explains that at that time he had retired from government service and was engaged in charitable work.[43]  Other than by misquoting the affidavit,[44] Plaintiffs have offered nothing to the contrary, nor do they make any attempt beyond mere

---

[43] *See* Dist. Ct. ECF 83-2, ¶¶ 5-6.  Al Hussayen later took another government post in 2002, after the time of the relevant events.  *See id.* ¶ 7. Plaintiffs have not alleged that any of the charitable organizations mentioned in Al Hussayen's affidavit are alter egos of Saudi Arabia.

[44] Plaintiffs erroneously contend (at 74) that Al Hussayen's "own affidavit" stated that he was a "'governmental official during the entire period in question'" and that the allegations against him concerned matters within his official capacity. The language Plaintiffs quote is not from the affidavit, but is argument from a legal filing by Al Hussayen's attorney, *see* Dist. Ct. ECF 83, at 6, 10, who was attempting at the time to assert foreign sovereign immunity on Al Hussayen's behalf.  The attempt failed, and Plaintiffs continued to proceed against Al Hussayen until he died in 2013.  *See In re Terrorist Attacks on September 11, 2001*, 718 F. Supp. 2d 456, 475 (S.D.N.Y. 2010) (recognizing that Plaintiffs' claims against Al Hussayen involved "alleged conduct undertaken outside the scope of his government duties"), *aff'd in part and vacated and remanded in part*, *Terrorist Attacks V*, 714 F.3d 659.

assertion to link whatever official status they contend Al Hussayen had with his alleged presence at the same hotel as some of the hijackers.

Plaintiffs also fail to explain what they think Al Hussayen actually did to help the hijackers. Their allegations against Al Hussayen personally had to do with his role at the nongovernmental Al Rajhi Bank, where he allegedly approved contributions that purportedly later went indirectly through the IIRO to al Qaeda. A2170 (¶ 233). Those approvals are not alleged to have been made in any official role for the Saudi Arabian government, *id.*, nor are they alleged to have taken place in the United States. Within the United States, Al Hussayen is alleged only to have been in "close proximity" to the hijackers, *id.* (¶ 231), and there is no tort of being nearby a tortfeasor.

Plaintiffs therefore err in relying (at 74-75) on this Court's decision in *Terrorist Attacks V*. That decision held that Plaintiffs' allegation that Al Hussayen had "switch[ed] hotels to stay in the same hotel as at least three of the hijackers" rendered plausible their allegation that in his role at Al Rajhi Bank he had intentionally (rather than unintentionally) approved transactions that went indirectly to al Qaeda. 714 F.3d at 679 (emphasis omitted). This Court further stated that the purported switch "suggest[ed] the possibility" that Al Hussayen "provided direct aid to members of al Qaeda." *Id.* But, as the district court noted, that statement about a possibility was not a holding that Plaintiffs had plausibly

alleged such aid.  Rule 8 draws a clear "line between possibility and plausibility." *Twombly*, 550 U.S. at 557.

Further, in response to Saudi Arabia's factual challenge, Plaintiffs did not produce any support (much less evidence) for their contention that Al Hussayen switched hotels.  They submitted two newspaper articles to support their allegations about Al Hussayen's proximity to the hijackers.[45]  Neither article says anything about a last-minute switch.  A3377-81; A3382-83.  Those documents also made clear that Al Hussayen had been "accused of no wrongdoing" and that there was "no evidence that he had contact with" the hijackers, A3377; *see also* A3383 (same).  Thus, even if Plaintiffs' allegation of a hotel switch were material (which it was not), and even if the newspaper articles were evidence (which they are not), Plaintiffs' claims would still fail for lack of support.

## 2.    Governmental and Nongovernmental Charities

### a.    Lack of Alter-Ego Status

Saudi Arabia cannot be held liable for actions by the various governmental and nongovernmental charities that Plaintiffs have contended are its alter egos.  This Court recently set forth the governing standard in *EM Ltd.*, which interpreted and applied the Supreme Court's decision in *Bancec*.  As *EM Ltd.* explains, the

---

[45] *See* A2637 (identifying two documents, Exhibits 64 and 65, to support Plaintiffs' allegations about Al Husssayen, which are Averment ¶¶ 231-240, A2170-72); A3377-81 (Exhibit 64); A3382-83 (Exhibit 65).

FSIA incorporates "a statutory 'presumption that a foreign government's determination that its instrumentality is to be accorded separate legal status' will be honored." 800 F.3d at 90 & n.53 (quoting *Bancec*, 462 U.S. at 628). That presumption exists for reasons including respect for "'the efforts of sovereign nations to structure their governmental activities in a manner deemed necessary to promote economic development and efficient administration'" and a desire to encourage foreign nations to recognize the "'juridical divisions'" created by United States law. *Id.* at 90 & nn.50, 52 (quoting *Bancec*, 462 U.S. at 626, 628).

To overcome the presumption of separateness, a plaintiff must show either that a sovereign exercises "'extensive control'" over its instrumentality – defined as "significant and repeated control" by the sovereign "over the instrumentality's day-to-day operations," *id.* at 91 – or else that recognizing the instrumentality "as a separate entity would work a 'fraud or injustice'" by enabling an "'abuse[] of [the] corporate form,'" *id.* at 95. Plaintiffs do not contend (and never have contended) that they can meet *Bancec*'s fraud-or-injustice test, so the only question before this Court is whether the district court correctly concluded that Plaintiffs cannot satisfy the control test.

As *EM Ltd.* makes clear, *Bancec*'s control test requires a "complete takeover of [the instrumentality's] day-to-day operations" by the sovereign. *Id.*; *see also id.* at 91 n.59 (citing, *inter alia*, *First Inv. Corp. of Marshall Islands v. Fujian Mawei*

58

*Shipbuilding, Ltd.*, 703 F.3d 742, 753 (5th Cir. 2012), and *Doe v. Holy See*, 557 F.3d 1066, 1080 (9th Cir. 2009) (per curiam)).  Less comprehensive forms of control are insufficient:  thus, a plaintiff cannot establish alter-ego status merely by showing that a sovereign appoints and removes directors and officers of an instrumentality, *see id.* at 92-93; sets "goals and policies" for the instrumentality to follow, *id.* at 93; or "consult[s] and coordinate[s] . . . actions" with the instrumentality, *id.* at 94.  Even in a purely legal inquiry concerning the sufficiency of the plaintiffs' allegations, as this Court conducted in *EM Ltd.*, such arguments fall short.  *See id.* at 95.  Here, where Plaintiffs had the burden of going forward with evidence, *see supra* pp. 29-30 & n.13, they were required not merely to allege day-to-day control but to show evidence of such control.  They have not done so.

i.    **The SHC.**  Plaintiffs' allegations that the SHC was an alter ego of Saudi Arabia consist of one conclusory paragraph, A2250 (¶ 520), plus references to two declarations filed in support of the SHC's sovereign immunity defense, *see id.* (¶¶ 521-522).[46]  Those declarations show the SHC's status as a "governmental entity" separate from Saudi Arabia, A2676 (¶ 4), formed to promote Saudi Arabian foreign policy towards Bosnia and Herzegovina, A2676 (¶ 5); A1567-68 (¶¶ 20-21), by distributing charitable donations from a mix of public and private sources,

---

[46] *See* A1563-68 (Declaration of Saud bin Mohammad Al-Roshood); A2675-81 (Declaration of Mutlib bin Abdullah Al-Nafissa).

59

A1568 (¶¶ 24-25). Decisions about how to distribute those funds were made on a discretionary basis by the SHC's Executive Committee, A2676-77 (¶ 9), which was headed by a Saudi Arabian government official but included private individuals among its members, A1564 (¶¶ 7-8). Nothing in either declaration suggests that Saudi Arabia exercised day-to-day control over the SHC's distribution of funds or any of its other activities.[47]

Plaintiffs also relied in the district court on an affirmation from a self-styled "International Terrorism Consultant," Evan Francois Kohlmann. A2417-61. Kohlmann's professed field of expertise is "terrorism issues." A2418 (¶ 6). He does not claim to be an expert on Saudi Arabia's law, its administrative procedure, or its governmental or nongovernmental organizations. His affirmation consists almost entirely of quotations from hearsay sources accompanied by conclusory assertions.[48] The district court appropriately rejected Kohlmann's proffered

---

[47] Plaintiffs quote out of context (at 79) a statement from the Al-Nafissa declaration that "[a]ctions taken by the [SHC] may be viewed as actions of the government of Saudi Arabia." A2675 (¶ 3). In context, this clearly meant that the SHC was a "governmental entity," A2676 (¶ 4), not that it was an alter ego of Saudi Arabia itself. *See id.* (¶ 8) (noting that the SHC "can be sued for [its] administrative acts in the Board of Grievances, the administrative court of Saudi Arabia"); *see also* A1565 (¶ 10) (SHC has its own staff and its own budget).

[48] *See Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (disapproving the practice of "'call[ing] an expert simply as a conduit for introducing hearsay'"), *cert. dismissed*, 135 S. Ct. 42 (2014); *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (explaining that an expert may not "simply 'repeat[] hearsay evidence without applying any expertise whatsoever'").

testimony as "largely boilerplate." SPA111 n.19. As to the SHC specifically, Kohlmann merely quotes from the same declarations as does the Averment without adding any analysis. A2455-57 (¶¶ 116-121). As set forth above, those declarations do not establish day-to-day control under the governing standard. Kohlmann (who does not address that standard) does not suggest otherwise.

ii.    **The SJRC.**  Plaintiffs' allegations that the SJRC was an alter ego of Saudi Arabia are similarly bare. A2260-61 (¶¶ 559-560). They rely on a declaration from the SJRC's former president stating that the SJRC "'functioned as a political subdivision, agency, or instrumentality of the Kingdom of Saudi Arabia,'" A2261 (¶ 560), which is not a concession of alter-ego status. The same declaration states that the SJRC, like the SHC, was a "charitable and humanitarian entity" created by Saudi Arabia "to collect and distribute aid to Albanian refugees in Kosovo," Dist. Ct. ECF 631-3, ¶ 4; that was supervised by government officials but also included private representation, *id.* ¶ 7; and that maintained its own staff as well as using seconded Saudi Arabian civil servants, *id.* ¶ 9. Kohlmann adds nothing of substance and does not suggest that the SJRC was under the day-to-day control of Saudi Arabia. A2457-60 (¶¶ 122-129).

iii.    **The Red Crescent.**  The analysis for the Red Crescent is essentially the same as for the SHC and the SJRC. *See* A2257 (¶¶ 544-545) (conclusory allegations); A6524 (¶ 4) (declaration of Red Crescent's President stating that

Saudi Arabia "sponsors and supervises the . . . Red Crescent, and appoints its directors," as well as "fund[s]" its "operations within Saudi Arabia," but not indicating day-to-day control); *id.* (stating further that the Red Crescent "is a Saudi Government instrumentality"). Kohlmann, in addition to quoting the same declaration, further states that the Red Crescent is one of a number of "public corporations whose budgets are annexed to the Saudi national budget," A2455 (¶ 115); that description is consistent with (and tends to support) it being a separate entity with its own finances.

iv.     **The MWL.** The MWL and the other remaining charities are differently situated from the SHC, the SJRC, and the Red Crescent:  they are nongovernmental organizations.  As a result, none has been entitled to foreign sovereign immunity.[49]  Plaintiffs have cited no case in which a *nongovernmental* organization has ever been held to be an alter ego of a foreign state:  *Bancec* and its progeny, including *EM Ltd.*, all deal with foreign state instrumentalities.  At a minimum, a showing of day-to-day control would be required before the alter-ego doctrine could be extended to a nongovernmental organization, and the district court correctly concluded that Plaintiffs had not made one.

---

[49] The MWL and the IIRO at one time earlier in the litigation attempted to assert governmental instrumentality status and foreign sovereign immunity, A4405, A4546, but neither ever moved to dismiss on that basis.

Leaving aside bare conclusions, A2198 (¶¶ 334-335), the specific facts that Plaintiffs have alleged as to control of the MWL by Saudi Arabia pertain to initially founding it as a service organization, A2198-99 (¶ 339); nominating or appointing its leadership, A2198 (¶¶ 336-338); and funding its operations, *id.* (¶¶ 336, 338-339). None of that points to alter-ego status. *See EM Ltd.*, 800 F.3d at 92-93. Nor does Kohlmann add anything to the analysis: his discussion focuses not on control of MWL by the government of Saudi Arabia, but on control of MWL's branch offices by its own central office, A2435-37, which is irrelevant to the alter-ego question.

     **v.**    **The IIRO.** Plaintiffs' allegations that Saudi Arabia controlled the IIRO are largely conclusory and rest on the premise that the IIRO is a "subsidiary" of the MWL. A2206-07 (¶¶ 371-373). As Plaintiffs have failed to allege day-to-day control of the MWL, it follows that they have failed to allege day-to-day control of its subsidiary. Kohlmann's discussion of the IIRO similarly discusses its relationship with the MWL, A2437-38 (¶¶ 69-70); he also quotes statements about funding it allegedly received from Saudi Arabia and from members of the Saudi Arabian royal family, A2439-43 (¶¶ 76-80), as well as discussion of control of its branch offices by its headquarters, A2443-46 (¶¶ 81-90). Even if Kohlmann's recitation of hearsay sources were evidence (which it is not), none of the sources

he cites would be relevant to the question whether the government of Saudi Arabia exercised day-to-day control over IIRO's operations.[50]

      **vi.**    **WAMY.**  As with MWL and IIRO, Plaintiffs allegations about Saudi Arabia's purported control of WAMY are largely conclusory.  A2224-25 (¶¶ 440-443).  The few specific facts Plaintiffs offer go to matters that are irrelevant under *EM Ltd.* and *Bancec.*[51]  Kohlmann's discussion of WAMY largely recites immaterial allegations that WAMY's leaders include Saudi Arabian government officials, A2447-48 (¶¶ 93, 96); that Saudi Arabia has funded and supported WAMY, A2447-48, A2449-51 (¶¶ 94-96, 100-103); and that WAMY's branch offices are supervised by or "intertwined" with its own headquarters in Saudi Arabia, A2451-53 (¶¶ 104-109).  Although he claims that there was "involvement

---

[50] Plaintiffs quote (at 78) testimony from one Canadian MWL or IIRO employee who stated the IIRO was "controlled in . . . [its] activities and plans" by Saudi Arabia.  A2199 (¶ 340); *see also* A2438-39 (¶ 73) (identical quotation by Kohlmann).  Read in context, this statement refers to control at a policy level, not day-to-day control.  *See* A2199 (¶ 340) ("The [IIRO] office, like any office in the world, here or in the [MWL], has to abide by the policy of the Government of Saudi Arabia.") (second alteration added).  Control of an instrumentality's "policies and goals" does not create an alter-ego relationship.  *EM Ltd.*, 800 F.3d at 94.  The testimony is also not admissible evidence because it is hearsay without an opportunity for cross-examination, *see* Fed. R. Evid. 804(b)(1)(B), which would have permitted Saudi Arabia to clarify further the type of control at issue.

[51] *See* A2224 (¶¶ 440-441) (conclusory allegations of control, plus funding and appointment of leadership); *id.* (¶ 442) (conclusory allegations of "direct[ion]" and "close[] supervis[ion]" plus testimony that Saudi Arabia "protect[s]" WAMY and offers it "financial support"); A2224-25 (¶ 443) (control of branch offices by central leadership and conclusory assertion of "close relationship with [Saudi Arabia's] government").

of Saudi government officials in the day-to-day administrative aspects of WAMY's operations," A2448-49 (¶¶ 98-99) – the only allusion that he makes to the governing legal standard with respect to any charity – he offers no meaningful support for that claim. Most of paragraphs 98 and 99 of Kohlmann's affirmation, which concern the above assertion, have been redacted from the publicly filed version, A2448-49, but were submitted to the district court. They describe financial assistance from Saudi Arabia to WAMY and the involvement of Saudi government officials in the resolution of a single dispute among WAMY personnel. Those facts do not permit an inference that Saudi Arabia exercised "significant and repeated control" over WAMY's "day-to-day operations," *EM Ltd.*, 800 F.3d at 91, as *Bancec* and *EM Ltd.* require.

**vii. Al Haramain.** Plaintiffs' allegations about Saudi Arabia's purported control of Al Haramain, A2235-36 (¶¶ 477-479), are insufficient for the same reasons that apply to their allegations about the other nongovernmental charities.[52]

---

[52] *See* A2235-36 (¶¶ 477-478) (conclusory allegations of control, plus funding and appointment of leadership). The Averment also cites the Financing Monograph, but that report makes clear (at 114) that Al Haramain is a "nonprofit organization" and in no way suggests it is an alter ego of Saudi Arabia. *See* Financing Monograph 12 (describing law-enforcement efforts directed at Al Haramain as an "important story about U.S.-Saudi cooperation on terrorist financing in the post 9/11 period"). To the contrary, the discussion in the Financing Monograph shows that the United States was urging Saudi Arabia to exert *more* control over Al Haramain during the time after the 9/11 attacks, *see id.* at 114, 117-19, which undermines Plaintiffs' assertions that Al Haramain was extensively controlled by Saudi Arabia before that time.

Kohlmann devotes a few more pages to Al Haramain, A2423-32 (¶¶ 26-54), but those pages contain no relevant substance. Most of that discussion asserts that Al Haramain's operations were controlled not by Saudi Arabia, but by its director Aqeel Al Aqeel, who is not a government official. A2427-32 (¶¶ 39-54). By contrast, Kohlmann's contentions about Saudi Arabia's connection to Al Haramain concern government "'supervision,'" "influence," and "'cooperation,'" *e.g.*, A2423-24 (¶¶ 28, 30, 31), as well as appointment of officers and funding, A2423, 2425 (¶¶ 28-29, 35), which are not enough.[53]

In sum, the district court correctly refused to accept Plaintiffs' boilerplate allegations and Kohlmann's collection of hearsay, especially in light of the stringent standard for alter-ego status established by *Bancec* and its progeny, and most recently set forth by this Court in *EM Ltd*. Plaintiffs make two additional arguments, neither of which has merit.

*First*, Plaintiffs argue (at 82-83) that this Court "plainly credit[ed]" their allegations about the charities' alter-ego status in *Terrorist Attacks III* and that the district court was therefore bound to do the same. *Terrorist Attacks III* did nothing of the kind; Plaintiffs are citing mere summary references from the background

---

[53] Kohlmann also quotes hearsay statements by two Guantanamo detainees that Al Haramain was a Saudi governmental organization. A2426-27 (¶ 38). Although those statements are both false and inadmissible, they are irrelevant because they would suggest at most that Al Haramain was a governmental entity like the SHC, the SJRC, and the Red Crescent, not an alter ego of Saudi Arabia.

section of this Court's opinion.  *See* 538 F.3d at 76-77.  *Terrorist Attacks III* neither needed to nor did decide whether Plaintiffs' alter-ego theory was either sufficiently pleaded or supported by evidence.

*Second*, Plaintiffs contend (at 83-84) that under Saudi Arabian law support for the Islamic faith is a "core function[ ]" of the Saudi Arabian state; that Saudi Arabia's support for the governmental and nongovernmental charities was one of the ways in which it supported Islam; and that it somehow follows that the charities were part of the Saudi Arabian state.  That is like arguing that, because one of the core functions of the United States government is to "provide for the common defence," U.S. Const. pmbl., a foreign court should treat a defense contractor such as Lockheed Martin as an alter ego of the United States.  Plaintiffs have provided no support for their novel contention.

The cases Plaintiffs cite (at 83) for their "core function[ ]" theory do not help them.  *Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006), held that Poland's Ministry of the Treasury could not be sued under the "'takings' exception" to foreign sovereign immunity because it was part of the Republic of Poland rather than a mere "agency or instrumentality."  *Id.* at 598.  *Garb* reached that conclusion after considering Polish law showing that the Ministry "does not hold property separately from the Polish State."  *Id.* at 595.  Similarly, *SerVaas Inc. v. Republic of Iraq*, No. 10-828-cv, 2011 WL 454501 (2d Cir. Feb. 11, 2016), held that Iraq's

Ministry of Industry was a "political organ of the state" rather than a separate instrumentality because Iraqi law defined it as part of the "'Government'" of Iraq and because it performed "regulatory function[s]" such as "trademark registration." *Id.* at \*2-3. Plaintiffs have shown nothing comparable here.

### b. Lack of Tortious Acts in the United States

Plaintiffs' attempts to defeat Saudi Arabia's presumptive immunity from suit based on the actions of the charities also fall short for the alternative reason that – even if the charities' actions could somehow be attributed to Saudi Arabia wholesale – Plaintiffs still have presented neither competent allegations nor any evidence that any governmental or nongovernmental charity committed a relevant tortious act in the United States. They therefore cannot satisfy the entire-tort rule.

**i. The Governmental Charities.** In *Terrorist Attacks IV*, this Court held the SJRC and the Red Crescent immune from suit under the entire-tort rule. It follows that, even if their actions are attributed to Saudi Arabia, Saudi Arabia is likewise still immune. Plaintiffs do not appear to argue otherwise: the relevant section of their brief (at 84-85) discusses only the MWL, the IIRO, and Al Haramain. Further, this Court's holding in *Terrorist Attacks IV* compels an identical result as to the SHC, for the reasons set forth below in Part I.D.

**ii. The Nongovernmental Charities.** Plaintiffs assert broadly (at 84) that the nongovernmental charities undertook relevant "fundraising, money

laundering and related activities in the United States," but an examination of their actual allegations shows that they overstate their case. Even on its face their Averment is insufficient: they identify (at 85) only a few relevant specific paragraphs describing the charities' U.S. activities, each too conclusory to be accepted as true under *Twombly* and *Iqbal*.[54]

Nor does Plaintiffs' purported evidence support their claims. For example, they cite a press statement by the U.S. Treasury in 2004 that Al Haramain "appeared to [have been] providing" support to Al Qaeda from a number of locations, one of which was "North America," A5672, as part of a joint enforcement action by the United States and Saudi Arabia against a number of Al Haramain field offices

---

[54] *See* A2213 (¶ 399) (conclusory statement, attributed to "the U.S. government," that "'Usama bin Ladin used the entire IIRO network for his terrorist activities'"); A2219 (¶ 424) (conclusory statement that "federal authorities determined that the IIRO and MWL offices in Washington, DC provided funding and material support to al Qaeda and Hamas"); A2242 (¶ 492) (referring to designation of Al Haramain's U.S. branch by U.S. Treasury and quoting conclusory statement by the U.S. Treasury that "'Al Haramain has been used around the world to underwrite terror'"); *see also* A2196 (¶ 330) (quotation attributed to State Department cable: "'some elements'" of IIRO "'have been exploited by terrorists and their financiers'"; no reference to U.S. activities); A4138-40 (cable that Plaintiffs are apparently quoting; no reference to U.S. activities). The fact that some of the conclusions in the Averment are attributed to U.S. officials does not make them less conclusory or entitle them to be assumed true without further facts showing how U.S. officials reached those purported conclusions – especially in light of the Solicitor General's definitive statement years ago on behalf of the entire Executive Branch that dismissal of Saudi Arabia was proper under the entire-tort rule. *See supra* pp. 43-44.

outside of the United States. A5670-74. That statement does not permit a reasonable inference that Al Haramain's United States branch took acts that caused the 9/11 attacks in 2001.[55]

### 3. The Moussaoui Statement

Plaintiffs sought several delays in the proceedings below to obtain allegedly new evidence in the form of a witness statement from Zacarias Moussaoui, a convicted terrorist currently serving a life sentence in federal prison. The district court properly rejected the statement they ultimately obtained from Moussaoui as immaterial. The court thus did not need to consider his massive credibility problems, including past testimony that he considered it "okay to lie in court as part of jihad"[56] and evidence that he suffers from "paranoia," "thought disorder," and "persecutory and grandiose delusions."[57]

---

[55] Plaintiffs contend in their brief (at 85) that the IIRO funded "camps where the September 11th hijackers received training for the attacks," but fail to support that statement. The Averment makes this claim about the charities as a whole as part of a laundry list of conclusory assertions, A2127-28 (¶ 48), which are not entitled to be assumed true. Plaintiffs' only documentary support for their contention appears to be an untitled document of unspecified provenance that they call a "CIA Report," A3639-52, which attributes to an unnamed "clandestine source" the assertion that the IIRO "help[ed] fund six militant training camps in Afghanistan." A3646. Such speculative multiple-level hearsay is not evidence.

[56] Trial Tr. 2382:19-24, *United States v. Moussaoui*, No. 1:01-cr-455 (E.D. Va. Mar. 27, 2006) (Dkt. 1755).

[57] Addendum to Evaluation of Adjudicative Competence 1-2, attached as Exh. C to Standby Counsel's Memorandum Regarding Rule 11 Considerations, *Moussaoui* (E.D. Va. filed July 24, 2002) (Dkt. 356) (originally filed under seal).

Moussaoui's statement says that in Afghanistan, in or around 1998, as part of a group that did not yet call itself al Qaeda, he made a computerized list of alleged "donors" to bin Laden. A2296-300. The list was not based on his personal knowledge: he received some information orally from other members of the group, and some from documents that he needed help to interpret. A2298-99. According to the statement, the alleged donors included the SHC and certain members of the Kingdom's royal family (though not the Kingdom itself). A2300-01. But Moussaoui did not claim to know the dates or purposes of any alleged donations; could not link any alleged donations to the 9/11 attacks, of which he had no personal knowledge;[58] and never suggested that any alleged donation occurred in the United States. Accordingly, the district court correctly concluded that his statements did not provide "a legal basis to strip Defendants of the immunity to which they are presumptively entitled." SPA116 n.13.[59]

---

[58] Mousassoui once pleaded guilty to conspiring to commit the 9/11 attacks, but later submitted a sworn statement that this was a "complete fabrication" and that he had no involvement in them whatsoever. Aff. of Zacarias Moussaoui ¶¶ 13-15, attached to Def.'s Mot. To Withdraw Guilty Plea, *Moussaoui* (E.D. Va. filed May 8, 2006) (Dkt. 1857).

[59] The remainder of Moussaoui's other statements, though colorful, were also immaterial. He asserted that he carried letters between bin Laden and members of the Saudi royal family in 1998, but denies knowing their contents. A2374-79. He also boasted of vague plans to "become a pilot" and "buy [a] crop dusting plane," which Plaintiffs speculate (at 89) might have been intended for an "attack on U.S. soil," though Moussaoui did not say that; and of a spurious plot to shoot down Air Force One, again in 1998, involving an individual who purportedly

### D.    Plaintiffs Failed To Satisfy the Entire-Tort Rule as to the SHC

Plaintiffs did not even bother to mention the SHC during their oral argument before the district court.  *See* SPA112 n.11 (quoting hearing transcript).  The court's subsequent rejection of Plaintiffs' claims against the SHC was unsurprising, straightforward, and correct.  The court observed that Plaintiffs' claims against the SHC were based on alleged actions that "took place outside the United States," by "providing funding to entities that allegedly funded al Qaeda."  SPA112.  Because that conduct was "akin to that alleged as to the [Red Crescent] and the SJRC" in *Terrorist Attacks IV*, the same result was appropriate:  dismissal for failure to satisfy the entire-tort rule.  *Id.*

Plaintiffs now argue for the first time on appeal (at 86-87) that *Terrorist Attacks IV* should be distinguished because SHC employees were purportedly engaged in the "development of plots to attack the American homeland."  That argument is forfeited, legally meritless, and unsupported by the record.  *First*, it is forfeited because Plaintiffs did not argue that SHC employees were directly involved in plots to attack the United States anywhere in their memoranda submitted to the district court, *see* Dist. Ct. ECF 2890-1, 2926, 2947, nor did they raise it before the district court at the hearing on the parties' cross-motions,

---

worked in the Saudi Embassy in Washington, D.C.  A2405-06.  Even Moussaoui admitted that no such plot was ever "put into action," A2407, and that he never met with the other individual in the United States, A2409.

A7366-449.  "[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal."  *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994).

*Second*, Plaintiffs' argument is legally meritless.  This Court made clear in *Terrorist Attacks IV* that Plaintiffs' claims failed because they did not "allege that the SJRC or the [Red Crescent] committed a single tortious act in the United States."  714 F.3d at 117.  In doing so, the Court rejected as legally insufficient Plaintiffs' (baseless) contentions that the 9/11 attacks were a "'direct, intended and foreseeable product'" of the SJRC's and the Red Crescent's alleged extraterritorial conduct.  *Id.*  Plaintiffs therefore cannot rescue their (equally baseless) claims against the SHC by characterizing them (at 87) as contentions of "direct collaboration with al Qaeda."  They need an act by the SHC in the United States, and they do not have one.

*Third*, even if "direct collaboration" through actions outside the United States were the standard, Plaintiffs could not meet it.  Their overreaching claim of having testimony that al Qaeda members "embedded" in SHC were "developing terrorist attacks against the United States" mischaracterizes the allegations and testimony they cite (at 87), which say no such thing.[60]  Similarly unhelpful to them

---

[60] *See* A2251-52 (¶ 527) (no mention of attacks on the United States); A6175-203 (same); A6318-19 (same).  Plaintiffs' witness Ali Ahmed Ali Hamad,

are the materials they cite from various proceedings involving various detainees

at Guantanamo Bay.[61] Finally, their reliance on hearsay reports of purportedly

suspicious materials found on the computers of SHC employees during a raid

in Bosnia is nothing more than speculation, lacking any specific allegation or

evidence of anything those employees might have done or of how any hypothetical

acts might have related to the scope of their employment.[62]

---

who purports to be a former SHC employee and former member of al Qaeda, states
that he has information about al Qaeda attacks on the United States and on former
President Clinton and his family, but declines to go into detail because he intends
to discuss these matters in a forthcoming book. A6204; *see also* A6316-17
(statements about attacks on American citizens in Bosnia, not in the United States).
Also, according to Ali Hamad's testimony, he was an active member of al Qaeda
only until he was imprisoned in 1997, years before the relevant events. A6175.

[61] There is no evidence of any attacks against the United States by or
undertaken with the support of the SHC in any of the Guantanamo materials that
Plaintiffs cite. A6395-516. Plaintiffs also improperly rely on a so-called "matrix
of threat indicators" used at Guantanamo, A5094-110, which mentions SHC
employment as one of many factors to be considered in detention proceedings
but which says very clearly that such indicators are "*not . . . evidence* to prove
a detainee's guilt or innocence," A5094 (emphasis omitted in part).

[62] For example, Plaintiffs allege that certain former SHC employees' computers
contained documents including "photographs of the World Trade Center before
and after its collapse" and "files on deploying chemical agents with crop dusters."
A2253-54 (¶ 533). They have no allegation or evidence that any of those individuals
were involved in the 9/11 attacks, that their before-and-after photographs reflected
hostility rather than sympathy to victims, or that the attacks had any relation of
any sort to crop dusters. Further, even their allegation about the contents of the
computers rests on unreliable third-hand hearsay. *See* A3927 (apparent source
for allegations about hard drives, citing newspaper articles); Brian Whitmore,
*Charity's Files Hold US Data, Bosnians Say*, Boston Globe, Feb. 17, 2002, at
A26, 2002 WLNR 2569194 (attributing statements to unnamed "senior Bosnian

## II.    Plaintiffs' Claims Are Also Barred by the FSIA's Discretionary-Function Exception and Causation Requirement

Plaintiffs' attempt to invoke the noncommercial-tort exception also fails for two alternative reasons that the district court did not need to reach:  the discretionary-function exception and the jurisdictional causation requirement.  If this Court for any reason concludes that it cannot or does not wish to rely on the entire-tort exception, it should rely on one or both of those alternative grounds to bring this litigation against the Kingdom and the SHC to a long-overdue end.  Plaintiffs' contrary contention (at 105-06) that this Court should remand (again) for the district court to consider such alternative grounds is without merit.

Reaching any alternative grounds required would be consistent with *Terrorist Attacks IV*, in which this Court recognized that "a central purpose of the FSIA is to 'enable a foreign government to obtain an early dismissal when the substance of the claim against it does not support jurisdiction.'"  714 F.3d at 117 (quoting *Robinson*, 269 F.3d at 146, and citing *Mortimer Off Shore*, 615 F.3d at 113).  Here, that purpose – which is a core part of the "immunity from . . . the attendant burdens of litigation" that Congress accords to foreign sovereigns and their instrumentalities, *Rein*, 162 F.3d at 756 – has already been poorly served by

---

officials"; adding clarification, which Plaintiffs omit, that officials did not "accuse the [SHC] of any wrongdoing"); Barbara Slavin, *U.S., Saudis plan to shut down charity's branches*, USA Today, Mar. 11, 2002, at 10A, 2002 WLNR 4501819 (similar statements without attribution to any particular source).

the decade-long course of this litigation. This Court should reject Plaintiffs'

suggestion that finality be put off for yet another round in the district court.

### A.     Plaintiffs Seek To Hold Saudi Arabia and the SHC Liable for Policy Decisions

The FSIA excludes from the noncommercial-tort exception (and therefore

preserves foreign sovereign immunity as to) "any claim based upon the exercise

or performance or the failure to exercise or perform a discretionary function

regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A).

The purpose of discretionary-function immunity is "to prevent 'judicial "second-

guessing" of . . . decisions grounded in social, economic, and political policy

through the medium of an action in tort.'" *Swarna*, 622 F.3d at 146 (quoting

*Varig Airlines*, 467 U.S. at 814) (alteration in original). The exception "generally

'protect[s] not only the initiation of discretionary activities but also the decisions

made about how to implement those activities,'" provided that the implementing

acts "'themselves involve the exercise of policy judgment.'" *USAA Cas. Ins. Co.*

*v. Permanent Mission of Republic of Namibia*, 681 F.3d 103, 113 (2d Cir. 2012)

(citations omitted).

The Supreme Court's recent decision in *OBB Personenverkehr AG v. Sachs*,

136 S. Ct. 390 (2015), offers further guidance. *OBB* construed the FSIA's

commercial-activity provision, but in so doing clarified the phrase "based upon,"

which also appears in the discretionary-function exception. It explained that a suit

is "based upon" certain conduct if that conduct is the "gravamen" or the "core of the[ ] suit." *Id.* at 396. The "gravamen" of a suit is different from the "elements" that make up each of a plaintiff's "causes of action": it means the "sovereign acts that actually injured" the plaintiff. *Id.* Applied in the discretionary-function context, *OBB* thus counsels this Court to look at the core of the sovereign conduct for which Plaintiffs seek relief. Doing so makes it even more apparent that Plaintiffs are asking the federal courts to "second-guess[ ]" Saudi Arabian policy decisions "through the medium of an action in tort." *Swarna*, 622 F.3d at 146.

Plaintiffs' Averment virulently attacks the Saudi Arabian government's support for the Islamic religion as a matter of domestic and foreign policy, often referring to Saudi Arabia, its religion, and its policies in frankly derogatory terms.[63] Plaintiffs continue such themes in their brief, accusing Saudi Arabia

---

[63] *See, e.g.*, A2127 (¶¶ 44, 46) (accusing Saudi Arabia of allegedly "propagat[ing] a radical strain of Islam" and promoting a strategy of "jihad and worldwide indoctrination into Wahhabi Islam"); A2129-47 (¶¶ 49-130) (extended discussion of the purportedly "unique relationship between the House of Saud and Wahhabi Islam"); A2178, A2179, A2180 (¶¶ 265, 272, 277) (accusing Saudi Arabia of "promot[ing] and spread[ing] the radical and extremist Wahhabi ideology"; "support[ing]" objectionable "religious ideologies"; and "promot[ing] . . . radical teachings"); A2183-85 (¶¶ 291-295) (describing al Qaeda's purported "ideological foundation" as being "shared" by Saudi religious leaders, who voiced support for its activities in Bosnia); A2189-94 (¶¶ 313-316) (accusing the charities of "spreading al Qaeda's jihadist ideology" and quoting political criticisms of Saudi Arabia); A2266-67 (¶¶ 581-587) (alleging that the "House of Saud made a conscious decision to deploy the Saudi [charitable] infrastructure to support Islamist movements throughout the World").

(at 22) of maintaining as its "'state religion'" a "'strand of Islam'" that "'form[s] the ideological foundation for al Qaeda,'" and arguing (at 27) that it is liable for the charities' actions because they assist it in the "propagation of Wahhabi Islam." Saudi Arabia cannot accept even for the sake of argument Plaintiffs' baseless and defamatory allegations and characterizations about its faith or its foreign policy: as His Royal Highness King Salman has recently made clear, it is his nation's long-held position to support "international efforts to confront and eliminate th[e] dangerous scourge" of "terrorist attacks," which are "condemned by all divine religions and international norms and conventions."[64]  Nevertheless, it is clear that Plaintiffs want to put on trial the policies of Saudi Arabia and the religion it supports.  The discretionary-function exception prevents them from doing so.

Plaintiffs also leave no doubt their claims are based on Saudi Arabia's discretionary choice to pursue its policy of supporting Islam by extending financial support to governmental and nongovernmental charity organizations.  Their brief (at, *e.g.*, 9, 13-14, 27-31, 84-85) is replete with allegations and arguments making clear that the funding of charities is at the core of their case.  Judge Casey correctly concluded in 2005 that Saudi Arabia's "decisions to support Islamic charities are

---

[64] Kingdom of Saudi Arabia, Ministry of Foreign Affairs, *Custodian of the Two Holy Mosques Condoles King of Belgium on Victims of Terrorist Attacks in Brussels*, http://www.mofa.gov.sa/sites/mofaen/ServicesAndInformation/news/ statements/Pages/ArticleID201632220404173.aspx (last updated Mar. 22, 2016).

purely planning level 'decisions grounded in social, economic, and political policy,'" *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 804 (quoting *Varig Airlines*, 467 U.S. at 814), *on recon. in part*, 392 F. Supp. 2d 539 (S.D.N.Y. 2005), *aff'd*, *Terrorist Attacks III*, *supra*, and his analysis remains correct. Nor can Plaintiffs change that result by asserting that Saudi Arabia or the SHC knew or should have known that money was allegedly going from the charities to terrorists, *e.g.*, A2266-67 (¶¶ 581-587), both because those assertions are conclusory and unsupported by evidence, and because the discretionary-function exception grants immunity "regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A).

In the district court, Plaintiffs argued that their claims were based not on planning-level decisions to fund charities, but on "operational level torts" by the Kingdom's purported "agents and alter-egos." Dist. Ct. ECF 2926, at 1-2, 28-29. That argument (which leaves unexplained why their Averment contains page after page of attacks on Saudi Arabia's policy of supporting Islam) fails for two reasons. *First*, Plaintiffs' allegations of operational-level assistance are based on the same conclusory and unsupported claims already discussed in Part I.

*Second*, Plaintiffs' arguments that they have shown operational-level assistance rely heavily on the same discretionary policies they improperly attempt to challenge. Thus, their argument that Al Bayoumi was acting within the scope of

his employment relies on the (implausible and baseless) contention (at 68) that Saudi Arabia had a policy of "providing support to jihadists" because doing so served its "interest in propagating Wahhabi Islamist ideology."  Their argument (at 48) that Al Thumairy must have supported al Qaeda relies on reports that his "'sermons . . . have a militant, anti-West tone to them,' and that he 'is also reported to be anti-United States and Israel.'"  Their argument (at 80) that the actions of the nongovernmental charities can be attributed to Saudi Arabia relies on the assertion that the charities "serve as the primary 'governmental arms' through which the Kingdom fulfills its self-described duty to propagate Islam."  In short, Plaintiffs attempt to characterize their claims as operational-level cannot disguise the "gravamen" of this case, *OBB*, 136 S. Ct. at 396, which is Plantiffs' complaints about (and mischaracterizations of) support for Islam as "'a core tenet'" of Saudi Arabia's "'foreign policy.'"  A2194 (¶ 316).

Plaintiffs also argued in the district court that the discretionary-function exception does not bar their claims because knowing material support for terrorism is unlawful.  *See* Dist. Ct. ECF 2926, at 29 & n.21.  But that is the point:  Judge Casey dismissed Plaintiffs' claims precisely because their conclusory assertions and speculation failed to show that Saudi Arabia or the SHC knowingly gave material support to terrorists in general or al Qaeda in particular.  Instead, as the 9/11 Commission put it, there is "no evidence that the Saudi government as an

institution or senior Saudi officials individually funded" al Qaeda. 9/11 Report 171. Plaintiffs' complaint at most alleges that "charities with significant Saudi government sponsorship diverted funds to al Qaeda." *Id.* Saudi Arabia need not (and does not) agree with that premise to argue that, whether true or false, it cannot give rise to a claim under the FSIA's noncommercial-tort exception.

### B. Plaintiffs Cannot Establish That Any Conduct by Saudi Arabia or the SHC Caused the 9/11 Attacks

The noncommercial-tort exception also requires a showing that the plaintiff's injury was "caused by the tortious act or omission" of a foreign sovereign. 28 U.S.C. § 1605(a)(5). When Congress uses ordinary language such as "'because of,'" "'results from,'" "'based on,'" or "'by reason of'" to establish a causal requirement, it thereby "imposes a requirement of but-for causation." *Burrage v. United States*, 134 S. Ct. 881, 889 (2014). The phrase "caused by" in § 1605(a)(5) is of the same kind and should be given the same effect. Doing so is consistent with the limited scope of the noncommercial-tort exception, which Congress originally meant for traffic accidents, *see Terrorist Attacks IV*, 714 F.3d at 116 n.8, and with Judge Robertson's persuasive reasoning in related litigation that § 1605(a)(5) "should be narrowly construed so as not to encompass the farthest reaches of common law," *Burnett*, 292 F. Supp. 2d at 19.

Plaintiffs cannot meet that standard. Their allegations of causation are based on boilerplate, conclusory assertions that, without the alleged support of Saudi

Arabia and the SHC, "al Qaeda would not have possessed the capacity to conceive, plan and execute the September 11th Attacks." A2117 (¶ 14); *see* A2172 (¶ 242) (similar generic assertions about "critical financial, logistical, ideological and other support"). Those grandiose conclusions far exaggerate the import of Plaintiffs' threadbare allegations and nonexistent evidence. For example, even if this Court were to assume that Al Bayoumi was an employee of Saudi Arabia who acted knowingly in helping Al Hazmi and Al Mihdhar find an apartment and introducing them to other members of the San Diego Muslim community – even if, contrary to the findings of the 9/11 Commission, this Court were to assume that he actually paid their rent for a month – Plaintiffs have offered no plausible reason or evidentiary basis to conclude further that, but for those purported acts of assistance to two of the 19 hijackers, the attacks would not have occurred.

Nor can Plaintiffs show causation by relying on claims of indirect funding through charitable organizations. That is the type of claim that Judge Robertson rejected in *Burnett*, which concluded that the FSIA does not permit claims against a sovereign defendant based on allegations that it "(i) . . . funded (ii) those who funded (iii) those who carried out the September 11th attacks." 292 F. Supp. 2d at 20. Accepting that layered theory of causation "would stretch the causation requirement of the noncommercial tort exception . . . to terra incognita." *Id.*

82

In *Robinson*, this Court warned of the dangers of allowing "conclusory . . . allegations . . . to sustain jurisdiction" under the FSIA. 269 F.3d at 146. Basing federal jurisdiction on "generic allegations of [misconduct]," *Robinson* reasoned, "would invite plaintiffs to circumvent the jurisdictional hurdle of the FSIA by inserting vague and conclusory allegations of tortious conduct in their complaints – and then to rely on the federal courts to conclude that some conceivable non-discretionary tortious act falls within the purview of these generic allegations under the applicable substantive law." *Id.*

Those concerns apply with far greater force here. *Robinson* involved a routine slip-and-fall claim. *See id.* at 135. The claims in these cases, by contrast, accuse a foreign sovereign (and a charity operating only in Bosnia and Herzegovina) of complicity in a horrific terrorist attack, based on novel and unsupported theories of tort liability and causation. It is therefore all the more important here to require proper allegations of "a 'tortious act or omission' caused by the [Saudi] government," *id.* at 145, before permitting these actions to persist any longer. Because Plaintiffs have not properly alleged or come forward with evidence that any act of Saudi Arabia or its instrumentalities caused their damages, their claims were properly dismissed.

### III. The District Court Was Well Within Its Discretion To Deny Jurisdictional Discovery

Finally, the district court did not abuse its discretion by denying Plaintiffs' request for jurisdictional discovery, to the extent that request was properly preserved at all. Jurisdictional discovery under the FSIA is not available automatically or as a matter of right. Instead, "in the FSIA context, 'discovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination.'" *EM Ltd.*, 473 F.3d at 486 (quoting *First City*, 150 F.3d at 176). The district court's exercise of its discretion should involve a "delicate balancing" process that takes into account a "'sovereign's . . . legitimate claim to immunity from discovery.'" *First City*, 150 F.3d at 176 (quoting *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 534 (5th Cir. 1992)); *Freund v. Republic of France*, 592 F. Supp. 2d 540, 564 (S.D.N.Y. 2008) (denying discovery based in part on "[a]ppropriate deference to principles of international comity"), *aff'd*, 391 F. App'x 939 (2d Cir. 2010).

Plaintiffs repeatedly failed in the district court and fail again now to identify "specific facts" into which limited discovery might be appropriate. *EM Ltd.*, 473 F.3d at 486. When this case was first before Judge Casey, they never moved for leave to conduct jurisdictional discovery or sought any discovery into particular facts. Instead, they waited until their oppositions to Defendants' motions to dismiss and then asked, each time in a single footnote, for broad, open-ended discovery "as

84

to any disputed fact the Court deems material to the FSIA jurisdictional analysis." A1635 n.5; *see* A1639 n.3.  After the case was reopened by Judge Daniels, they again never made any affirmative attempt to conduct discovery, but instead sought discovery as a footnote fallback in their opposition papers.  A2107 n.10.

At the hearing, Judge Daniels addressed incisively Plaintiffs' failure to identify any specific points for discovery:

> You present to me what you say is a significant factual averment from the averment of facts that you say meets your burden.  Either it does or it doesn't.  You don't say to me there's something that you don't know or that you can't demonstrate because they have the information and you don't.  [You] say, Well, if you disagree with us, then just open the door to discovery.  That's not particularly useful for me because I see no basis for further discovery, nor do you.  You say that you have what is sufficient and pretty much whatever you're going to get.  You don't articulate anything on any issue that you would anticipate that you and the Court are going to be more knowledgeable about if I end up disagreeing with you that your 100-page additional averment of facts, plus the original complaint and what developed over the last decade [is sufficient] . . . . You say if I lose, give me discovery.  That's all you're saying.

A7435-36; *see also* SPA118 & n.16.  In response, Plaintiffs' counsel could come up with nothing better than a suggestion that Plaintiffs depose the same witnesses the 9/11 Commission had already interviewed, which the district court reasonably rejected as unlikely to bear fruit.  A7437-38.[65]

---

[65] Counsel also suggested for the first time in the last moments of the hearing that they could take discovery about the purported role of Saudi Arabia in "directing how [the charities] carry out their activities" and related issues.  A7439.

Even if Plaintiffs had made a more appropriate request for discovery, it would have done them no good. There is no basis for further investigation into the facts of September 11, which have been the subject of an extraordinarily thorough investigation across multiple branches of government. The individuals whom Plaintiffs baselessly accuse of complicity, such as Al Bayoumi and Al Thumairy, were all interviewed multiple times, and Saudi Arabia cooperated in making such witnesses available to the 9/11 Commission and to the FBI. Plaintiffs' suggestion that, more than 10 years later, they could find new and different evidence is implausible – especially after a recent review found "no new evidence to date that would change the 9/11 Commission's findings regarding responsibility for the 9/11 attacks." 9/11 Review Report 117.

Further confirmation that Plaintiffs' allegations are baseless would require discovery, now many years after the relevant events, into extraordinarily sensitive topics about Saudi Arabia's diplomatic and intelligence services. Those are areas in which Saudi Arabia has an even stronger than usual "'legitimate claim to immunity from discovery,'" *EM Ltd.*, 473 F.3d at 486 (quoting *First City*, 150 F.3d at 176), and in which the United States would never under any circumstances

---

Given the manifest insufficiency of Plaintiffs' allegations on their alter-ego theory, the extremely broad nature of the request, the discretionary-function doctrine, and Plaintiffs' failure to make such a request in anything resembling a timely fashion, the district court did not abuse its discretion in rejecting this point as well.

permit discovery by a litigation adversary in a foreign court.  The international norms of comity and reciprocity that are the foundation for the FSIA therefore confirm that the district court at a minimum exercised its discretion reasonably in denying discovery – and indeed reached the only reasonable outcome.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

  /s/ *Michael K. Kellogg*

MICHAEL K. KELLOGG
GREGORY G. RAPAWY
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (fax)

*Attorneys for the Kingdom of*
*Saudi Arabia*


  /s/ *Roy T. Englert, Jr.*

LAWRENCE S. ROBBINS
ROY T. ENGLERT, JR.
ROBBINS, RUSSELL, ENGLERT,
  ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411
Washington, D.C. 20006
(202) 775-4500
(202) 775-4510 (fax)

*Attorneys for the Saudi High Commission*
*for Relief of Bosnia & Herzegovina*

Dated: June 8, 2016

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief complies with the applicable type-volume limitations. This brief was prepared using a proportionally spaced type (Times New Roman, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), this brief contains 21,963 words. This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Office Word 2013) used to prepare this brief.

  /s/ *Michael K. Kellogg*

Michael K. Kellogg

June 8, 2016

## CERTIFICATE OF SERVICE

I hereby certify that, on this 8th day of June 2016, I electronically filed the foregoing Brief of Defendants-Appellees with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.  I further certify that all participants in this case are registered CM/ECF users and will be served by the appellate CM/ECF system.

 /s/ *Michael K. Kellogg*

Michael K. Kellogg